**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| BRIAN CARROLL and ASHLEY CARROLL, | ) ) ) | Civil Action No._____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| WYNDHAM VACATION RESORTS, INC. and COMENITY LLC d/b/a COMENITY BANK, | ) ) ) | |
| Defendants. | | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, allege Wyndham Vacation Resorts, Inc. ("Wyndham") and Comenity, LLC ("Comenity") (collectively "Defendants") violated the Military Lending Act 10 U.S.C. § 987 *et seq.* and its implementing regulations 32 CFR § 232.1 *et seq.* (collectively the "MLA"), the Fair Credit Reporting Act 15 U.S.C. § 1681 *et seq.* ("FCRA") and the Florida Consumer Collection Practices Act § 559.55 *et seq.* ("FCCPA"). Plaintiffs, on behalf of themselves and all others similarly situated, also seek relief under the Declaratory Judgment Act 28 U.S.C. § 2201(a).

## I.     INTRODUCTION

1.     Predatory lending to military members and their families ("Covered Borrowers") not only causes needless harm, but also "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all-volunteer fighting force." Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents

("Report").[1]

2.      Wyndham "is the world's largest timeshare business, with 224 resorts and approximately 880,000 owners."[2] Comenity is a major credit card issuer with over 50 million cardholders. Together, they sell and finance thousands of timeshares to consumers nationwide using unfair, deceptive, and unconscionable conduct.

3.      As creditors, Defendants have a duty under the MLA to verify whether a potential borrower is active duty military or a dependent of an active duty military member ("Covered Borrower") before the credit agreement is consummated, but they fail to satisfy this obligation. As a result, the Defendants systematically violate the MLA because they issue credit using standard form credit agreements and applications that omit mandatory financial disclosures required under the MLA.

4.      The Defendants' illegal conduct is not limited to military members.

5.      As the Plaintiffs experienced, Wyndham's salespeople approach a consumer and ask if they want a "free" prize to sit through a timeshare presentation. When the consumer agrees, the salespeople explain that the consumer's personal financial information must be provided to attend the presentation, a seemingly legitimate business purpose. But, unknown to the consumer, the salespeople use that information to attain the consumer's credit report, and then, apply for, open-up, and max out credit cards in the consumer's name with Comenity—without the consumer's knowledge or consent. The consumer first learns of the unauthorized credit card weeks later after receiving either a notification from a credit reporting agency or a new, maxed out credit card in the mail.

6.      Comenity knows the credit applications, like the Plaintiffs' credit application, are

---

[1] http://www.defense.gov/pubs/pdfs/report_ to_congress_final .pdf
[2] https://s22.q4cdn.com/457996430/files/doc_financials/quarterly_reports/2018/q4/WYND-2018-10K.pdf

fraudulent. Indeed, upon information and belief, Comenity has received thousands of consumer complaints about Wyndham submitting unauthorized credit applications, which Comenity blindly approves, resulting in the issuance of thousands of unauthorized and maxed out credit cards. But Comenity has every incentive not to stop. It's a business model that generates enormous profit at the expense of consumers.

7.      Defendants' misconduct inevitably leads to rampant violations of consumer protection laws like the MLA and substantial injury to consumers and Covered Borrowers. The Plaintiffs, on behalf of themselves and all others similarly situated, look to hold Defendants accountable for violating the MLA and FCCPA.

## II.      JURISDICTION AND VENUE

8.      The Court has personal jurisdiction over Wyndham because it conducts business in Florida and the acts and transactions complained of occurred in Florida.

9.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 because the Plaintiffs allege Defendants violated the MLA, a federal statute.

10.      This Court has supplemental jurisdiction over the Plaintiffs' state law claim under 28 U.S.C. § 1367 because the state law claim arises from the same illegal conduct as the federal claim.

11.      Venue is proper because this is where the cause of action accrued.

## III.      PARTIES

12.      Brian Carroll is a natural person who resides in Florida.

13.      Ashley Carroll is a natural person who resides in Florida.

14.      Wyndham is a foreign profit corporation with its principal address at 6277 Sea Harbor Dr., Orlando, FL 32821. Wyndham is a wholly owned subsidiary of Wyndham Destination,

Inc.

15.     Comenity is a limited-purpose credit card bank incorporated in Delaware. It is a bank subsidiary of Alliance Data Systems Corporation.

## IV.     APPLICABLE LAW

### A.  The Military Lending Act.[3]

16.     In 2006, the United States Department of Defense ("DOD") issued the Report, focusing on "predatory lending" to military members. Ex. A. The Report highlighted the "steady and significant increase in the rate of revoked or denied security clearances for military personnel due to financial problems; 'At a time when we are at war, this is an unacceptable loss of valuable talent and resources.'" *Cox v. Community Loans of Am., Inc.*, 4:11-CV-177 CDL, 2012 WL 773496, at *4 (M.D. Ga. Mar. 8, 2012) *citing* Report at 87.

17.     In response, Congress enacted the MLA to supply vital protection to Covered Borrowers and to curb predatory lenders from leaving them "in worse financial shape than when they initially contacted the lender." *Id*. pg. 7.

18.     The MLA is implemented by DOD regulations. 32 CFR § 232.1(a). The regulations "impose limitations on the cost and terms of certain extensions of credit to Service members and their dependents, and to provide additional protections relating to such transactions in accordance with 10 U.S.C. 987." 32 CFR § 232.1(b).

19.     The MLA:

> (1) Provides the maximum allowable amount of all charges, and the types of charges, that may be associated with a covered extension of consumer credit;
>
> (2) Requires a creditor to provide to a covered borrower a

---

[3] The "Military Lending Act" is the common name for the John Warner National Defense Authorization Act for Fiscal Year 2007 § 670, Limitations on Terms of Consumer Credit Extended to Servicemembers and Dependents, Pub.L. 109–364, 120 Stat.2083, 2266, codified at 10 U.S.C. § 987.

statement of the Military Annual Percentage Rate, or MAPR, before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit. The statement required by § 232.6(a)(1) differs from and is in addition to the disclosures that must be provided to consumers under the Truth in Lending Act;

(3) Provides for the method a creditor must use in calculating the MAPR; and

(4) Contains such other criteria and limitations as the Secretary of Defense has determined appropriate, consistent with the provisions of 10 U.S.C. 987.

20. Under the MLA, a creditor must provide, orally and in writing, the following information to Covered Borrowers before or at the time the borrower becomes obligated on the transaction or establishes an account for the consumer credit:

(1) A statement of the MAPR applicable to the extension of consumer credit;

(2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and

(3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

32 CFR § 232.6(a)(1)-(3), (d)(1)-(2).

21. The MAPR statement must be "substantially similar" to the following:

Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any

> participation fee charged (other than certain participation fees
> for a credit card account).

32 CFR § 232.6(c)(3).

22.     Along with mandatory disclosures, the MLA prohibits a creditor from requiring a Covered Borrower pay an MAPR for credit other than: (1) Agreed to under the terms of the credit agreement or promissory note; (2) Authorized by applicable State or Federal law; and (3) Not specifically prohibited by this part. 32 CFR § 232.4(a)(1)-(3) *c.f.* 10 U.S.C. § 987(a)(1)-(3).

23.     In calculating the MAPR, the MLA requires creditors to include certain charges like an application or processing fee. 32 CFR § 232.4(c)(1)(iii)(A)-(C).

24.     If a creditor violates the MLA, a Covered Borrower may void the contract. 32 CFR § 232.9(c) *c.f.* 10 U.S.C. § 987. The Covered Borrower is also entitled to receive "actual damages, but not less than $500 for each violation"; punitive damages; equitable and declaratory relief; and any other relief allowed by law.

**B.  The Florida Consumer Collection Practices Act**

25.     The FCCPA prohibits debt collectors from engaging in certain abusive practices in the collection of consumer debts. *See generally* Fla. Stat. § 559.72.

26.     The FCCPA's goal is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

27.     Specifically, the FCCPA states that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." Fla. Stat. § 559.72(9).

28.     The FCCPA creates a private right of action under Fla. Stat. § 559.77.

29.     The FCCPA defines "consumer" as "any natural person obligated or allegedly

obligated to pay any debt." *Id.* § 559.55(8).

30.     The FCCPA mandates that "no person" shall engage in certain practices in collecting consumer debt. *Id.* § 559.72. This language includes all unlawful attempts at collecting consumer claims. *Williams v. Streeps Music Co.*, 333 So. 2d 65, 67 (Fla. Dist. Ct. App. 1976).

31.     The FCCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *Id.* § 559.55(6).

## V.      FACTUAL ALLEGATIONS

### A. Defendants' standard business practice violates the MLA.

32.     Defendants use form credit agreements and applications to sell timeshares throughout the United States.

33.     As creditors, Defendants have a duty under the MLA to verify whether a potential borrower is a "Covered Borrower" before consummating the credit agreement. Despite this duty, they systematically fail to verify whether the potential borrower is a "Covered Borrower" during the standard credit application process.

34.     For example, Defendants do not give Covered Borrowers accurate, clear, and conspicuous information about the actual cost of credit. 32 CFR § 232.6(a)(1)-(3). They do not give Covered Borrowers the MAPR statement required under the MLA. *Id*. And they charge and collect "processing fees" that Covered Borrowers have not agreed to pay, that are unauthorized by applicable law, and that are prohibited by the MLA. 32 CFR § 232.4(a)(1)-(3). As a result, Defendants systematically violate the MLA when extending credit to Covered Borrowers.

**B. Defendants have a standard business practice of using deceptive, unfair, and unconscionable sales practices.**

35.    Wyndham offers financing for consumers who are buying timeshares. In 2018, it generated "$1.5 billion of new receivables on $2.2 billion of gross vacation ownership sales … resulting in 68% of our vacation ownership sales being financed."[4]

36.    Wyndham uses a variety of marketing strategies to attract potential borrowers into financing a timeshare, "including sponsored contests that offer vacation packages or gifts[,]" and it co-sponsors "sweepstakes, giveaways and promotional programs with professional teams at major sporting events and with other third parties at high-traffic consumer events."[5] These directed marketing strategies generated "37,000, 36,000 and 33,000 new owners during 2018, 2017 and 2016, respectively."[6]

37.    Wyndham's sales goals place unrelenting pressure on sales employees, resulting in the use of high-pressure sales tactics and out-right fraudulent conduct like submitting credit applications and opening credit cards without the consumer's knowledge or consent. Wyndham rewards, compensates, and reprimands employees depending on whether they meet these sales goals.

38.    Upon information and belief, Wyndham has policies and procedures in place, including training materials, which encourage sales employees to use unfair, deceptive, and unconscionable conduct when selling timeshares.

39.    Wyndham acts in lockstep with Comenity to sell and finance the timeshares. Wyndham, through its salespeople, submits unauthorized credit applications to Comenity who, in turn, negligently or intentionally issues the credit without verifying whether the consumer

---

[4] https://s22.q4cdn.com/457996430/files/doc_financials/quarterly_reports/2018/q4/WYND-2018-10K.pdf
[5] *Id*.
[6] *Id*.

consented.

40.     In 2016, a jury awarded a Wyndham whistle blower employee $20 million after being wrongfully terminated for exposing Wyndham's illegal business practice of defrauding elderly consumers. The whistle blower revealed that Wyndham employees opened and maxed out credit cards without the consumer's knowledge and lied about fees in the credit agreement. Ex. B.

41.     In October 2003, the California Attorney General filed a lawsuit against Wyndham's predecessor, Trendwest Resorts, for its unlawful sales practices and material misrepresentations. The case settled with Trendwest agreeing to an injunction barring future illegal conduct and requiring it to offer rescission to customers. Further, it paid $795,000 in civil penalties.[7]

42.     In 2015, the State of Wisconsin sued Wyndham, alleging sales personnel engaged in unfair, deceptive, and misleading sales practices. Wyndham paid $665,000 in restitution; a $99,520 civil fine; $62,702.20 in fees and costs; and had to rescind the contracts. (Sauk County Wisconsin Case No. 2015CX000005).

43.     Beyond the lawsuits, consumers have posted numerous complaints on the internet about Wyndham opening unauthorized credit cards.

44.     For example, the Campbells attended a Wyndham timeshare presentation, and unknown to them, left with a $15,000 credit line maxed out in their name.[8] Like the Plaintiffs, the Wyndham salesperson told the Campbells they needed their personal financial information for their "free" prize, but unknown to them, the Wyndham salesperson "opened a $15,000 account on

---

[7] https://oag.ca.gov/news/press-releases/attorney-general-lockyer-settles-lawsuit-against-one-world s-largest-timeshare. (Last visited December 6, 2019).
[8] https://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/couple-goes-to-wyndham-timeshare-meeting-unknowingly-gets-15k-line-of-credit

us that I didn't know nothing about."[9]

**C. Comenity's relationship with Wyndham.**

45.     Comenity credit cards are co-branded with retail stores, travel services, gas stations, auto dealers, healthcare providers, and financial institutions. It offers more than 100 store-specific credit cards for retail financing, including with Wyndham.

46.     Comenity knows about Wyndham's conduct of submitting unauthorized credit applications and opening unauthorized credit cards. Upon information and belief, it has received thousands of consumer complaints, like the Plaintiffs' complaints, about Wyndham's salespeople opening fraudulent credit cards.

47.     When Wyndham submits an unauthorized credit application, Comenity negligently or intentionally ignores the thousands of consumer complaints and blindly  requests that consumer's credit reports from consumer reporting agencies, like Transunion, Equifax, and Experian, and issues the credit card with no verification. Comenity's activity is reported on the consumer's credit report, resulting in a hard inquiry and a drop in the consumer's credit score.

48.     Like Wyndham, Comenity has a history of using unfair, deceptive, and unconscionable conduct that harms consumers. In 2015, Comenity agreed to a settlement with the Federal Deposit Insurance Corporation regarding the its deceptive practices and material misrepresentations and omissions in relation to credit card add-on products.[10] Comenity paid a $2 million penalty and $53 million in restitution to harmed consumers as part of the settlement.

**D. The transaction with the Plaintiffs.**

49.     In March 2019, the Plaintiffs were leaving SeaWorld with their children when a

---

[9] *Id.*

[10] *FDIC Announces Settlement with Comenity Bank and Comenity Capital Bank for Deceptive Practices Related to Credit Card Add-On Products*, Federal Deposit Insurance Corporation (Sept. 8, 2015), https://www.fdic.gov/news/news/press/2015/pr15073.html.

Wyndham representative stopped them and asked if they were interested in a "free" prize to sit through a Wyndham timeshare presentation.

50.     Wyndham's representative asked for the Plaintiffs' personal financial information, which he explained, was required before they could sit through the presentation.

51.     The representative got the Plaintiffs' electronic signatures using a tablet.

52.     Relying on his statements, the Plaintiffs gave the representative their address and social security numbers, then they sat though the presentation.

53.     At the end, Mr. Carroll explained the timeshare was unaffordable, because he was in the military, and they did not want to be bound by a contract. But the representative persisted, offering a no interest deal, payable by monthly installment payments of $100, and most importantly, no contract.

54.     Based on these representations, the Plaintiffs agreed to buy the rights to a timeshare, which according to the representative, they could cancel at any time.

55.     The representative never verified whether the Plaintiffs were Covered Borrowers under the MLA.

56.     But for the representative's representations, the Plaintiffs would not have agreed to buy the timeshare interest.

57.     Wyndham issued a Club Wyndham Discovery Membership Agreement ("Credit Agreement"). Exhibit C.

58.     Upon information and belief, Wyndham uses a standard form credit agreement, like the Credit Agreement, nationwide.

59.     Unknown to the Plaintiffs, the representative used their personal financial information and submitted a credit application to Comenity, which Comenity approved.

60.     Also unknown to the Plaintiffs, the representative maxed out that credit card to pay for the timeshare interest. Exhibit D.

61.     The Plaintiffs never consented to open a credit card or have a credit application submitted in their name.

62.     The Credit Agreement does not mention a credit card.

63.     The Credit Agreement does not have the MAPR disclosure required by the MLA. *Id*.

64.     The Credit Agreement has a 0% annual Percentage Rate; $0.00 finance charge; $0.00 amount financed; $0.00 total of payments; and a total sale price of $3,753.06. *Id*.

65.     The Credit Agreement excludes the $159 "Processing Fee" from the finance charge in violation of the MLA.

66.     On the Credit Agreement, Wyndham under disclosed and misstated the MAPR because it excluded the $159 "Processing Fee." This caused the Plaintiffs to receive inaccurate financial disclosures, and further, caused them to be charged a finance charge to which they did not agree.

67.     The Credit Agreement limits the Plaintiffs' cancellation rights to 10 calendar days. *Id*. pg. 2.

68.     The representative, without the Plaintiffs' consent, had no legal right to submit a credit application in their name. Moreover, the representative had no legal right to bind the Plaintiffs to a credit agreement that he knew they did not want and could not afford.

69.     The Plaintiffs later received a package in the mail from Comenity about the credit card, revealing a maxed-out credit line of over $3,000.

70.     Comenity did not provide the disclosures required under the MLA.

12

71.     The Plaintiffs never consented to have a credit card opened in their name.

72.     The Plaintiffs never consented to the credit card agreement's credit terms.

73.     The Plaintiffs were confused, and understandably shocked, because they never agreed to have a credit application submitted in their name or to have the unauthorized credit account opened in their name.

74.     The Plaintiffs then discovered that the Comenity credit card account appeared on Mr. Carroll's credit report, which lowered his credit score.

75.     Plaintiffs immediately contacted Wyndham and Comenity and disputed the credit card account.

76.     Further, Mr. Carroll contacted three credit reporting agencies and disputed the Comenity account appearing on his credit report.

77.     To date, the Defendants have refused to cancel the account.

**E.  Defendants' conduct has caused the Plaintiffs actual, concrete damages.**

78.     Because Defendants opened and maxed-out a credit card in the Plaintiffs' name, they are bound to pay for a credit card they did not consent to and cannot afford, creating an imminent and material risk of paying an amount not owed. As a result, the Plaintiffs have spent time trying to cancel the unauthorized credit card account, suffering emotional distress and frustration in the process.

79.     The Plaintiffs are Covered Borrowers under the MLA, and therefore, they have a right to receive the specific disclosures required by the MLA. Because Defendants deprived the Plaintiffs of those disclosures, they have suffered a "real" injury: they did not receive vital financial information they were entitled to receive under the MLA— information that Congress found so important that the lack of it could undermine the nation's military readiness.

80.     Moreover, by submitting the unauthorized credit application, Defendants also lowered Mr. Carroll's credit score and reduced his credit borrowing ability.

## VI.     CLASS REPRESENTATION ALLEGATIONS

81.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons (the "Nationwide Class 1"), subject to modification after discovery and case development:

> All persons in the United States for whom Wyndham submitted a credit application to Comenity or opened a Comenity credit card without the person's lawfully gained consent.

82.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons (the "Nationwide Class 2"), subject to modification after discovery and case development:

> All Covered Borrowers who, during the applicable statute of limitations, entered into a credit agreement with Wyndham or Comenity and neither Wyndham nor Comenity verified whether the potential borrower was a Covered Borrower under the MLA.

83.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons ("Nationwide Class 3"), subject to modification after discovery and case development:

> All Covered Borrowers, during the applicable statute of limitations, who entered into a credit agreement with Wyndham or Comenity that did not have an MAPR disclosure.

84.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons ("Nationwide Class 4"), subject to modification after discovery and case development:

> All Covered Borrowers, during the applicable statute of limitations, who entered into a credit agreement where Wyndham or Comenity charged a "Processing Fee" or similar type fee that was not disclosed as a finance charge.

85.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons ("Florida Class 1"), subject to modification after discovery and case development:

> All Covered Borrowers, during the applicable statute of limitations, who lived in Florida and entered into a credit agreement where Wyndham or Comenity charged a "Processing Fee" or similar type fee that was not disclosed as a finance charge; or a Covered Borrower that entered into a credit agreement with Wyndham or Comenity that did not have an MAPR disclosure.

86.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons ("Florida Class 2"), subject to modification after discovery and case development:

> All persons located in Florida for whom Wyndham opened a Comenity credit card without the person's lawfully gained consent.

87.     Defendants have acted or refused to act on grounds that apply generally to the class members because they systematically failed to verify whether a potential borrower is covered by the MLA; failed to disclose the "Processing Fee" or similar type charge as a finance charge; and used standard form credit agreements/applications that omit the required MAPR disclosure.

88.     Defendants have further acted or refused to act on grounds that apply generally to the class members because they systematically submitted unauthorized credit applications and opened unauthorized credit card accounts without the persons knowledge or consent.

89.     Class members are identifiable through Defendants' records and payment databases.

90.     Excluded from the Classes are Defendants; any entities in which they have a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

91.     Plaintiffs propose that they serve as class representatives.

92.     Plaintiffs and the Classes have all been harmed by Defendants' conduct.

93.     Numerosity is satisfied as there are likely thousands of class members, making individual joinder of these persons is impracticable.

94.     There are questions of law and fact common to Plaintiff and to the Class, including, but not limited to:

    a.   Whether Defendants violated the MLA by omitted the MAPR disclosure;

    b.   Whether Defendants violated the MLA by omitting the Processing Fee or similar type fee from the MAPR;

    c.   Whether Defendants entered into standard form credit agreements with the Class Members;

    d.   Whether Defendants' standard form credit agreements/applications violate the MLA;

    e.   Whether Defendants opened credit cards without the persons knowledge or consent;

    f.   Whether Defendants charged the Class Members fees not owed in violation of the FCCPA;

    g.   Whether the Class Members are entitled to void their credit agreements under the MLA and the Declaratory Judgment Act; and

    h.   Whether the Class Members are entitled to actual and statutory damages under the FCCPA and MLA.

95.     Plaintiffs' claims are typical of the claims of class members. Defendants opened credit cards in the Class Members' names without their knowledge or consent. The Defendants

entered into standard form credit agreements with the Class Members without verifying if the person was protected by the MLA. The Plaintiffs' standard form credit agreement omitted the MAPR disclosure in the same manner as the class members. The Plaintiffs' standard form credit agreement failed to disclose the $159 Processing Fee in the same manner as the class members. And Wyndham charged the Plaintiffs the $159 Processing Fee when it had no legal right to do so in the same manner as the class members.

96.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the class members' interest, and they will fairly and adequately protect the class members' interests. Plaintiffs have taken actions before filing this complaint by hiring skilled and experienced counsel to protect the class members' interests.

97.    Plaintiffs have hired counsel that is skilled and experienced in class actions and capable of protecting the class members' interests.

98.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

99.    The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

### COUNT I AS TO WYNDHAM'S VIOLATION OF THE MILITARY LENDING ACT 10 U.S.C. § 987 *et seq*.

#### (Nationwide Classes 2, 3, and 4)

100.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 10 U.S.C. § 987(i)(1)(B).

101.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 10 U.S.C. § 987(i)(2) *c.f.* 10 U.S.C. § 1072(2)(A).

102.    Wyndham is a "creditor" because it extends "consumer credit" to consumers nationwide, including the Plaintiffs, for timeshare interests. 10 U.S.C. § 987(i)(5).

103.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

104.    The Credit Agreement is a "closed-end" retail installment credit agreement and it is not "open-end credit." 32 CFR § 232.3(d).

105.    Wyndham extended "consumer credit" because the timeshare interest was for personal or family use, was subject to a finance charge—*i.e.* the $159 Processing Fee—and payable in more than four installments. 32 CFR § 232.3(f)(1)(i)-(ii).

106.    Under the MLA, a creditor cannot require a Covered Borrower to pay interest prohibited by the MLA or not agreed to under the terms of the credit agreement. 10 U.S.C. §§ 987(a)(1), (3).

107.    The MLA defines "interest" as including "all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit." 10 U.S.C. § 987(i)(3).

108.    Further, the MLA requires a creditor to give a Covered Borrower, orally and in writing, the following: (A) A statement of the annual percentage rate of interest applicable to the extension of credit; (B) Any disclosures required under the Truth in Lending Act (15 U.S.C. 1601 *et seq.*); (C) A clear description of the payment obligations of the member or dependent, as

applicable. 10 U.S.C. § 987(c)(1)(A)-(C).

109.   In extending credit to the Plaintiffs, Wyndham violated the MLA because it charged interest, *i.e.* the $159 Processing Fee, that Plaintiffs did not agree to pay in the Credit Agreement and that was prohibited by the MLA because it omitted the fee from the finance charge disclosure.

110.   In extending credit to the Plaintiffs, Wyndham violated the MLA because it opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

111.   In extending credit to the Plaintiffs, Wyndham violated the MLA because it gave the Plaintiffs unclear, inconspicuous, and inaccurate information about the credit terms in the Agreement.

112.   In extending credit to the Plaintiffs, Wyndham violated the MLA because it did not give the Plaintiffs oral and written credit term disclosures about the credit terms in the Agreement.

113.   As a result of Wyndham's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

114.   As a result of Wyndham's misconduct, the Plaintiffs are entitled to void the Credit Agreement. 10 U.S.C. § 987(f)(3).

115.   As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 10 U.S.C. §§ 987(5)(A)(i)-(iv), (B).

**COUNT II AS TO WYNDHAM'S VIOLATION OF
THE MILITARY LENDING ACT 32 CFR § 232.4 *et seq.***

**(Nationwide Classes 2, 3, and 4)**

116.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

117.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

118.    Wyndham is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests.

119.    Wyndham extended "consumer credit" because the timeshare interest was for personal or family use, was subject to a finance charge—*i.e.* the $159 Processing Fee—and payable in more than four installments. 32 CFR § 232.3(f)(1)(i)-(ii).

120.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

121.    The Credit Agreement is a "closed-end" retail installment credit agreement and it is not "open-end credit." 32 CFR § 232.3(d).

122.    Under the MLA, a creditor cannot require a Covered Borrower to pay an MAPR prohibited by the MLA or not agreed to under the terms of the credit agreement. 32 CFR § 232.4(a)(1)-(3).

123.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it charged interest, *i.e.* the $159 Processing Fee, that Plaintiffs did not agree to pay in the Credit Agreement

and that was prohibited by the MLA because it omitted the fee from the finance charge disclosure.

124.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

125.    As a result of Wyndham's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

126.    As a result of Wyndham's misconduct, the Plaintiffs are entitled to void the Credit Agreement. 32 CFR § 232.9(c).

127.    As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

## COUNT III AS TO WYNDHAM'S VIOLATION OF THE MILITARY LENDING ACT 32 CFR § 232.4 *et seq.*

### (Nationwide Classes 2, 3, and 4)

128.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

129.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

130.    Wyndham is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests.

131.    Wyndham extended "consumer credit" because the timeshare interest was for

personal or family use, was subject to a finance charge—*i.e.* the $159 Processing Fee—and payable in more than four installments. 32 CFR § 232.3(f)(1)(i)-(ii).

132.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

133.    The Credit Agreement is a "closed-end" retail installment credit agreement and it is not "open-end credit." 32 CFR § 232.3(d).

134.    Under the MLA, a creditor must include the following in the MAPR:

> (1) Any application fee charged to a covered borrower who applies for consumer credit, other than an application fee charged by a Federal credit union or an insured depository institution when making a short-term, small amount loan, provided that the application fee is charged to the covered borrower not more than once in any rolling 12-month period; and

> (2) Any fee imposed for participation in any plan or arrangement for consumer credit, subject to paragraph (c)(2)(ii)(B) of this section.

32 CFR § 232.4(c)(1)(iii)(B), (C).

135.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it omitted the $159 Processing Fee from annual percentage rate in the Credit Agreement.

136.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

137.    Under the MLA, creditors must calculate the MAPR for "closed-end" credit "following the rules for calculating and disclosing the "Annual Percentage Rate (APR)" for credit transactions under Regulation Z based on the charges set forth in paragraph (c)(1) of this section."

32 CFR § 232.4(c)(2)(i).

138.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it miscalculated the MAPR in the Credit Agreement by omitting the $159 Processing Fee from the MAPR calculation.

139.    As a result of Wyndham's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

140.    As a result of Wyndham's misconduct, the Plaintiffs are entitled to void the Credit Agreement. 32 CFR § 232.9(c).

141.    As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

## COUNT IV AS TO WYNDHAM'S VIOLATION OF
## THE MILITARY LENDING ACT 32 CFR § 232.6 *et seq.*

### (Nationwide Classes 2, 3, and 4)

142.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

143.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

144.    Wyndham is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests.

145.    Wyndham extended "consumer credit" because the timeshare interest was for

personal or family use, was subject to a finance charge—*i.e.* the $159 Processing Fee—and payable in more than four installments. 32 CFR § 232.3(f)(1)(i)-(ii).

146.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

147.    The Credit Agreement is a "closed-end" retail installment credit agreement and it is not "open-end credit." 32 CFR § 232.3(d).

148.    Under the MLA, a creditor must disclose the following:

> (1) A statement of the MAPR applicable to the extension of consumer credit;
>
> (2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and
>
> (3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

32 CFR § 232.6(a)(1)-(3).

149.    The MAPR statement required above must be similar to the following:

> Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account).

32 CFR § 232.6(c)(3).

150.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it omitted the MAPR disclosure from the Credit Agreement.

151.    In extending credit to the Plaintiffs, Wyndham violated the MLA because the disclosures given to the Plaintiffs were inaccurate, unclear, and inconspicuous.

152.    Under the MLA, creditors must calculate the MAPR for "closed-end" credit "following the rules for calculating and disclosing the "Annual Percentage Rate (APR)" for credit transactions under Regulation Z based on the charges set forth in paragraph (c)(1) of this section." 32 CFR § 232.4(c)(2)(i).

153.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it miscalculated the MAPR in the Credit Agreement by omitting the $159 Processing Fee from the MAPR calculation.

154.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it did not give the Plaintiffs oral and written credit term disclosures in compliance with the MLA. 32 CFR § 232.6(d)(1)-(2).

155.    As a result of Wyndham's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

156.    As a result of Wyndham's misconduct, the Plaintiffs are entitled to void the Credit Agreement. 32 CFR § 232.9(c).

157.    As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable

attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

## COUNT V AS TO WYNDHAM'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

### (Florida Classes)

158.    Plaintiffs are "consumers" as defined by Fla. Stat. § 559.55(8) because the credit transaction involved a timeshare interest for personal or family use.

159.    Wyndham is a "person" as interpreted under the FCCPA.

160.    As a creditor, Wyndham has a duty to know whether the potential borrower is protected by the MLA.

161.    Wyndham knew it omitted the $159 Processing Fee from the Credit Agreement.

162.    Further, Wyndham knew it omitted the MAPR disclosure from the Credit Agreement.

163.    As a result, Wyndham knowingly violated the FCCPA because it attempted to enforce, claimed, and asserted a known non-existent legal right to a debt as defined by Fla. Stat. § 559.55(6) when it unfairly, deceptively, and unconscionably charged, attempted to collect, and collected the $159 Processing Fee. *Id.* § 559.72(9).

164.    As a further result, Wyndham knowingly violated the FCCPA because it attempted to enforce, claimed, and asserted a known non-existent legal right to a debt as defined by Fla. Stat. § 559.55(6) when it unfairly, deceptively, and unconscionably charged, attempted to collect, and collected under the Credit Agreement without giving the Plaintiffs the MAPR disclosure. *Id.* § 559.72(9).

165.    As a result of Wyndham's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not

consent to and cannot afford.

166.    As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual

damages; statutory damages, and reasonable attorneys' fees and costs. Fla. Stat. § 559.77(2).

### COUNT VI AS TO COMENITY'S VIOLATION OF
### THE MILITARY LENDING ACT 10 U.S.C. § 987 *et seq.*

### (Nationwide Classes 2, 3, and 4)

167.    Mr. Carroll is a "covered member" under the MLA because he is an active member

of the Florida Army National Guard. 10 U.S.C. § 987(i)(1)(B).

168.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 10 U.S.C.

§ 987(i)(2) *c.f.* 10 U.S.C. § 1072(2)(A).

169.    Comenity is a "creditor" because it extends "consumer credit" to consumers

nationwide, including the Plaintiffs, for timeshare interests for personal or family use. 10 U.S.C.

§ 987(i)(5).

170.    No exception to "consumer credit" applies because the credit transaction did not

include a residential mortgage; did not finance the purchase of a vehicle or personal property; is

not otherwise exempt under Regulation Z; and Comenity did not verify whether the Plaintiffs were

Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

171.    Comenity extended "open-end" credit to Plaintiffs because it imposes a finance

charge from time to time on the outstanding balance, the credit is reusable upon repayment, and

Comenity reasonably anticipates repeat transactions. 32 CFR § 232.3(f)(1)(i)-(ii) *c.f.* 12 CFR §

1026.2(a)(20).

172.    Under the MLA, a creditor cannot require a Covered Borrower to pay interest not

agreed to under the terms of the credit agreement. 10 U.S.C. §§ 987(a)(1), (3).

173.    In extending credit to the Plaintiffs, Comenity opened a credit card account that

Plaintiffs never consented to and maxed it out for the payment of the timeshare interest. As a result, Comenity violated the MLA because it charged interest that Plaintiffs never agreed to pay.

174.    As a result of Comenity's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Comenity has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

175.    As a result of Comenity's misconduct, the Plaintiffs are entitled to void the credit card agreement. 10 U.S.C. § 987(f)(3).

176.    As a further result of Comenity's misconduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 10 U.S.C. §§ 987(5)(A)(i)-(iv), (B).

### COUNT VII AS TO COMENITY'S VIOLATION OF THE MILITARY LENDING ACT 32 CFR § 232.4 *et seq.*

**(Nationwide Classes 2, 3, and 4)**

177.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

178.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

179.    Comenity is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests for personal or family use.

180.    Comenity extended "open-end" credit to Plaintiffs because it imposes a finance charge from time to time on the outstanding balance, the credit is reusable upon repayment, and

Comenity reasonably anticipates repeat transactions. 32 CFR § 232.3(f)(1)(i)-(ii) *c.f.* 12 CFR § 1026.2(a)(20).

181.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Comenity did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

182.    Under the MLA, a creditor cannot require a Covered Borrower to pay an MAPR prohibited by the MLA or not agreed to under the terms of the credit agreement. 32 CFR § 232.4(a)(1)-(3).

183.    In extending credit to the Plaintiffs, Comenity violated the MLA because it opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

184.    Comenity violated the MLA because it charged interest that Plaintiffs did not agree to pay for, and it omitted fees from the finance charge disclosure.

185.    Because of Comenity's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Comenity has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

186.    As a result of Comenity's misconduct, the Plaintiffs are entitled to void the Credit Agreement. 32 CFR § 232.9(c).

187.    As a further result of Comenity's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable

attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

### COUNT VIII AS TO COMENITY'S VIOLATION OF
### THE MILITARY LENDING ACT 32 CFR § 232.4 *et seq.*

### (Nationwide Classes 2, 3, and 4)

188.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

189.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

190.    Comenity is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests for personal and family use.

191.    Comenity extended "open-end" credit to Plaintiffs because it imposes a finance charge from time to time on the outstanding balance, the credit is reusable upon repayment, and Comenity reasonably anticipates repeat transactions. 32 CFR § 232.3(f)(1)(i)-(ii) *c.f.* 12 CFR § 1026.2(a)(20).

192.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

193.    Under the MLA, a creditor must include the following in the MAPR:

> (3) Any application fee charged to a covered borrower who applies for consumer credit, other than an application fee charged by a Federal credit union or an insured depository institution when making a short-term, small amount loan, provided that the application fee is charged to the covered borrower not more than once in any rolling 12-month period; and

(4) Any fee imposed for participation in any plan or arrangement for consumer credit, subject to paragraph (c)(2)(ii)(B) of this section.

32 CFR § 232.4(c)(1)(iii)(B), (C).

194.    In extending credit to the Plaintiffs, Wyndham violated the MLA because it opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

195.    In extending credit to the Plaintiffs, Comenity did not verify whether the Plaintiffs were Covered Borrowers.

196.    In extending credit to the Plaintiffs, Comenity violated the MLA because it omitted the $159 Processing Fee from annual percentage rate disclosure in the credit documents sent to the Plaintiffs.

197.    As a result, Comenity miscalculated the MAPR by omitting the $159 Processing Fee from the MAPR calculation, violating the MLA.

198.    As a result of Comenity's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

199.    As a result of Comenity's misconduct, the Plaintiffs are entitled to void the credit card agreement. 32 CFR § 232.9(c).

200.    As a further result of Comenity's conduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

## COUNT IX AS TO COMENITY'S VIOLATION OF
## THE MILITARY LENDING ACT 32 CFR § 232.6 *et seq.*

### (Nationwide Classes 2, 3, and 4)

201.    Mr. Carroll is a "covered member" under the MLA because he is an active member of the Florida Army National Guard. 32 CFR § 232.3(g)(1), (2)(ii).

202.    Mrs. Carroll is a "dependent" because she is Mr. Carroll's wife. 32 CFR § 232.3(g)(3) *c.f.* 10 U.S.C. § 1072(2)(A).

203.    Comenity is a "creditor" because it engages in the business of extending consumer credit to consumers nationwide, including the Plaintiffs, for timeshare interests for personal and family use.

204.    Comenity extended "open-end" credit to Plaintiffs because it imposes a finance charge from time to time on the outstanding balance, the credit is reusable upon repayment, and Comenity reasonably anticipates repeat transactions. 32 CFR § 232.3(f)(1)(i)-(ii) *c.f.* 12 CFR § 1026.2(a)(20).

205.    No exception to "consumer credit" applies because the credit transaction did not include a residential mortgage; did not finance the purchase of a vehicle or personal property; is not otherwise exempt under Regulation Z; and Wyndham did not verify whether the Plaintiffs were Covered Borrowers under the MLA. 32 CFR § 232.3(f)(2)(i)-(iv).

206.    Under the MLA, a creditor must disclose the following:

(1) A statement of the MAPR applicable to the extension of consumer credit;

(2) Any disclosure required by Regulation Z, which shall be provided only in accordance with the requirements of Regulation Z that apply to that disclosure; and

(3) A clear description of the payment obligation of the covered borrower, as applicable. A payment schedule (in the case of closed-end credit) or account-opening disclosure (in the case of

> open-end credit) provided pursuant to paragraph (a)(2) of this section satisfies this requirement.

32 CFR § 232.6(a)(1)-(3).

207.    The MAPR statement required above must be similar to the following:

> Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account).

32 CFR § 232.6(c)(3).

208.    Upon information and belief, in extending credit to the Plaintiffs, Comenity violated the MLA because it omitted the MAPR disclosure from the credit card agreement.

209.    Upon information and belief, in extending credit to the Plaintiffs, Comenity violated the MLA because the disclosures given to the Plaintiffs were inaccurate, unclear, and inconspicuous.

210.    In extending credit to the Plaintiffs, Comenity violated the MLA because it did not give the Plaintiffs oral and written credit term disclosures in compliance with the MLA. 32 CFR § 232.6(d)(1)-(2).

211.    As a result of Comenity's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Comenity has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

212.    As a result of Comenity's misconduct, the Plaintiffs are entitled to void the credit

card agreement. 32 CFR § 232.9(c).

213.    As a further result of Comenity's misconduct, the Plaintiffs are each entitled to actual damages but not less than $500 for each violation; consequential damages; compensatory damages; incidental damages; punitive damages; equitable and declaratory relief; and reasonable attorneys' fees and costs. 32 CFR §§ 232.9(e)(1)(i)-(iv), (2).

## COUNT X AS TO COMENITY'S VIOLATION OF
## THE FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681 *et seq.*

### (Nationwide Class 1)

214.    Each time Comenity opens a new credit card, it obtains a "consumer report," as defined in the FCRA. 15 U.S.C. § 1681a(d).

215.    Under FCRA, Comenity cannot obtain or use a consumer reports from consumer reporting agencies under false pretenses and without proper authorization from the consumer who is the subject of the report. 15 U.S.C. § 1681b, 1681n, and 1681o.

216.    Comenity has a mandatory duty to use or obtain consumer reports only for permissible purposes. 16 U.S.C. § 1681b(f).

217.    Despite these clear and unambiguous requirements of the FCRA, Comenity regularly obtains consumer reports regarding consumers without their knowledge or consent in order to cause new unauthorized credit cards to be issued, in violation of the FCRA.

218.    Comenity violated FCRA when it knowingly and intentionally obtained or used the Plaintiffs' consumer reports under false pretenses and without Plaintiffs' consent, lowering their credit score and reducing their credit borrowing ability.

219.    As a result, Comenity is liable for negligently and willfully violating the FCRA by obtaining consumer reports without a permissible purpose or authorization. 15 U.S.C. §§ 1681n and 1681o,

## COUNT XI AS TO COMENITY'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

### (Florida Classes)

220.    Plaintiffs are "consumers" as defined by Fla. Stat. § 559.55(8) because the credit transaction involved a timeshare interest for personal or family use.

221.    Comenity is a "person" as interpreted under the FCCPA.

222.    As a creditor, Comenity has a duty to know whether the potential borrower is protected by the MLA.

223.    In extending credit to the Plaintiffs, Comenity failed to verify whether the Plaintiffs were Covered Borrowers.

224.    In extending credit to the Plaintiffs, Comenity opened a credit card account that Plaintiffs never consented to and maxed it out for the payment of the timeshare interest.

225.    Comenity received Plaintiffs dispute about the unauthorized credit card account, but it has refused to cancel the account.

226.    Since it received the Plaintiffs dispute about the unauthorized account, and thousands of other consumer complaints about the same conduct, Comenity knew it had no legal right to refuse to cancel the credit card account.

227.    Comenity has no legal right to attempt to collect a debt incurred because of unfair, deceptive, and unconscionable means.

228.    As a result, Comenity has knowingly violated the FCCPA because it has attempted to enforce, claimed, and asserted a known non-existent legal right to a debt as defined by Fla. Stat. § 559.55(6) when it unfairly, deceptively, and unconscionably charged, attempted to collect on the unauthorized credit card account. *Id.* § 559.72(9).

229.    As a further result, Comenity knowingly violated the FCCPA because it attempted

to enforce, claimed, and asserted a known non-existent legal right to a debt as defined by Fla. Stat. § 559.55(6) when it unfairly, deceptively, and unconscionably charged, attempted to collect, and collected under the credit card agreement without giving the Plaintiffs the MAPR disclosure. *Id.* § 559.72(9).

230.   As a result of Comenity's misconduct, the Plaintiffs have been deprived of important financial disclosures they were entitled to receive under the MLA. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay for credit that they did not consent to and cannot afford.

231.   As a further result of Wyndham's conduct, the Plaintiffs are each entitled to actual damages; statutory damages, and reasonable attorneys' fees and costs. Fla. Stat. § 559.77(2).

## COUNT XII UNDER THE DECLARATORY
## JUDGMENT ACT 28 U.S.C. § 2201(a) AGAINST DEFENDANTS

### (Nationwide Class 1)

232.   The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

233.   As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiffs and Class Members.

234.   Plaintiffs, on behalf of the Class Members, seek an order declaring that Defendants' practices of (1) completing credit applications and submitting them without authorization from the consumer; and (2) Defendants' practice of obtaining unauthorized consumer reports and causing unauthorized credit cards to be issued is unlawful.

235.   As a result of Defendants' illegal conduct, Plaintiffs seek disgorgement of all

monies unlawfully collected, an order from the Court voiding all unauthorized credit agreements, and an order from the Court declaring Defendants' conduct as described herein unlawful.

236.    Plaintiffs respectfully request attorney's fees and costs based on the "common benefit doctrine." *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392–393, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970); *see also Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (fees were awarded in a Medicare class action by ordering 1% deducted from each class members' Medicare benefit payment).

## JURY DEMAND AND RESERVATION OF PUNITIVE DAMAGES

237.    Plaintiffs are entitled to and respectfully demand a trial by jury on all issues so triable.

238.    Plaintiffs reserve the right to amend their complaint and add a claim for punitive damages.

## RELIEF REQUESTED

WHEREFORE. Plaintiffs on behalf of the Classes respectfully request this Court to enter judgment against Defendants for the following:

a.   That Plaintiffs and all class members be awarded actual damages, including but not limited to forgiveness of all amounts not owed;

b.   That Plaintiffs and all class members be awarded statutory damages;

c.   That all credit agreements between Defendants and Plaintiffs and all class members be voided;

d.   That all amounts paid by Plaintiffs and all class members be disgorged and returned;

e.   That Plaintiffs and all class members be awarded costs and attorney's fees;

f.  That the Court enter an order that Defendants and their agents, or anyone acting on their behalf, are immediately restrained from altering, deleting or destroying any documents or records that could be used to identify class members;

g.  That the Court certify Plaintiffs' claims and all other persons similarly situated as class action claims under the Federal Rules of Civil Procedure and

h.  Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

Plaintiffs,
by Counsel

/s/ James L. Kauffman
James L. Kauffman
FL Bar No.: 12915
Bailey & Glasser LLP
1055 Thomas Jefferson Street, N.W., Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 342-2103
Email: jkauffman@baileyglasser.com

Darren R. Newhart, Esq.
FL Bar No.: 0115546
721 US Highway 1, Suite 201
North Palm Beach, FL 33408
Tel: (561) 822-3446
Fax: (305) 574-0132
Email: darren@cloorg.com

Christopher W. Legg, Esq.
FL Bar No.: 44460
CHRISTOPHER W. LEGG, P.A.
499 E. Palmetto Park Rd., Ste. 228
Boca Raton, FL 33432
Tel: 954-962-2333
Email: Chris@theconsumerlawyers.com

# EXHIBIT

# A



# Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents.

**August 9, 2006**

# **Table of Contents**

| Sections | Subject | Page |
|---|---|---|
| 1 | Introduction | 1 |
| 2 | Executive Summary | 4 |
| 3 | Prevalence of Predatory Lending Around Military Communities | 10 |
| 4 | Education Programs | 23 |
| 5 | Strategies and Practices to Reduce the Prevalence and Impact of Predatory Lending | 28 |
| 6 | Effect of Predatory Lending on Service Members and Their Families | 37 |
| 7 | Need for Federal and State Legislative and Statutory Protections | 45 |
| 8 | Recommendations for Statutory Controls | 50 |
| 9 | Conclusion | 53 |

Appendices

| | | |
|---|---|---|
| 1 | Unsolicited Letters of Support | 54 |
| 2 | Maps of Military Communities Showing Lenders | 57 |
| 3 | Survey on Internet Payday Loan and Installment Lenders | 63 |
| 4 | DoD Strategy for Personal Finance | 68 |
| 5 | Leadership Messages | 82 |

# 1.  <u>Introduction</u>

This report is in answer to the requirements established in Section 579 of the National
Defense Authorization Act for Fiscal Year 2006, which states as follows:
SEC. 579. REPORT ON PREDATORY LENDING PRACTICES DIRECTED AT
MEMBERS OF THE ARMED FORCES AND THEIR DEPENDENTS.

> (a) Report Required- Not later than 180 days after the date of the enactment of this
> Act, the Secretary of Defense shall submit to the appropriate committees of
> Congress a report on predatory lending practices directed at members of the
> Armed Forces and their families. The report shall be prepared in consultation with
> the Secretary of the Treasury, the Chairman of the Federal Reserve, the Chairman
> of the Federal Deposit Insurance Corporation, and representatives of military
> charity organizations and consumer organizations.

> (b) Elements- The report under subsection (a) shall include the following:

>> (1) A description of the prevalence of predatory lending practices directed
>> at members of the Armed Forces and their families.

>> (2) An assessment of the effects of predatory lending practices on members
>> of the Armed Forces and their families.

>> (3) A description of the strategy of the Department of Defense, and of any
>> current or planned programs of the Department, to educate members of the
>> Armed Forces and their families regarding predatory lending practices.

>> (4) A description of the strategy of the Department of Defense, and of any
>> current or planned programs of the Department, to reduce or eliminate—

>>> (A) the prevalence of predatory lending practices directed at
>>> members of the Armed Forces and their families; and

>>> (B) the negative effect of such practices on members of the Armed
>>> Forces and their families.

>> (5) Recommendations for additional legislative and administrative action to
>> reduce or eliminate predatory lending practices directed at members of the
>> Armed Forces and their families.

> (c) Definitions- In this section:

>> (1) The term `appropriate committees of Congress' means—

(A) the Committee on Armed Services and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Armed Services and the Committee on Financial Services of the House of Representatives.

(2) The term `predatory lending practice' means an unfair or abusive loan or credit sale transaction or collection practice.

The report will be presented in the following sequence:

a.  Executive summary of the report, summarizing the findings of the report.

b.  Description of the prevalence of predatory lending around military communities – reviewing payday lending, internet lending, car title lending, military installment lending, rent-to-own programs, tax refund anticipation loans, and coercive collection actions.  The forms of lending included in this report were selected through feedback from military financial counselors and legal assistance attorneys.  Mortgage lending was not considered by these counselors as having the level of prevalence associated with the types of loans listed above, and consequently was not reviewed as part of this report.

c.  Education programs provided to Service members and their family members – education provided in 2005 concerning predatory practices, other on-going financial awareness and education efforts, and planned changes to enhance current efforts.

d.  Strategies and practices to reduce the prevalence and impact of predatory lending – actions taken by commanders to reduce the prevalence and alternatives provided to reduce the impact of predatory lending.

e.  Effect of predatory lending on Service members and their families – effect of predatory lending and the influences of on-going education and efforts to reduce the impact of predatory lending on Service members and their families.

f.  Review of legislative assistance – a review of legislative initiatives at the state and federal level concerning predatory lending

g.  Recommendations for statutory control – final recommendations for federal legislative controls.

Predatory lending in the small loan market is generally considered to include one or more of the following characteristics:  High interest rates and fees; little or no responsible

2

underwriting; loan flipping or repeat renewals that ensure profit without significantly paying down principal; loan packing with high cost ancillary products whose cost is not included in computing interest rates; a loan structure or terms that transform these loans into the equivalent of highly secured transactions; fraud or deception; waiver of meaningful legal redress; or operation outside of state usury or small loan protection law or regulation.  The effect of the practices include whether the loan terms or practices listed above strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave the borrower in worse financial shape than when they initially contacted the lender.

This report has been compiled with the assistance of Personal Financial Management Specialists and Legal Assistance Officers assigned to military installations worldwide, with research assistance provided by Army Emergency Relief, Navy-Marine Corps Relief Society, Air Force Aid Society, the Consumer Federation of America, the Center for Responsible Lending, the National Association of Consumer Advocates, and the National Consumer Law Center.   In addition, representatives from the US Treasury, Office of Financial Institutions Policy; the Federal Deposit Insurance Corporation; and the Federal Reserve Board, Division of Consumer and Community Affairs, were consulted.

During the development of this report, two unsolicited letters were received by the Department from the American Bar Association and the Navy-Marine Corps Relief Society.  These letters are provided in Appendix 1 of the report.

## 2. Executive Summary

a.  Predatory lending practices are prevalent and target military personnel, either through proximity and prevalence around military installations, or through the use of affinity marketing techniques, particularly on-line.  Mortgage lending was not considered as part of this report.  The predatory lenders reviewed as part of this report provide short term loans (payday, car title, and tax refund anticipation loans) and installment loans (unsecured loans focused on the military and rent-to-own).  These lenders have several characteristics in common:

(1).  Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit.  These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2).  Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.

(3).  Predatory lenders market to the military through their ubiquitous presence around military installations and/or through the use of terms to affiliate themselves with the military.  Increasingly the Internet is used to promote loans to Service members.

(4).  Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product.  The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

(5).  Most of the predatory business models take advantage of borrower's inability to pay the loan in full when due and encourage extensions through refinancing and loan flipping.  These refinances often include additional high fees and little or no payment of principal.

(6).  Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.

b.  The Department is exerting significant effort to educate Service members on the potential dangers of using predatory loans, better ways of managing their finances, and in the event they have financial problems, better solutions for them to pursue.

4

(1).  The Military Services educated 354,000 Service members and family members in 2005, and partner organizations educated an additional 61,000.  Messages were also transmitted through 960 news articles and 157 official memos on military installations.

(2).  On-going programs to enhance awareness, to continue the awareness process, to provide counseling and to provide assistance are included in a comprehensive strategic plan.

c.  Commanders are using the methods available to them to curtail the prevalence of predatory loans; however, doing so is not a simple proposition.

(1).  The Armed Forces Disciplinary Control Board (AFDCB) provides an avenue to declare a lender off-limits; however, the process is not suited to deal with businesses that work within the law.  The Department is taking steps to improve this process.

(2).  Senior commanders are delivering the message that obtaining counseling and assistance is a far better option than using predatory loans or continuing to service debt through high cost loans.

(3).  Alternatives to payday loans and high interest installment loans are available through the Military Aid Societies and through several banks and many credit unions located on or near military installations.  The Military Aid Societies provided over $87 million in assistance in 2005 and have established special programs to assist Service members trapped in  high cost loans.

d.  There are on-going efforts to persuade Service members not to fall victim to the lure of easy credit to solve their financial concerns, and to consider several better options.  As a result, Service members are doing better with their finances, though considerable predatory lending problems still remain.

For example: Active duty Air Force E-4, assigned to Maxwell AFB, AL, originally obtained a $500 payday loan with an agreement to pay back $600 in two weeks.  She then took out other payday loans and was forced to do multiple rollovers on each one.  To pay off these loans she contacted an installment loan company who provided her with a $10,000 loan at 50 percent annual percentage rate (APR).  Total cost to pay off the payday loans was $12,750 and her total obligation to the installment loan company was $15,000.  Her financial problems were a contributing factor to her pending divorce.

e.  Eleven States including Connecticut, Georgia, Maine, Maryland, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, Vermont, and West Virginia continue to maintain strong usury laws and to aggressively enforce those laws, thereby limiting the impact of predatory lending on their citizens.  In addition, some states have enacted statutes to eliminate exemptions which lenders have used to operate outside of existing state usury caps.  For example:

(1).  The State of Georgia recently enacted a tough anti-payday loan law to close loopholes and strengthen penalties against lenders that exceed the state's 60% usury cap.  The State of North Carolina refused to reauthorize its payday lending law following the sunset of its original authorization.

(2).  The other thirty-nine states have legalized payday lending using provisions such as mandatory databases, cooling off periods, attempts to stop rollovers and back-to-back transactions, and attempts to stop borrowing from multiple lenders. However, even with the addition of all these "consumer bells and whistles", these laws do not stop the debt trap.

f.  The Department of Defense seeks the following protections against predatory lending to Service members, as described in the report:

(1).  **Require that unambiguous and uniform price disclosures be given to all Service members and family members regard to any extension of credit (excluding mortgage lending).**

(a).  Require all fees, charges, insurance premiums and ancillary products sold with any extension of credit to be included within the definition of finance charge for the computation and disclosure of the APR for all loans made to military borrowers.

(b).  Require that the finance charge and the APR be included in all advertising to Service members including on-line websites and be quoted verbally to prospective military borrowers prior to application.

(c).  It is understood that such special military disclosures may discourage lenders and limit the availability of credit to certain Service members, but the Department believes this risk is justified given the impact of predatory loans.

(2).  **Require a federal ceiling on the cost of credit to military borrowers, capping the APR to prevent any lenders from imposing usurious rates.**

(a).   Lenders should be prohibited from directly or indirectly imposing, charging, or collecting rates in excess of 36 percent APR with regard to extensions of credit made to Service members and their families. This APR must include <u>all</u> cost elements associated with the extension of credit, including the "optional" add-ons commonly used to evade ceilings, such as credit insurance premiums.

(b).   It is understood that such an interest rate cap may limit the availability of credit to certain Service members.  Limiting high-cost options assists the Department in making the point clear to Service members and their families that high cost loans are not fiscally prudent.  A clear, unambiguous rate ceiling is justified given the high fees, interest and other charges associated with loans to Service members reviewed in this report, and the impact of those predatory loans on military readiness and troop morale.

(b).   Lenders should not interpret the 36 percent cap as a target for small loans provided to Service members; it would be a ceiling, and often a lower rate would be more appropriate to the risk of a borrower.  The passage of such a protection should not be deemed an authorization for any lender to lend at a rate not otherwise authorized by applicable state or federal law.

(3).   **Prohibit lenders from extending credit to Service members and family members without due regard for the Service member's ability to repay.**

(a).   Prohibit lenders from using checks, access to bank accounts and car title pawns as security for obligations.  These methods provide undue and coercive pressure on military borrowers and allow lenders more latitude in making loans without proper regard for the Service member's ability to repay.  They also place key assets at undue risk.

(b).   Restrict the ability of creditors and loan companies to require or coerce Service members into establishing allotments to repay their obligations. Allotments must be at the convenience and discretion of the military borrower and not a prerequisite for obtaining a loan.

(4).   **Prohibit provisions in loan contracts that require Service members and family members to waive their rights to take legal action.**

Service members should maintain full legal recourse against unscrupulous lenders.  Loan contracts to Service members should not include mandatory arbitration clauses or onerous notice provisions, and should not require the Service member to waive his or her right of recourse, such as the right to

participate in a plaintiff class.  Waiver is not a matter of "choice" in take-it-or-leave-it contracts of adhesion.

(5).   **Prohibit contract clauses that require Service members to waive any special legal protections afforded to them.**

These proposed protections, and those provided to Service members through the Servicemembers Civil Relief Act, were intended to strengthen our national defense by enabling Service members to devote their entire energy to the defense needs of the Nation.  In the interest of our national defense, such protections should not be subjected to waiver (other than in circumstances currently stated in the Servicemembers Civil Relief Act), in writing or otherwise.

(6).   **Prohibit states from discriminating against Service members and family members stationed within their borders, and prohibit lenders from making loans to Service members that violate consumer protections of the state in which their base is located.**

(a).   States should be prohibited from discriminating against Service members stationed within their borders and should be required to assure that such Service members are entitled to and receive the benefit of all protections offered to citizens of the state, including regulation of lenders located in the state or that provide loans via the Internet to Service members stationed there.

(b).   States have a vested interest in assuring the financial safety and stability of Service members stationed within their borders.  States should be prohibited from authorizing predatory lenders to treat "non-resident" Service members stationed within the state's borders differently than the state would permit that lender to treat in-state residents.

(c).   Lenders should be prohibited from charging Service members stationed within a state an APR higher than the legal limit for residents of the state, and should also be prohibited from violating any other consumer lending protections for residents of the state in which the base is located.

g.   It is understood that limits, such as interest rate caps, may limit the availability of credit to certain Service members.  The intent of these limits is to reduce availability if the credit being offered does not factor in Service members' ability to repay.  Limiting high-cost options assists the Department in making the point clear to Service members and their families that high cost loans are not fiscally prudent and that they are to resolve their financial problems through counseling and alternatives, rather than perpetuate them through predatory high cost loans.

8

h.  Service members see the value of limitations on the availability of credit and the cost of obtaining it.  When asked by the Consumer Credit Research Foundation whether "government should limit the interest rates that lenders can charge even if it means fewer people will be able to get credit," 75 percent of non-payday borrowers and 74% of payday borrowers surveyed said they agreed.[1]

i.  The Department takes seriously the responsibility of the individual Service member to make prudent decisions and to manage personal finances well.  However, predatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force.  Education, counseling, assistance from Aid Societies, and sound alternatives are necessary but not sufficient to protect Service members from predatory lending practices or products that are aggressively marketed to consumers in general and to military personnel directly.

---

[1] Dr. William O. Brown, Jr., and Dr. Charles B. Cushman, Jr., "*Payday Loan Attitudes and Usage Among Enlisted Military Personnel*," Consumer Credit Research Foundation, June 27, 2006, p. 10

### 3.  Prevalence of Predatory Lending Around Military Communities

Military families have characteristics that can make them a market of choice for predatory lenders.  Forty-eight percent of enlisted Service members are less than 25 years old,[2] typically without a lot of experience in managing finances, and without a cushion of savings to help them through emergencies.  They are on their own without the guidance or assistance of family, with perhaps their first significant paycheck.  They are paid regularly and are not likely to be downsized, outsourced or to quit their employment. Also, the military culture emphasizes financial responsibility, with basic policy explicitly stating that Service members are to pay their just debts.[3]

Finally, geographic concentration is another factor making Service members and their families a lucrative market.  Active-duty military are physically concentrated in and around bases, and having a clearly defined cultural identity allows some lenders to identify themselves in the virtual market place as being close to the military community.

### a.  Payday Lending

Payday loans are small loans secured by the borrower's personal check or by an agreement to electronically withdraw payment from the borrower's bank account.  Loans average about $350, are due in full on the next payday, typically in 14 days, and cost from 390 to 780% annual interest rate.  Payday lending has emerged in the last ten years and is now allowed in thirty-nine states.  Payday loans are made by storefront lenders, check cashing outlets, pawn shops, rent-to-own stores and via Internet sites.

Payday lenders are heavily concentrated around military bases in states where this product is legal.  In the case of Camp Pendleton, CA, McChord/Lewis, WA, Newport News/Norfolk, VA and Fort Campbell, KY (maps at Appendix 2), there is clear evidence that certain portions of the lending industry are focused on the military market.  These maps were produced by Professor Steven M. Graves, California State University, Northridge, as an update to the original research written by Professor Graves and Professor Christopher L. Peterson, University of Florida and published in the Ohio State Law Journal, Volume 66, Number 4, 2005, "Predatory Lending and the Military: The Law and Geography of 'Payday' Loans in Military Towns."

Most notably, payday lenders and military installment lenders situate themselves in close proximity to the front gates of military installations.  More particularly, payday lending storefront operations outnumber military installment loan companies as much as 137 to

---

[2] Population Representation in the Military Services for FY 2004, Office of the Under Secretary of Defense, Personnel and Readiness, website: http://new.humrro.org/poprep04/appendix/appendix.html
[3] DoD Directive 1344.9, Indebtedness of Military Personnel, October 27, 1984

1[4] in the maps at Appendix 2.  Analysis of statewide statistics shows that each of the communities hosting these installations easily rank among the most heavily targeted communities in their respective states.  Near McChord Air Force Base and Fort Lewis, there are four times as many payday lenders per capita compared to residents living in the rest of Washington State.[5]

Professor Graves makes the point clear that the prominent placement of payday lending storefronts is according to market-based plans:

> "According to these filings, Check Into Cash claims that, 'convenience of a store's location is extremely important to customers' therefore, 'management seeks to open each new store within three miles of the market area that it is intended to serve' (Check into Cash, 1998)."

Peterson and Graves based their findings on their analysis of 20 states and nearly 15,000 payday shops.   The authors found that payday lenders are located in counties and ZIP codes adjacent to military bases in significantly greater numbers and densities than other areas. This held true in 19 of the 20 states they studied.

For example, the zip code at the southern gate of Camp Pendleton Marine Corps in Oceanside, California has 22 payday lenders; 17 more than what would be expected based on Oceanside's population. Similarly, in the zip codes around Davies-Monthan Air Force Base in Tuscan Arizona, there are 12 more payday lenders than you would expect based on statewide averages. In a zip code in Killeen, Texas at the main commercial district just outside Fort Hood, there are 9 payday lenders, which is 7.3 more payday lenders than would be expected for the population in that zip code. Within 3 miles of Fort Hood's perimeter, there are at least 18 payday lenders and 13 of those are within one mile of base.

A notable exception is Parris Island Marine Corps Recruit Depot, located in South Carolina, which has virtually no payday lending because the Marine recruits do not have an opportunity to leave the installation during the time they are assigned to that location. Without the availability of these Service members, the payday lending industry is far less likely to establish a presence in the host community.

Payday lending industry has experienced fast store and volume growth over the last couple of years, and has reached $40 billion volume in 2005.[6]

---

[4] Comparison of payday lending locations versus installment loan locations on the map of San Diego, CA region at Appendix 2 of this report.  Other maps show ratios of 135:1 around Tidewater, VA; 99:1 around Fort Lewis /McChord AFB, WA; and 9:1 around Fort Campbell, KY.
[5] Gordon Trowbridge and Karen Jowers, "Payday Predators," *Army Times*, May 2, 2005, p. 4 of 14.
[6] Stephens Inc. presentation at CFSA conference in 03/06

Figure:1 Payday  Store Growth [7]



Determining the use of payday loans by active duty Service members and their families is more difficult to ascertain.  Surveys of active duty Service members by the Defense Manpower and Data Center (DMDC) provide lower usage through self reported data than usage numbers that can be derived through extrapolation of industry information.

Based on a Center for Responsible Lending September 2005 analysis of the payday industry's own data and statements, active-duty military personnel are three times more likely than civilians to have taken out a payday loan.  This report also estimates, again based on industry data, that one in five active-duty Service members were payday borrowers, and, finally, predatory payday lending costs military families over $80 million in abusive fees every year. [8]  While military personnel make up 1.1 percent of the adult population of Colorado, they account for 4.6 percent of payday loan customers in Colorado.[9]  This military targeting ratio is even higher than that reported by the Center for Responsible Lending, with military personnel in Colorado more than four times more likely than civilians in Colorado to have taken a payday loan.

---

[6]

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|
| # of stores | 8,000[(1)] | 10,000[(2)] | 13,000[(2)] | 15,000[(2)] | 18,000[(3)] | 21,500[(3)] | 23,000[(3)] |
| *Growth* | | 25% | 30% | 15% | 20% | 19% | 7% |

(1) Stephens Inc report Sep, 99 estimates 8000-10000 stores
(2) Stephens Inc report Sep, 03 "Update on the Payday Loan Industry: Observations on Recent Industry Developments"
(3) Stephens Inc. presentation at CFSA conference in 03/06

[8] "Payday Lenders Target the Military," Center for Responsible Lending, September 2005.  *"Predatory payday lending — fees charged to borrowers caught in the debt trap, or on their fifth and subsequent payday loans in one year — costs American families at least $5.5 billion in abusive fees every year, up from $3.4 billion in 2002. If 1.5 percent of payday borrowers are military personnel, then military families are losing over $80 million in abusive fees every year to  predatory payday lenders."* http://www.responsiblelending.org/pdfs/ip011-PaydayMilitary-0905.pdf
[9] Paul Chessin, "Borrowing from Peter to Pay Paul:  A Statistical Analysis of Colorado's Deferred Depsoit Loan Act," Denver University Law Review, Vol. 83 No. 2, 2005, p. 407.
http://dola.colorado.gov/demog/Population/PopulationTotals/CurrentEstimates/Table1-04FinalEstimates.pdf

By comparison, the March 2006 DMDC survey data shows that approximately 5 percent of the active force use payday loans.  This estimate (69,000 Service members[10]) appears far too low if compared to the industry estimate that the military represents approximately 1 to 4 percent of their market of 15 million households,[11] which equates to approximately 150,000 to 600,000 military borrowers.  Using a conservative estimate of 1.5 percent of the payday lending market, there would be approximately 225,000 Service members using payday loans (17 percent of the force).  This estimate is in the range between the Consumer Credit Research Foundation (CCRF) results of 13 percent of enlisted Service members[12] and the findings of Center for Responsible Lending which estimated 19 percent of Service members using payday loans.[13]  CCRF results (13%) imply that military members are twice as likely as civilians to be a payday borrower.[14]

The DMDC survey also states that Service members used an average of 4.6 loans in 2005 and rolled these loans over an average of two times.  This represents a potential of 13 loan transactions per year.[15]   If the average amount borrowed is $1,654, the average loan would be $360, which is congruent with the typical payday loan.  The amount of fees charged to Service members would be approximately $744,[16] which would represent an estimated total of $167 million in fees for the $372 million borrowed.

High cost is one of the characteristics that make these loans problematic for Service members.  The Center for Responsible Lending lists the following predatory characteristics of payday loans:[17]

 (1). Triple digit interest rate
    Payday loans carry very low risk of loss, but lenders typically charge fees equal to 400% APR and higher.

---

[10] Represents 5 percent of 1,336,972 active duty Service members (not including academy cadets) as of December 31, 2005, according to the Defenselink website: http://siadapp.dior.whs.mil/personnel/MILITARY/rg0512.pdf
[11] "Payday Lenders Target the Military," http://www.responsiblelending.org/pdfs/ip011-PaydayMilitary-0905.pdf
[12] Dr. William O. Brown, Jr., and Dr. Charles B. Cushman, Jr., "*Payday Loan Attitudes and Usage Among Enlisted Military Personnel*," Consumer Credit Research Foundation, June 27, 2006, p. 2.
[13] "Payday Lenders Target the Military," http://www.responsiblelending.org/pdfs/ip011-PaydayMilitary-0905.pdf
[14] This figure makes military members twice as likely to be a payday borrower than civilians based on CRL methodology in their paper  "Payday Lenders Target the Military," http://www.responsiblelending.org/pdfs/ip011-PaydayMilitary-0905.pdf

| Percentage of payday borrowers in civilian population (a) | 6.75% |
| Percentage of payday borrowers in military population (b) | 13% |
| Number of times military personnel are more likely to be payday borrowers than civilians (b/a) | 2 |

[15] Average number of loans (4.6) times the average number of rollovers (2) plus the initial transaction fee.
[16] The $744 equals $1,654 (total amount borrowed) times an average fee of $15 per $100 borrowed, times an initial fee plus two rollovers.
[17] "Nine Signs of Predatory Payday Loan," Center for Responsible Lending website: http://www.responsiblelending.org/payday/signs.cfm

(2). Short minimum loan term
  75% of payday customers are unable to repay their loan within two weeks and are forced to get a loan "rollover" at additional cost. In contrast, small consumer loans have longer terms (in NC, for example, the minimum term is six months.)

(3). Single balloon payment
  Unlike most consumer debt, payday loans do not allow for partial installment payments to be made during the loan term. A borrower must pay the entire loan back at the end of two weeks.

(4). Loan flipping (extensions, rollovers or back to back transactions)
  Payday lenders earn most of their profits by making multiple loans to cash-strapped borrowers. 90% of the payday industry's revenue growth comes from making more and larger loans to the same customers.

(5). Simultaneous borrowing from multiple lenders
  Trapped on the "debt treadmill", many consumers get a loan from one payday lender to repay another. The result: no additional cash, just more renewal fees.

(6). No consideration of borrower's ability to repay
  Payday lenders encourage consumers to borrow the maximum allowed, regardless of their credit history. If the borrower can't repay the loan, the lender collects multiple renewal fees.

(7). Deferred check mechanism
  Consumers who cannot make good on a deferred (post-dated) check covering a payday loan may be assessed multiple late fees and NSF check charges or fear criminal prosecution for writing a "bad check."

(8). Mandatory arbitration clause
  By eliminating a borrower's right to sue for abusive lending practices, these clauses work to the benefit of payday lenders over consumers.

Check-holding, a central feature of payday loans, is particularly risky for military borrowers.  Every payday loan involves a prospective "bad" check.  Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit.  Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.

The two-week loan payday lenders claim they are providing is virtually nonexistent. Research by Center for Responsible Lending shows that only one percent of loans go to

14

borrowers who take out one loan in a year.  Indeed, the industry relies on revenue from borrowers caught in a debt trap. Ninety-one percent of payday loans go to borrowers with five or more loan transactions per year.[18] They are trapped in this wage-stripping debt through loan terms that require them to either pay off the entire principal on payday, which most of these borrowers cannot afford to do, or to pay another fee of about $50 every payday for weeks, months, or years as they repeatedly roll over the loan or renew it in a back-to-back transaction. They do this to avoid default, for if the lender deposits their uncovered check, they face serious consequences. This debt trap is the rule, not the exception: the average borrower pays back $834 for a $339 loan.[19]

## b.  Internet Lending

In addition to the marked increase in the volume of storefront locations, military personnel stationed anywhere in the world can get high cost loans from lenders that advertise, accept applications, deliver and collect loans via the Internet.  Military borrowers encounter a booming virtual market of small loan offers, payday loans, and "military" loans via the Internet.  Search results and sponsored links fill page after page. Referral sites feed applications to actual lenders and affiliate marketing places loan ads on numerous sites.

There are no reliable statistics on the volume of payday loans, installment loans, or car title loans made online or by telephone/fax.  An industry analyst estimates that Internet payday lending brings in $500 million in annual revenue.[20]  One installment lender reported to the SEC that much of its growth in finance receivables came from its Internet subsidiary.  Loans made by Pioneer via the Internet in fiscal year 2005 grew 59 percent from $84.2 million to $134.1 million.[21]  An online search for "military loans" gets over

---

[18] Keith Ernst, John Farris & Uriah King, *Quantifying the Economic Costs of Predatory Payday Lending*, Center for Responsible Lending (2003), at http://www.responsiblelending.org/pdfs/CRLPaydayLendingStudy121803.pdf.

[19] According to recent state regulator data (2004 and/or 2005) average loans per borrower is 9. The data of  the states given below except Florida and Oklahoma reflect the average transactions per borrower from a single shop, and do not account for the fact that payday borrowers typically use more than one lender. Therefore, the average total loan transactions per borrower per year is in fact higher.

| States with payday loan data | Average loans per borrower per Year |
|---|---|
| Washington State | 9 |
| Florida | 8 |
| Oklahoma | 9 |
| Colorado | 9 |
| Virginia | 7 |
| Iowa | 12 |
| Average | 9 |

According to the 2005 SEC filings of Advance America, the nation's largest payday lender, average principal is $339, and average fee is $55. For a loan renewed eight times, a borrower pays back $834.

[20] Dennis Telzrow, "Industry Report:  Payday Loan Industry," Stephens Inc., April 5, 2006, p. 17.

[21] Pioneer Financial Services, Inc., Form 10-K Year Ended September 30, 2005, Securities and Exchange Commission, page 13.

thirty-eight million hits on Google, while "military payday loan" fills over three million pages.  Sponsored links on search pages connect potential military borrowers to numerous online lenders as well as web sites that appear to be educational but are laden with ads for high cost loans.

A 2004 survey[22] of Internet payday lending found that finance charges range from $25 (650% APR) to $30 (780% APR) per $100 borrowed for two-week terms with loans ranging from $200 to $2,500.  Loans are delivered and collected online through electronic fund transfer.  Some lenders structure loans to automatically renew with payment of the finance charge unless the borrower takes extra steps to terminate the debt with full payment.  Internet loans expose borrowers to privacy and security risks due to applications with detailed financial information transmitted to distant lenders and electronic access granted to bank accounts.

Internet lenders claim jurisdiction in states with lax protections and unlimited rates and often attempt to bypass the state credit, usury or payday loan laws of the state where the borrower receives the loan.  All of the military installment lenders surveyed for this report listed Nevada as their home state.  State regulators have successfully enforced home-state law against Internet payday lenders making loans to consumers in their states in Colorado, New York, Massachusetts, Kansas, Pennsylvania and the District of Columbia.

Military borrowers who search under typical loan terms are shown lenders that cater to the military and those that make loans uniformly to any borrower.  The military loan sites use military names, sometimes display official-looking seals, and tout their understanding of Power of Attorney forms and ask for Leave and Earnings Statements as the basis for making loans.  A snapshot of military loan sites visited for this report is provided at Appendix 3.

## c.  Car Title Lending

Car title lenders make loans secured by the title to vehicles owned free and clear by borrowers.  The typical loan is for a fraction of the car's value, costs 300% APR, and has a one-month loan term.  Title loans are often renewed month after month, without reduction in principal.  Failure to repay can result in repossession of the vehicle.  The Tennessee Department of Financial Institutions reported that title lenders with 931 outlets repossessed 17,313 vehicles in 2004.[23]   The high cost and risk of car title loans traps borrowers in repeated loan renewals in order to keep from losing essential transportation and key family assets.

---

[22] Consumer Federation of America, "Internet Payday Lending:  How High-priced Lenders Use the Internet to Mire Borrowers in Debt and Evade State Consumer Protections," November 30, 2004.
[23] Tennessee Department of Financial Institutions, "Report to the Tennessee General Assembly, Pursuant to Public Chapter 440, Acts of 2005, Section 7(e)," February 1, 2006.

This form of high cost, high risk credit is legal in twenty-two states while lower rates are authorized for title-secured loans in another four states.  In some states loans are sized to fall outside state rate caps or lenders structure loans to evade rate caps.  California caps rates for small loans of $2,500 or less, leading some title lenders to make larger loans secured by titles without rate caps or to characterize title loans as sale-leaseback arrangements.  Maps for bases in Texas, Kentucky, and Washington at Appendix 2 do not show title loan outlets.  In these states, title loans are either prohibited or rates are capped at low levels under state laws.[24]

Outlets loaning money secured by car titles are heavily concentrated around some bases but not at others due to varying legal status for this form of lending.  The maps at Appendix 2 for bases in Virginia and Tennessee show the most title loan locations.  Title lending, structured as open-end credit, is not regulated in Virginia and has grown rapidly in the last few years.  Authorized rates are extremely high for fully-secured loans.  Tennessee permits title lenders to charge 22% per month or 264% APR for loans, while Arizona caps rates on a sliding scale of 10 to 17% per month or 120 to 204% annual interest.

National industry-wide data is not available on title lenders but it is evident that title lending is becoming more widespread.  The industry estimates that title loans are a $20 million business in California, while the Mississippi Department of Banking and Consumer Finance reports almost $25 million in loans made during 2003.

**d.  Military Installment Loans**

Several of the loan companies offering high interest loans through the Internet, such as Armed Forces Loans of Nevada, are known as "military installment loan companies."  Military installment loan companies offer small loan products exclusively to military members.  In addition to providing their services through the Internet, three of these companies (Pioneer, Patriot and Omni) operate about 51 shops in 16 states, primarily situated around military installations.  Several of the Internet sites of military installment loan companies are listed in Appendix 3.

Lenders who only lend to non-resident military personnel stationed in about half the states have either been granted formal exemption from state regulation or have not been required to be licensed or supervised by state regulators under a variety of legal arguments.  This gap in protection for military borrowers results from state credit laws written to apply to residents.  Since military borrowers list their home state on Leave and Earnings Statements, lenders claim that their customers are not residents and therefore

---

[24] Consumer Federation of America, "Driven into Debt:  CFA Car Title Loan Store and Online Survey," November 2005, Appendix A: 50-State Car Title Loan Legal Status.

not covered by state requirements.  For example, installment lenders who loan only to Service members in Virginia and North Carolina are not licensed small loan companies. In other cases lenders have argued that state regulation would violate the Commerce Clause of the US Constitution or that their broker business model should not trigger state requirements.

For example, Pioneer Military Lending is licensed in Nevada, Georgia and Washington State, and has received letters from the state agencies in Alaska, Arizona, Colorado, Kansas, Kentucky, Michigan, New Mexico, and Wyoming to operate without a license or regard for state rate caps.  Without this exemption from state small loan laws, a military lender would be subject to rate caps and other requirements.  Alaska, Arizona, Colorado, Kansas and Kentucky have rate limits of 36% APR.  Georgia's rate cap is 60%, Michigan and Washington rate caps are 25%, plus a fee up to 5% and Nevada has no rate cap and is where many Internet loans originate.  State rate caps do not include the added cost of premiums for "voluntary" credit insurance or other ancillary products required to get the loan.

California had provided Pioneer Military Lending with an exception, but rescinded it on May 19, 2006.  Significantly, the California Department of Corporations stated in their public statement:  "After further review, the Commissioner has determined that there are other state interests that apply to military personnel, regardless of whether they are residents or non-residents of California."

Of particular concern with the lack of universal state licensing is that these companies do not have to comply with state laws covering disclosure, rate caps, fee limits, loan size and collateral requirements.  For example, the lender can request the pledge of a nominal personal possession as part of the loan agreement as a basis for providing high mark-up credit property insurance.  If this insurance is provided as a "voluntary" purchase, the cost is not calculated in the APR.  Without licensing there is no oversight provided on these lending institutions.

Repeat lending or loan flipping are characteristic of installment lenders as well as payday lenders.  For example, Pioneer reports that it typically makes a number of loans to the same customer over the course of several years, "many of which were refinanced with a new loan after approximately one third of the scheduled payments were made.  We market the opportunity to refinance existing loans prior to maturity, thereby increasing the amount borrowed and increasing the fees and other income we realize.  In fiscal 2005, approximately 45.8% of the number and 30.2% of the amount of our loan originations were refinancings of outstanding loans."  One of the reasons loans are easily renewed is the master credit agreement that Pioneer customers sign.  The agreement, which helps expedite the extension of subsequent loans to the customer, is licensed from the sole

18

director and CEO of the company who receives a royalty of $2.76 for every contract signed.[25]

A complaint filed with the California Department of Corporations in 2005 against Omni Military Loans alleges lending practices that harm military borrowers.  The complaint states that Omni operates without a license, charges usurious interest, collects a prepaid finance charge which is not permitted in California, contracts for excessive dishonored check fees, and automatically adds various forms of credit insurance to the loan agreement, with 98% of loans including "voluntary" purchase of credit insurance.   The complaints states that Omni also fails to post or quote the APR for loans so that the borrower first sees the 34.95% APR on the contract when the loan check is presented to the borrower. [26]   The Internet study attached to this report found that Omni does not quote an APR on its loan web site.

### e.  Rent-to-Own Lending

The rent-to-own industry is composed of dealers who rent furniture, electronics, major appliances, computers, jewelry and other products with an option to buy. Rent-A-Center, RentWay, and Aaron Rents are a few of the large chains.  In 2005 there were 8,300 stores, serving 2.7 million people, and the industry earned $6.6 billion in revenue.[27]

Rent-to-own programs allow consumers who may not otherwise qualify for a credit purchase to immediately take possession of a desired item or items.  However in providing this opportunity, the lender does not consider the borrower's ability to pay, charges three-to-four times the value of the item in rental fees and does not disclose the true cost of the rental/purchase.  For example, a consumer may rent a television for $10 per week for 78 weeks prior to paying off (purchasing) the item, paying a total of $780, even though the television retails for approximately $220.  The $560 in charges above the retail price equals a 228 percent annualized interest rate.

While the rent-to-own industry claims only 25-30 percent of customers purchase rented items, the Federal Trade Commission (FTC) reported "sixty-seven percent of customers intended to purchase the merchandise when they began the rent-to-own transaction, and 87 percent of the customers intending to purchase actually did purchase."   The FTC study also portrays the RTO customer base as among the poorest consumers. [28]

---

[25] Pioneer Financial Services, Inc., Form 10-K Fiscal Year Ended September 30, 2005, SEC, page 3 and 40.

[26] Corporal Joshua W. Brack complaint, California Department of Corporations, filed September 13, 2005 by Frank J. Fox, Esq..

[27] The Association of Progressive Rental Organizations website http://www.rtohq.org/About%5Frent%2Dto%2Down/Industry%5Foverview/

[28] James M. Lacko, Signe-Mary McKernan, and Manoj Hastak, "Survey of Rent-to-Own Customers," Federal Trade Commission Bureau of Economics Staff Report, http://www.ftc.gov/reports/renttoown/rtosummary.htm, Executive Summary

These purchases are made without disclosure of the cost of credit involved and are not specifically regulated by federal law.  According to a Federal Trade Commission report:[29]

> "Clear and accurate disclosure of the total cost and other terms of purchase would allow potential customers to compare rent-to-own transactions to other alternatives, and would help ensure that consumers choosing rent-to-own transactions do so on an informed basis.  Disclosure of the total cost and other basic terms of purchase on product labels, along with disclosures in advertisements and agreement documents, would ensure that the information is available to consumers while they are considering the rent-to-own transaction."

Only New Jersey imposes a usury ceiling on rent-to-own, while Vermont requires APR disclosure and Minnesota, Wisconsin and North Carolina impose other consumer protection provisions.  Recently the Governor of Wisconsin vetoed a bill that would have removed the requirement for rent-to-own retailers to disclose interest rates on purchases.

**f.  Refund Anticipation Loans**

Refund anticipation loans (RALs) are very expensive short-term loans secured by the taxpayer's expected tax refund.  Consumers took out approximately 12.38 million RALs during the 2004 tax-filing season and paid $1.24 billion in RAL fees and $360 million in associated fees to tax preparers and banks that make these loans.  RALs cost 40% to 700% annual interest rates for ten-day loans.  The annualized interest rate for a loan of the average refund size of about $2,150 is 178% APR.

RALs are mostly marketed to low-income taxpayers by commercial tax preparers.  According to IRS data, 78% of RAL applicants in 2004 had adjusted gross incomes of $35,000 or less.  IRS data also shows that nearly 56% of RAL consumers were Earned Income Tax Credit (EITC) recipients while EITC recipients made up only 17% of individual taxpayers in 2004.[30]

**g.  Coercive Collection Actions**

Examples of coercive collection actions occur in all segments of this industry.   The Community Financial Service Association (CFSA) has produced a set of voluntary best practices, which describes some of the coercive collection actions they advocate their members to refrain from considering or using as a threat towards a military customer:

---

[29] Ibid.

[30] National Consumer Law Center and Consumer Federation of America, "Another Year of Losses:  High-Priced Refund Anticipation Loans Continue to Take a Chunk Out of Americans' Tax Refunds," January, 2006.

(1). Requesting a garnishment of military wages.

(2). Attempting to collect a loan from a military customer who has been deployed to a combat or combat support posting.

(3). Contacting the military chain of command in an effort to collect on a loan.

Though these military best practices sound good, they are voluntary with no enforcement mechanism.  In addition, since the majority of national payday chains are CFSA members who presumably would already be abiding by these best practices, it is clear that they have not been sufficient to stop the debt trap.  In addition, threats of criminal prosecution are sometimes used by lenders to coerce borrowers to pay their debts or keep paying to renew loans.

Also, check holding creates an *in terrorem* effect of disproportionate penalties to borrowers.  Some payday lenders threaten criminal sanctions when borrowers are unable to make good on the checks used to secure payday loans.  For example, the Washington Department of Financial Institutions and the Arizona Attorney General brought charges against licensees accused of threatening prosecution to consumers unable to repay loans.

Some state laws treat the unpaid payday loan as a civil or criminal bad check, triggering multiple damages, attorneys' fees and court costs.  Because the lender holds the means of repayment, the consumer does not have due process rights to present defenses to the debt and loses control over decisions on when to pay which debts.

Finally, the Federal Arbitration Act limits the ability of state legislatures and regulators to restrict the application of arbitration clauses, therefore limiting their ability to protect consumers in their state.   This further eliminates the borrowers' opportunity to obtain legal recourse.  The third party arbitrator, paid for by the lender, has final jurisdiction over any disputes that may arise as part of the contract.

## h.  Conclusion

The predatory lenders described in this portion of the report have several characteristics in common:

(1). Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit.  These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2). Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.

(3). Predatory lenders market to the military through their ubiquitous presence around military installations and/or through the use of terms to affiliate themselves with the military.  Increasingly the Internet is used to promote loans to Service members.

(4). Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product.  The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

(5). Most of the predatory business models take advantage of borrower's inability to pay the loan in full when due and encourage extensions through refinancing and loan flipping.  These refinances often include additional high fees and little or no payment of principal.

(6). Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.

In each of the situations discussed, the borrower is placed at a disadvantage and penalized through high fees and interest and dire consequences if they default.  Borrowers who seek out these options may not realize the financial ramifications of using these products or may assume there are no other options.  They may also believe that these loan products are sanctioned or approved by the military, due to extensive affinity marketing tactics. Consequently, the Department has directed effort towards three major initiatives to resolve predatory lending issues: education, alternatives and effective policy/statute.  This report will cover all three elements, starting with the effort to educate and motivate Service members and their families to control their finances and build savings so they will not need  "fast cash" loans, and in the event of needing emergency funding, understanding that there are much better sources of funding.

## 4. <u>Education Programs</u>

The Department has established basic policy for personal finance in DoD Instruction 1342.27, *Personal Financial Management Programs for Service Members*, November 17, 2004.   At a minimum, this policy requires Services members receive assistance to accomplish the following:

> "Within 3 months after arriving at the first permanent station, a Service member shall demonstrate a basic understanding of pay and entitlements, banking and allotments, checkbook management, budgeting and saving (to include the thrift savings plan), insurance, credit management, car buying, permanent change of station moves, and information on obtaining counseling or assistance on financial matters.
>
> Prior to any deployment that exceeds 4 weeks, a Military Service member shall be able to establish an extended absence financial plan as part of personal readiness preparation.
>
> Prior to assuming a leadership role as a supervisor, officers and noncommissioned officers shall have a basic understanding of policies and practices designed to protect junior military Service members within their command/supervisor, to include those policies and practices governing commercial solicitation."

The overall message of these courses is to manage your finances, spend less than you earn, save money for when you need it, use credit wisely so that payments do not become overwhelming and be cautious in the marketplace.  First term Service members receive information about predatory lending as part of their initial training upon arriving (or prior to arrival at) their first permanent duty station.   The policy does not specify the amount of time required to instruct Service members, but requires that they be trained to possess a basic understanding of the topics listed above.  A basic understanding is defined as a Service member being able to comprehend the underlying principles of a subject and apply them to everyday life situations.

To determine how much training has been accomplished that includes information on predatory lending, a survey was sent to all military installations for them to provide feedback on the following for programs provided in 2005:

a. Number of courses in which predatory lending is covered, the predatory lending topics covered, number of times courses are offered per year and total number of participants.

b. Number of government-provided pamphlets/brochures covering predatory lending, the predatory lending topics covered and number distributed.

c.  Number of informational articles in base newspapers and daily bulletins.

d.  Number of command-sponsored memos and policy letters.

e.  Partner organizations that provided education courses, to include the topics covered, number of times courses are offered per year and total number of participants.

f.  Partner organizations that provided educational materials, predatory lending topics covered, and the number distributed.

The Military Services provided the following information about their courses and government provided materials as a result of the survey:

| Service | Installations reporting | Number of courses | Classes per year | Service members attending | Family members attending | Total number attending | Products distributed per year |
|---|---|---|---|---|---|---|---|
| Army | 59[1] | 264 | 6,197 | 79,641 | 5,721 | 85,362 | 16,634 |
| Navy | 50 | 269 | 2,772 | 96,368 | 4,124 | 100,492 | 116,752 |
| Marine Corps | 17 | 78 | 1,550 | 113,398 | 5,171 | 118,569 | 10,870 |
| Air Force | 61 | 161 | 1,345 | 35,065 | 4,461 | 39,526 | 6,997 |
| DoD total | 187 | 772 | 11,864 | 324,472 | 19,477 | 353,949 | 151,253 |

The most prevalent topics covered in the presentations and the materials included: payday lending, military installment loans, auto financing, rent-to-own programs, title loans and overall credit management.  Education materials provided were most commonly generated by the Military Services or provided by the Federal Trade Commission.

Service members attending education include new enlistees, Service members arriving at new duty stations, those attending command-directed training and those seeking additional information.  The totals reflected above show relatively good coverage when compared to the number of recruits assessed into the Military Services for Fiscal Year 2005 (recruit numbers driving the requirement for basic educational classes).  There were 73,373 recruits assessed into the Army, 37,703 into the Navy, 32,961 into the Marine Corps and 19,222 into the Air Force.

In addition to courses and educational materials, the Military Services delivered 960 news articles in local base papers and base bulletins, and 157 memos from command on the topic of predatory lending.  Numbers of articles and policy memos by Military Service are as follows:

24

| Service | Number of news articles | Number of policy memos |
|---|---|---|
| Army | 217 | 23 |
| Navy | 273 | 80 |
| Marine Corps | 131 | 13 |
| Air Force | 339 | 41 |
| DoD total | 960 | 157 |

The Military Services provided the following educational programs and materials covering predatory lending practices through external organizations that have partnered with the Military Services to supplement their basic educational programs:

| Service | % reporting installations using partners | Classes per year | Service members attending | Family members attending | Total number attending | Products distributed per year |
|---|---|---|---|---|---|---|
| Army | 54% | 387 | 5,611 | 343 | 5,954 | 15,397 |
| Navy | 56% | 445 | 37,955 | 198 | 38,153 | 40,026 |
| Marine Corps | 29% | 198 | 11,355 | 382 | 5,954 | 7,305 |
| Air Force | 34% | 270 | 4,431 | 395 | 4,826 | 9,208 |
| DoD total | 46% | 1300 | 59,352 | 1,318 | 60,670 | 71,936 |

The most predominant partner organizations providing support were the Banks and Credit Unions on military installations, which have the responsibility as part of their operating agreement to provide free education.  Other organizations participating were state agencies and private organizations that are partners in the DoD Financial Readiness Campaign.

The Financial Readiness Campaign represents the collaborative efforts of approximately 20 federal agencies and nonprofit organizations which provide materials and assistance to supplement the efforts of the Military Services.  The efforts of these organizations has been incorporated into a strategic plan (included at Appendix 4) that outlines the assistance many of these organizations provide to the Department to support financial awareness campaigns and education to Service members and their families.  These activities, outlined in sections 3 – 6 of the Strategic Plan are on-going and enhance the capability of the Department to influence the behavior of Service members and particularly their family members.

The Strategic Plan also outlines in sections 1 and 2, the follow-on approach the Department plans to take to providing basic level financial education, which will also provide a measurement of competency rather than training.  The Department plan includes the use of a web-based program that evaluates the basic policy:  comprehension of basic understanding, as defined above.  This self-administered test would determine the ability of Service members to apply basic principles to life scenarios.  Those Service members who are able to pass the test would not need to attend the basic education.  Those Service members who do not pass can use the website to obtain the information

(while the question is still fresh in their minds) or if web-based training is not sufficient, receive classroom instruction and coaching.  There are also plans to introduce games as instructional tools (currently being considered by the National Association of Securities Dealers Foundation).

Along with providing education to those who need it, in a format that suits their learning styles, the proposed competency-based evaluation and training system will also provide a more results-oriented oversight of financial education.  Instead of measuring one-size-fits-all training events, we will be able to assess the competency of Service members and identify those who may need additional assistance.  This is a significant change to our current approach of providing financial education and will require further development, testing and incremental implementation to ensure there will be no lapses in the education currently being provided.

The web-based evaluation is the first step in the education process outlined in the strategic plan.  Follow-up efforts, described in sections 3 – 6 include awareness campaigns, educational seminars and readily available educational materials (as fulfillment to the awareness efforts), opportunities to contact a counselor for further consultation, and assistance in those situations where Service members have financial problems.  These efforts are already in place and are provided as part of the strategic plan to show their relevance to the overall program.

One awareness program being implemented by the Military Services that may have particular impact on predatory lending is "Military Saves," which is a social marketing campaign to persuade, motivate and encourage Service members and their families to save money and reduce consumer debt.  The parent campaign, America Saves, is sponsored by Consumer Federation of America (CFA), which is a non-profit partner in the DoD Financial Readiness Campaign.  Following service-specific tests in the Army, Navy, and Marine Corps, Military Saves was developed by a multi-disciplinary team at Eglin AFB from June 2004 to October 2005, and launched 7 February 2006.  Military Saves engages leadership to be involved in promoting wealth building messages and conducting campaigns for military members to set savings goals, open savings accounts, make regular contributions to household savings, increase debt payments, and participate in financial education programs.   The campaign at Eglin AFB has enrolled 1,151 "Savers" who have pledged to save $2.9 million annually.

Their average monthly savings is $209, with the top 5 goals in number of Savers being: 1) general savings/investment; 2) retirement; 3) emergency fund; 4) debt reduction; 5) home ownership.  The top 5 goals in dollars pledged is: 1) retirement; 2) general savings/investment; 3) home ownership; 4) debt reduction; 5) emergency fund.

Financial education and support is not a one-time effort, or comprised of a one-dimensional solution.  The Department will continue to provide various sources of

26

instruction and education as a way of effecting change in the financial behavior of Service members and their family members.   Even with the amount of outreach and education currently being conducted by the Military Services and through partner organizations, there are hundreds of thousands of Service members using predatory loan products.   Additional educational efforts to curb the use of potentially harmful short-term lending products can only go so far.   As with many other forms of abusive practices, some limits are also needed in the supply of these services.

**5.** **Strategies and Practices to Reduce the Prevalence and Impact of Predatory Lending**

**a.  Strategies to Reduce Prevalence of Predatory Lending**

In addition to providing education to Service members, the survey of military installations showed that commanders are taking action to reduce the prevalence of predatory lending activities in their communities.   There have been a total of fourteen actions taken against lenders in the past few years and ten locations placed off-limits.

Predatory lenders have seldom been placed off-limits, primarily because the process associated with placing commercial entities off-limits, through the review and recommendations of the Armed Forces Disciplinary Control Board (AFDCB), is not well suited to this purpose.  The AFDCB, covered by Joint Army Regulation 190-24, is designed to make businesses outside of military installations aware that their practices cause morale and discipline concerns and to offer these businesses an opportunity to modify their practices to preclude being placed off-limits.  When the commercial entity refuses to comply, the AFDCB recommends to the regional command authority to place the business off-limits for all Service members within the region (regardless of Service).

Normally concerns are raised when a business has demonstrated practices that violate state or federal statute, and remediation involves the business curtailing these illegal practices.  In the case of payday lending, businesses usually offer their services within the legal limits.  Since the AFDCB takes on businesses one at a time, bringing a payday lender under scrutiny has been difficult if the lender is complying with the same rules as its competitors.  Additionally, the magnitude of mediating with the number of outlets surrounding military installations has exacerbated the process.

State lawmakers have questioned representatives of the Department on several occasions about why DoD does not make payday lenders off-limits.  Without appropriate guidelines, commanders and AFDCBs have difficulty citing payday lenders as needing to take remedial action.  In states that authorize payday lending, AFDCBs must establish their own local guidelines in addition to the provisions of state law, ensure all affected businesses are aware of these new guidelines, and then monitor whether these businesses comply when dealing with military personnel.  The Department may appear to become a financial regulatory agency for entities outside the military installation, establishing policy, monitoring this policy and deciding whether to place violators off limits based on this policy.

There is no legal authority for the Department of Defense to establish rules governing off-base private business dealings.  Having either state or federal statutes which protect Service member from the lending practices listed in section 3 of this report would allow commanders to consider using their AFDCB process in monitoring the actions of local

28

lenders with military personnel, in the same manner that the AFDCB is used to address other illegal activities that impact the good order and discipline of Service members.

The Commandant of the Marine Corps and the Vice Chief of Naval Operations have sent messages to commanders expressing concern about predatory lending and directing them to encourage Service members in their command to seek financial education and to request assistance for financial concerns, rather than become trapped in a potential cycle of high interest debt.  The message from the Commandant of the Marine Corps tells commanders to take firm but fair action through the AFDCB to deny access to lenders who take unfair advantage of Marines.  The message from the Vice Chief of Naval Operations also clearly states that Service members should not feel shame in discussing their financial problems or in seeking assistance.  These messages are included in Appendix 5.

These senior uniformed leaders are addressing the issue of predatory lending as well as the aspects of military culture that perpetuate Service members being reluctant to address their financial problems.  Service members should view their need for assistance not as an issue to be hidden from their peers and from their supervisors, but as an issue that can detract from the mission, which needs to be resolved to preclude reoccurrence.  They must be encouraged to use available resources without stigma.  Commanders must also consider what actions they need to take to protect their Service members from those who take unfair advantage.

The Commander of the Navy Southwest Region has established a taskforce for the region to deal with predatory lending.  Captain Mark Patton, Commanding Officer, Naval Base Point Loma, CA, and head of the taskforce, testified to the California Assembly on May 23, 2006 to express concerns about high cost lending within the Southwest Region.  His testimony is included in Appendix 5.

**b.      Strategies to Reduce the Impact of Predatory Lending**

In addition to internal efforts to decrease the availability of predatory loans, the Department strongly advocates making alternative financial resources available to assist those Service members who need this support.  Whereas there may be few alternatives for the average consumer with bad credit to obtain cash, there is a safety net available for Service members and their families outside of high interest loans.  The Military Services have the support of the Army Emergency Relief (AER), the Navy-Marine Corps Relief Society (NMCRS) and the Air Force Aid Society (AFAS) that are chartered expressly to assist Service members and their families who have financial crises.  Additionally, the banks and credit unions located on military installations have begun to provide lending products that fulfill the need for quick cash.

The survey of military installations shows that the Military Aid Societies are broadly seen as providing funding for emergency needs. In 2005, the Aid Societies provided the following support, either through no-interest loans or grants:

| Society | Number of cases | Amount of support | Average per case |
|---|---|---|---|
| AER | 43,039 | $39,473,978 | $917 |
| NMCRS | 42,934 | $35,858,780 | $835 |
| AFAS | 14,835 | $12,000,000 | $808 |
| Total/average | 100,808 | $87,332,758 | $866 |

These totals represent support provided for various reasons to include travel, rent, repair to the primary automobile, food and utilities. AER provided support for the following reasons:

| Reason for Assistance | Number of cases | Percent | Dollar amount | Percent |
|---|---|---|---|---|
| Required travel | 8,912 | 21 | $8,156,669 | 21 |
| Rent | 8,181 | 19 | $11,050,075 | 28 |
| Essential automobile | 7,548 | 18 | $9,021,569 | 23 |
| Food | 5,203 | 12 | $1,996,104 | 5 |
| Utilities | 4,755 | 11 | $1,898,261 | 5 |
| Other | 3,720 | 9 | $1,998,827 | 5 |
| Referrals | 3,177 | 7 | $2,714,496 | 7 |
| Funeral | 558 | 1 | $1,472,263 | 4 |
| Non-receipt of pay | 506 | 1 | $542,076 | 1 |
| Medical/dental | 362 | .8 | $484,062 | .7 |
| Loss of funds | 117 | .2 | $139,576 | .3 |
| Total | 43,039 | 100 | $39,473,978 | 100 |

AER has established a new program entitled "Commander's Referral Program," which allows Commanders and First Sergeants to refer soldiers who need assistance with basic living expenses as well as financial problems associated with high-interest debts, such as payday loans. The new program has provided $2.1 million in assistance through April 2006, which represents 16% of total AER assistance to Soldiers.

Since August 2001, NMCRS has tracked loans and grants provided to Service members who have needed them as a result of payday loans. The amount provided to clients has progressively increased every year in terms of the number of clients, the dollar amounts and the amount per client:

| Calendar year | Number of cases | Dollar amount | Average per case |
|---|---|---|---|
| 2002 | 697 | $275,546 | $395 |
| 2003 | 1,144 | $516,069 | $451 |
| 2004 | 1,511 | $755,423 | $499 |
| 2005 | 1,509 | $987,077 | $654 |
| Total/average | 4,861 | $2,534,115 | $521 |

The Federal Deposit Insurance Corporation held a conference on September 29, 2005 entitled "Meeting the Needs: Affordable, Responsible Short-Term Lending," in an effort to develop an understanding of why there is a lack of affordable credit in the marketplace and highlighting alternative loan programs that can be used to meet this need.  Speakers included academics, bankers and representatives from public interest organizations.  The program included a panel discussion on the special credit problems and needs of military personnel, which featured a description of availability of payday lending around military installations, a description of programs considered as alternatives for the military, and an example of a bank which provides alternatives for Service members with financial problems.[31]

The banks and credit unions located on military installations are encouraged to provide small loans at reasonable fees and interest charges, often with a requirement that borrowers who use the small loan also must obtain additional financial education.  The June 2005 Annie E. Casey Foundation report, "Low-Cost Payday Loans: Opportunities and Obstacles" states that:[32]

> "Depository institutions have the tools and infrastructure that they could deploy to offer their customers low-cost alternatives to payday loans. Whether they are willing to enter this market remains to be seen.  Perceptions of high operational costs and credit losses appear to be exaggerated based on the limited experience of institutions that have successfully offered payday loan alternatives to date.  Perceptions of regulatory hostility also appear to be unfounded.  Our interviews with regulators indicated unanimous agreement that development by depository institutions of their own low-cost payday loan alternatives would be positive from a public policy standpoint and likely warrant CRA [Community Redevelopment Act] credit."

In fact, the survey of military installations yielded a variety of alternative programs.  The following are examples of alternative programs designed to assist Service members who need small short term loans:

(1).  1st Advantage Federal Credit Union (Fort Eustis, VA) – provides loans up to $500 at 17.95% APR for up to 31 days, with 5% of the loan deposited in a savings account.

---

[31] Information on the conference may be found at http://www.fdic.gov/news/conferences/affordable/.
[32] Shiela Bair, "Low-Cost Payday Loans:  Opportunities and Obstacles," A report by the Isenber School of Management, University of Massachusetts at Amherst, prepared for the Annie E. Casey Foundation, June 2005, page 38.

(2). Arkansas Federal Credit Union (Little Rock AFB, AR) provides signature loans starting at $100, with a minimum payback of $35 per month and APR as low as 11.5%.

(3). Armed Forces Bank (Fort Rucker AL; Yuma MCAS, Fort Huachuca, and Luke AFB, AZ;  NAS San Diego, NAS North Island, Fort Irwin, Travis AFB, Vandenberg AFB, and Edwards AFB, CA; Fort Carson, CO; MacDill AFB and NAS Pensacola, FL; Moody AFB, GA; NTC Great Lakes, IL; Fort Leavenworth and Fort Riley, KS; Fort Knox, KY; Fort Leonard Wood, MO; Grand Forks AFB, ND; McGuire AFB, NJ; Nellis AFB, NV; Fort Bliss, TX; Fort Myer and NS Norfolk, VA; Fairchild AFB, McChord AFB and Fort Lewis, WA) – provides "Workout Loans," limited to the borrower's gross monthly pay, at 18% APR and up to 24 months to repay.  Loan decisions are not based on the borrower's credit score and provide an opportunity to rebuild credit.

(4). Coasthills Federal Credit Union (Vandenberg AFB, CA) provides signature loans starting at $250 with up to 36 months to repay at 15.95% APR, with monthly minimum repayment of $25 per month.

(5). Credit Union West (Luke AFB, AZ) – provides a "Payday Assistance Loan" with a line of credit up to $500 at 18% APR, payable in one to four paydays.  In addition, the borrower is referred to financial counseling and must open a savings account.

(6). Dayton Credit Union (Wright Patterson AFB, OH) – provides "Salary Advance Loan" line of credit up to $500 at 18% APR, with an annual fee of $35.

(7). Eglin Federal Credit Union (Eglin AFB, FL) – provides loans up to $500 at 16.9% APR, with 90 day repayment period and minimum semi-monthly payments of $50.

(8). Eisenhower Bank (Fort Sam Houston, Fort Hood, Randolph AFB, Lackland AFB and Goodfellow AFB, TX) – provides a first loan program for first term Service members, up to $1,200 at 16% APR.

(9). First Citizens Bank (Fort Bragg, Pope AFB, Camp Lejeune and Cherry Point MAS, NC) – provides signature loans $700 - $1,000 at 16% APR, with a 12 month repayment period.  There is a $25 fee for loans that close.

(10). First National Bank of Midwest City (Tinker AFB, OK) – provides consolidation loans up to $5,000 at 16% APR, with a mandatory savings element and monthly budget coaching.

32

(11). Fort Belvoir Federal Credit Union (Fort Belvoir, VA) – provides installment loans up to $500 and provides up to three months to repay with an 16% - 18% APR (approximately $14.86 for $500 at 18% APR).

(12). Fort Bragg Federal Credit Union (Fort Bragg, NC) – provides installment loans as small as $300 up to a maximum of 14% APR.  Requires minimum $20 per month payment towards principal and interest.  Fort Bragg FCU also provides the "Asset Recovery Kit (ARK)," which are loans of $50 to $500 (or 80 percent of the applicants pay) for a flat fee of $6.  Loans are for two weeks and include financial education/counseling.

(13). Fort Hood National Bank (Fort Hood, TX) – provides "Flash Cash" signature loans from $50 to $500 with repayment terms from 4 to 12 months. Loans are subject to credit approval.

(14). Fort Sill Federal Credit Union (Fort Sill, OK) – provides a tiered rate loan offered to members with little or no credit and/or some credit problems.  Loans are for up to $500 at a maximum rate of 18% APR, with up to 6 months to pay.

(15). First Light Federal Credit Union (Fort Bliss, TX) – provides the "Pawnshop Buster Loan" of up to $500 at 18% APR,  to be paid back in 4 months, at which time it can be converted into a line of credit.

(16). Global Credit Union (Fairchild AFB, WA) – provides installment loans up to $700 loan for a $5 flat fee.

(17). Keesler Federal Credit Union (Keesler AFB, MS) – provides a credit card service to first-term Service members with minimal or no credit, through the "First-Term Airman Pilot Program."  Card has a $750 limit, with comparable interest rates to other VISA/Mastercards.

(18). Langley Federal Credit Union (Langley AFB, VA) – provides emergency loans up to $500, called Quick Cash,  at 18% APR, or a little over $3.00 for a $500 loan for two weeks.

(19). Miramar Credit Union (NAS Miramar, CA) – provides signature loans (13.5% APR) and signature lines of credit (13% APR), starting with a $300 limit.

(20). Navy Federal Credit Union – provides a line of credit from $500 to $15,000 credit limit at 12.5% APR.  Requires monthly payment of 2% of the principal balance or $20, whichever is greater.

(21). Pacific Marine Credit Union (Camp Pendleton and MCRD San Diego) –
provides a "Ready Cash" line of credit at 24% APR, $50 minimum monthly
payment for borrowers with no credit or a credit score between 525 and 619.

(22). Pentagon Federal Credit Union (Fort Bragg, NC; Fort Hood, TX) – provides the
"Asset Recovery Kit (ARK)," which are loans of $50 to $500 (or 80 percent of
the applicants pay) for a flat fee of $6.  Loans are for two weeks and include
financial education/counseling.

(23). Travis Credit Union (Travis AFB, CA) – provides signature loans starting at
$500 with repayment up to 48 months with an APR between 15.25% and
17.75%.

(24).Windward Credit Union (Marine Corps Base Hawaii, HI) – provides loans of less
than $2,000 for six months at interest rates between 10.9% and 12.9%.  Credit
report is used to determine the applicant's ability to repay, and those with debt to
income ratio of more than 55% receive additional attention.

In addition to these specific loan products, many banks and credit unions offer other
alternatives to high cost borrowing.  These include, among others: traditional overdraft
programs (discussed in next paragraphs), low interest rate credit cards (secured and
unsecured), signature lines of credit, small signature loans, and most importantly, savings
programs to build family wealth.

The Annie E. Casey Foundation report goes on to say a "more substantial impediment to
banks and credit unions entering this market is the proliferation of fee-based bounce[d]
[check] protection."[33]  Obtaining higher fees through these services may drive some
financial institutions to view small dollar credit alternatives not to be in their best interest.

Overdraft protection has inadvertently become a source of short term lending for some
consumers.  Traditionally, bank customers have contracted to cover overdrafts through
line of credit loans, or transfer from a linked savings account or to a credit card.  Recently
banks have adopted "courtesy" overdraft programs and cover ATM withdrawals, point of
sale purchases with debit cards, and checks drawn on insufficient funds while charging
the bank's overdraft fee.  Consumers do not receive Truth in Lending Act cost of credit
disclosures for these non-contractual loan products.  Overdrafts and fees are repaid from
the accountholder's next deposit into the account.  Although overdraft protection was not
intended to be used as loans, individuals who frequently use them can be liable for fees
that represent high interest rates, depending on the size of the overdraft, the fee, and the
time to repay.

---

[33] Ibid

34

The Center for Responsible Lending Issue Paper on overdraft protection shows that 16% of the individuals surveyed accounted for 71% of the fees collected by financial institutions.  Additionally, they found that individuals who use overdraft protection provided through a line of credit or automatic funds transfer from another account were far less vulnerable.  For example, the average "courtesy" overdraft charge in their survey was $26.90, which produces an APR of 877% for $80 overdraft paid for in two weeks.  Comparatively, a traditional line of credit with an interest rate of even 19% APR would cost $0.58 for an $80 overdraft, paid for in two weeks.[34]

Most military banks and credit unions offer overdraft protection through a line of credit or credit card connected to the account, or through an automatic funds transfer from savings.  A survey of the websites of the 283 Armed Forces Financial Network (AFFN) members, which provide financial services to Service members on or near military installations, shows that 58% advertise line of credit and transfer from savings as the primary form of overdraft protection for checking accounts.  Of the remaining members, 10% advertise courtesy (fee based) overdraft as the primary form of protection, 6% did not have an available website and 26% do not indicate the form of their overdraft protection.[35]

Some financial institutions on military installations use their overdraft programs as a way of identifying Service members who need assistance.  For example, Eisenhower Bank (Fort Sam Houston, Fort Hood, Randolph AFB, Lackland AFB, and Goodfellow AFB, TX) provides a program called "Second Chance/Overdraft Workout Program," which notifies bank customers who have multiple overdrafts and offers them an opportunity to move the indebtedness to a "savings account" where they can pay it off within 90 days without incurring fees or interest charges.   Thirty percent of these customers choose to keep an automatic transfer of funds to the savings account after the indebtedness has been paid, establishing an emergency fund.

Alternative sources of financial relief do require Service members to bring their financial problems into the light; whereas their underlying financial concerns can remain undetected when borrowing from payday lenders, title loan companies and military installment lenders.  The Department provides financial education to Service members so they can maintain their finances as part of their personal readiness.  When Service members develop financial problems, the Department would rather know about these issues (sooner than later) so that Service members can be assisted and provided whatever remedial education and counseling is needed.  As the Vice Chief of Naval Operations stated in his message, Service members should not feel shame for having created a financial bind.  What is seen as more reprehensible is having Service members continue to service and increase debts without changing the core behavior that created it.  In these

---

[34] Lisa James and Peter Smith, "Overdraft Loans:  Survey Finds Growing Problem for Consumers," Center for Responsible Lending, Issue Paper No. 13, April 24, 2006, page 4
[35] Armed Forces Financial Network, Participating Financial Institutions, http://www.affn.org/financial_insts.php

situations, Service members begin to lose their mission effectiveness, their security clearances and their career status.

Consequently, the Department also views credit counseling and debt management (when accomplished through agencies without excessive fees) as part of the alternatives to high interest debt.   Military installations provide credit counseling as part of their family support programs.  Several installations recognized Consumer Credit Counseling Agencies in the survey as providing viable alternatives for Service members to consider restructuring of their debt and developing budgets that can reduce their monthly cash outflow.  DoD resources, such as the Military OneSource toll free number and website, provide 24 – 7 access to credit counseling to afford Service members an opportunity to discuss options to alleviate their financial burdens instead deepening their burden with high cost loans.  Counseling sessions with Military OneSource are confidential and allow the Service member to obtain credible assistance without embarrassment or career concerns.  Partner organizations in the Financial Readiness Campaign have provided their resources to assist Service members in breaking their cycle of debt.  The InCharge Institute provides free credit counseling via a toll free number and offers debt management with a minimal contribution from the military client (the contribution is voluntary and the service will be provided without a contribution).

36

## 6.  Effect of Predatory Lending on Service Members and Their Families

The prevalence of predatory lenders, along with the actions taken within the Department of Defense provide context for the effect of these lending practices on Service members and their families.  The Department measures the self-assessed abilities of Service members to maintain their finances through a question posed as follows:  "In the past 12 months, did any of the following happen to you (and your spouse)?"  The chart below shows the results for Service members of all the Services, with the bars representing the percentage of respondents answering yes to choices a. through g. listed beside the chart.



**Survey of Active Duty Service Members**

Percent answering yes

a. Bounced two or more checks

b. Failed to make a monthly/ minimum on your credit card, AAFES, NEXCOM account, or Military Star Card account

c. Fell behind in paying your rent or mortgage

d. Was pressured to pay bills by stores, creditors or bill collectors

e. Had your telephone, cable or Internet shut off

f. Had your water, heat or electricity shut off

g. Had a car, household appliance, or furniture repossessed

Source:  Defense Manpower Data Center Active Duty Survey.

As can be seen in the above bar chart, Service members have progressively improved their ability to manage their finances (the margin of error on these results are ± 2 for 2003 and ± 1 for the subsequent three years).  There is significant decrease in all categories which have over 4 percent affirmative response.  This shift can be attributed to several factors, to include pay increases, financial education and command attention.

The Department reviews survey data on abilities of Service members in the first four enlisted ranks to ensure the individuals with the least income and least financial experience are able to cope with their financial responsibilities.  The responses of E1 – E4s on the survey question shown above are as follows:

### Survey of E1-E4 Service Members



Percent responding yes

□ 2003   ■ 2004   ■ 2005   ■ 2006

Source: Defense Manpower Data Center Active Duty Survey.

a. Bounced two or more checks

b. Failed to make a monthly/ minimum on your credit card, AAFES, NEXCOM account, or Military Star Card account

c. Fell behind in paying your rent or mortgage

d. Was pressured to pay bills by stores, creditors or bill collectors

e. Had your telephone, cable or Internet shut off

f. Had your water, heat or electricity shut off

g. Had a car, household appliance, or furniture repossessed

As discussed in section 3, the self reported information concerning the use of predatory loans is significantly lower for payday loans than information extrapolated from industry derived data or from other survey efforts.  However, the DMDC data is useful to show trends over time in the reported use of predatory loans.  The review of high cost lending practices considered as predatory in 2004 shows a similar downward trend between August 2004 and March 2006.  Overall, the number of respondents using these products dropped from 12 percent in 2004, to 10 percent in 2006, with a maximum margin of error of ± 1 percent.   A review of overall responses and the E1 – E4 responses is as follows:

### Survey of All Service Members and E1 – E4 Service Members



Percent responding yes to one or more answers

□ 2004 All   ■ 2006 All   ■ 2004 E1-E4   ■ 2006 E1-E4

a. Payday loans

b. Rent-to-buy

c. Automobile title pawn

d. Tax refund anticipation loan

Source:  Defense Manpower Data Center Active Duty Survey.

38

It is possible to assume that Service members would need fewer high cost loans if they are doing better at paying bills on time.  It is also possible that the factors responsible for improving their ability to maintain their financial responsibilities has also led to a decrease in the dependence of these forms of loans.

Continued emphasis from military leadership, and on-going efforts to raise awareness and understanding have provided some improvement to Service members' ability to control their finances.  However, case-studies collected as part of information requested from military installations, and also provided by the Navy-Marine Corps Relief Society, show that high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career.

Regardless of the efforts of the Military Services to educate Service members and provide them effective alternatives, problems associated with poor financial management will be a source of considerable collateral damage unless Service members select more positive interventions to relieve their financial burdens.  For example, a recent study within the Navy showed that the number of security revocations and denials for financial reasons has increased from 212 in fiscal year (FY) 2002, to 1,999 in FY 2005 (representing 80 percent of all revocations and denials for that year).[36]

As part of the installation-level review of education, actions to reduce the prevalence of predatory lenders, and alternatives to high cost products, anonymous case-studies were collected, designed to obtain information on the impact of predatory loans.  Financial counselors and legal assistance attorneys from the installation were requested to complete worksheets to help articulate situations where they assisted Service members with the aftermath of being trapped in high interest loans.  A total of 3,393 case studies were collected.  A few of the case studies are as follows:

a.  Active duty Air Force E-4, assigned to Maxwell AFB, AL.  She was behind in her car and rent payments and quickly needed some cash.  Since she had bad credit, she felt a payday loan was a good choice.  She originally obtained on $500 loan with an agreement to pay back $600 in two weeks.  Unable to repay, she then took out other payday loans and was forced to do multiple rollovers on each one.  To pay off these loans she contacted an installment loan company who provided her with a $10,000 loan at 50 percent APR.  Total cost to pay off the payday loans was $12,750 and her total obligation to the installment loan company was $15,000.  Her financial problems were a contributing factor to her pending divorce.

---

[36] Department of the Navy Central Adjudication Facility

b.  Active duty Air Force E-5, assigned to Maxwell AFB, AL.  A pattern of over-spending drew him to take out a title loan.  He used his wife's car as collateral.  For a few months all he could pay was the fee to keep the account current, without paying any of the principal.  When he missed two months of payments, the car was repossessed in the middle of the night.  After the repossession, the title loan store reported that he still owed them $1,000.  With this balance, as well as other credit obligations, the member decided to file for bankruptcy.  In addition his financial difficulties resulted in him receiving disciplinary action.

c.  Active duty Air Force E-4, assigned to Scott AFB, IL.  She had payday loans over seven months with two lenders, totaling $900 owed in principal, with $200 in fees each month to rollover the loans.  At the time she went to financial counseling she had spent $1,875 carrying the loans.  In addition, she had a military installment loan for $7,000 and an additional loan for $13,000.  The interest rate on the military installment loan was 61 percent, and the loan agency would not provide any accommodations to allow her to extend her repayments.

d.  Active duty Air Force E-4, assigned to Robins AFB, GA, single parent.  Service member was short $400 and borrowed from a payday lender.  She could not pay back the loan and went to a second payday lender in order to pay off the first payday loan.  This process was repeated five times until she realized she was paying $1,200 per month to maintain the loans.  By the time she sought help she had paid $3,000 on the $400 loan.  She had to declare bankruptcy to financially survive.

e.  Active duty Air Force E-4, assigned to Columbus AFB, MS.  He obtained a payday loan for $300 that he paid for over 18 months at a cost of $2,700 involving 3 payday lenders.  He could not escape the cycle of debt and eventually filed for bankruptcy.

f.  Active duty Navy E-5 (21 years old), assigned to the Navy Mid-Atlantic Region, and married with three children.  He began using payday loans in March 2004 with 3 payday loans to take his family to visit his grandfather across country who was diagnosed with cancer.  By October 2005, he had 4 payday loans, totaling $2,300 and costing him $600 every month in rollover fees.  To cover all of this plus the bounced checks that the heavy debt load caused, he borrowed from his thrift savings plan account and obtained loans from three military installment lenders.  He also routinely paid late charges for rent and car payments.

g.  Active duty Navy E-6, assigned to the Navy Mid-Atlantic Region, married.  He had taken out a payday loan to pay for his wife's trip to Japan to visit her ill father.  He had taken out another loan to pay off the first and began to take more to cover the initial obligation.  Eventually he had taken out 10 payday loans.  He used his Selective Re-enlistment Bonus to pay off the lenders, and refinanced his house to pay off other outstanding debts.

40

h.  Active duty married Navy E-5, assigned to Navy Southwest Region.  He and his wife had 9 payday loans and one installment loan outstanding at the time they approached the Navy-Marine Corps Relief Society (NMCRS) for assistance to pay the $7,561 they owed ($2,156 in finance charges and $5, 405 in principal).  In addition, they were regularly using the courtesy overdraft protection provided by their credit union at $25 per returned check.

i.  Active duty Navy E-5, assigned to Navy Mid-South Region, and a single mother with two children.  She obtained a consolidation loan from an installment lender to cover $1,020 in bills at a total commitment of $2,708.  She was operating at a $145 deficit at the end of each month attempting to pay off the loan.  With the assistance of NMCRS, she was able to pay off the loan.

j.  Active duty Navy E-5, assigned to the Navy Mid-Atlantic Region, Norfolk, VA.  He requested assistance from NMCRS for four payday loans (total principal owed of $1,738) in conjunction with requesting assistance to repair his car ($1,886).  The Service member was married only four months at the time and was supporting two households because his new wife lived in another state with her disabled father.  NMCRS provided a no interest loan to cover both debts.

k.  Active duty Marine E-2, assigned to Camp Pendleton, CA, married.  He and his wife had accrued 10 payday loans (total of $2,390 in principal owed) with a monthly finance charge of $422.  He eventually went to NMCRS to obtain a no interest loan to pay off the continuing debt.

l.  Active duty married Marine E-4, assigned to Marine Corps Region, Midwest.  When his wife could no longer work because of a problem pregnancy, he took out a payday loan to make up the difference in the family budget.  He did not tell his command of his problem until he had taken 9 payday loans ($4,527 in principal owed), overdrew two bank accounts ($1,344) and missed a car payment of $307.  NMCRS provided him a no-interest loan payable over 24 months to allow for affordable monthly payments of $258.

m.  Active duty single Marine E-2, assigned to Marine Corps Southwest Region, CA. After 5 months at his first duty station he had accrued $8,609 in debt, with 8 payday loans ($3,123 in principal owed), 2 military installment loans ($1,735), a cell phone bill of $1,020 a bank overdraft of $340, car repairs of $335 and impound fees of $2,056.  His car repair, impound fees, car rental fees and other expenses had driven him to take payday loans to cover his obligations.  The payday loans had sent him into a spiral of debt.  NMCRS provided him with a no interest loan for 36 months to allow him time to payback his debts.

n. Active duty Army E-7, assigned to Fort Jackson, SC.  He had two payday loans ($1,862), a car loan ($37,550) and two military installment loans ($15,400). With the significant debt load from his car payment and his installment loans, the additional requirement of paying off two payday loans was more than his budget could withstand.  Prior to paying off these loans, he was harassed and threatened by debt collectors, closed his bank account, was sued and had the unit intervene in collecting on his debts.

o. Active duty married Army O-3, assigned to Miami, FL.  Captain had loans from four military installment lenders (total of $15,465) with interest rates ranging from 14 percent to 26 percent.  Additionally he had payday loans from four lenders for approximately 24 months.  His indebtedness impacted his family and he was pending disciplinary action from his unit when the case was reported.

p. Active duty Army E-6, assigned to Fort Jackson, SC.  He had three installment loans for $2,660 and $1,000 owed to a rent-to-own company.  As a result of his loans, he closed his bank account, was threatened that his wages would be garnished, had his unit involved in the collection action and received disciplinary action from his unit.

r. Active duty Army E-1, assigned to Fort Irwin, CA.  As an E-1, he received a car loan for $42,000 at 24.1 percent APR.  In addition he had an installment loan for $2,500.  As an E-1, his take home pay is approximately $2,340, and with a 60 month pay back, his monthly payment on the car loan would be $1,211 (about half his monthly pay).  After 60 payments he will have paid the equivalent of a year's salary ($30,292) in interest.

These case studies share several common factors that could be summarized as follows:

a. The majority were junior enlisted in grade.  For example, 80 percent of the Army case studies were from grades E-1 through E-4.

b. Many that were counseled had gone through multiple loans and options prior to going to seek counseling.  They had turned to payday loans, high interest installment loans and title loans as a result of a financial emergency, a history of over-extended credit, or both.

c. Many were harassed by the lender, through phone calls, threats to contact their commander or supervisor, or threatened with garnishment of pay.  The most grievous harassment noted in a case study was an active duty Air Force E-4, assigned to Pope AFB, NC, who was served a summons at his duty section.

d. Some had experienced disciplinary action as a result of their attempt to solve financial difficulties through predatory loans.  The extent of the disciplinary action went from

42

letters of reprimand and non-judicial punishment, to loss of promotions and separation from the military.

e.  The case studies did not emphasize how the loans were finally resolved, because many of them involved several overlapping loans.  The March 2006 DMDC survey provided the following insight concerning repayment of payday loans:

| Sources of funding outside of payday lending | |
|---|---|
| Aid society | 11% |
| Bank/credit union | 14% |
| Family/friends | 27% |
| Family budget | 54% |
| Additional job | 16% |
| Another loan | 13% |
| (respondents were able to chose more than one answer) | |

The sources of financial support listed above could have been available to support the initial requirement that prompted the Service member to consider a payday loan, military installment loan or car title loan.  As previously stated, borrowers seek out these options in a panic to find financial resources to fulfill their immediate needs (emergency travel, car payments, overdue bills, etc.), or to make an impulse purchase spurred by aggressive push marketing, without fully considering the financial ramifications of taking out a loan that is not predicated on their ability to repay.

Service members themselves see the value of limits placed on credit and the costs involved in obtaining it.  The June 2006 Consumer Credit Research Foundation survey of Service members gave the following responses concerning the availability of credit when asked in the following sequence whether they strongly agreed, agreed somewhat, disagreed somewhat or strongly disagreed with the following statements:[37]

---

[37] Dr. William O. Brown, Jr., and Dr. Charles B. Cushman, Jr., "*Payday Loan Attitudes and Usage Among Enlisted Military Personnel*," Consumer Credit Research Foundation, June 27, 2006, pp. 10 – 11.

| Statement | Responses | % of non-payday borrowers surveyed | % of payday borrowers surveyed |
|---|---|---|---|
| "Most people benefit from the use of credit" | **Net agree** | **72%** | **78%** |
| | Strongly agree | 30% | 32% |
| | Agree somewhat | 42% | 46% |
| | **Net disagree** | **29%** | **23%** |
| | Disagree somewhat | 17% | 14% |
| | Strongly disagree | 12% | 9% |
| "The government should limit the interest rates that lenders can charge even if it means fewer people will be able to get credit" | **Net agree** | **75%** | **74%** |
| | Strongly agree | 42% | 40% |
| | Agree somewhat | 33% | 34% |
| | **Net disagree** | **25%** | **26%** |
| | Disagree somewhat | 20% | 18% |
| | Strongly disagree | 5% | 8% |
| "There is too much credit available today" | **Net agree** | **75%** | **63%** |
| | Strongly agree | 51% | 37% |
| | Agree somewhat | 24% | 26% |
| | **Net disagree** | **25%** | **37%** |
| | Disagree somewhat | 18% | 21% |
| | Strongly disagree | 7% | 16% |

The lender only considers the borrowers' income and presumes that their loans will be paid prior to other requirements.  The use of checks, access to bank accounts, mandatory allotments and car titles pressure the borrower to consider loan payments as being their top priority.  The harassment received by borrowers through debt collection activities reminds them of this impending obligation.

44

7.  **Need for Federal and State Legislative and Statutory Protections**

The data and information from the previous chapters of this report clearly indicate that:

(1).  As the Graves-Peterson study of predatory lending around military bases showed, predatory loan practices and unsafe credit products are prevalent and targeted at military personnel through proximity and concentration around military installations, through the use of affinity marketing, through easy online access to military personnel around the globe, and through use of military allotment payment arrangements.

(2).  Predatory loans to Service members come with extremely high interest rates and often include extra fees and charges not disclosed in APR calculations.  Due to unaffordable payment terms and the lack of an ability to repay these loans, borrowers find themselves trapped in repeat transactions and susceptible to coercive collection tactics designed to take their assets pledged for loans or harm their good service ratings in the military.

(3).  Although the Department of Defense provides extensive financial training, a significant number of Service members, especially in the lower ranks of enlisted personnel, still fall victim to easy credit widely available around bases or online.  Education does not trump the marketing of these loans and the easy availability of quick cash with few questions asked.

(4).  Commanders have imperfect methods available to curtail the prevalence of predatory lending off base.  Clearer standards for placing lenders off-limits can be used by Armed Forces Disciplinary Control Boards (AFDCBs) to restrict access to individual lenders, but AFDCBs will not supplant the role of state and federal credit regulators, consumer protection requirements, or private remedies for borrowers.

(5).  Appropriate alternatives to high cost loans are available for Service members while charities provide additional assistance.  Banks and credit unions on-base and near bases offer numerous better alternatives to Service members.

(6).  Loans at 400% and up that are secured by personal checks written without funds on deposit, or that cost 300% APR with payment in full due in one month and secured by a vehicle title, or involve larger installment loans repaid by required military allotments, and other forms of harmful lending undermine troop readiness, morale, and quality of life.  Financial issues account for 80 percent of security clearance revocations and denials for Navy personnel.

45

(7).   Because most predatory lenders require borrowers to waive their rights to go to court to resolve disputes and instead submit borrowers to private adjudication through mandatory arbitration, Service members need to have recourse to administrative remedies through state credit regulators and to judicial remedies through the courts for redress.  Due to state credit law provisions on residency in many states, state regulators do not license lenders that claim to lend only to non-resident personnel stationed there and do not supervise these lenders or enforce state laws.

## a.  Need for Federal and State assistance

The Department of Defense cannot prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies.  Although the Department can assist with enforcing stronger laws and regulations through its disciplinary process and can educate Service members on their rights and recourse, statutory protections are necessary to protect Service members from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit costs and terms.  Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles.  All costs involved in borrowing should be included in interest rate calculations and disclosures.  Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states.

It is clear that the payday lending business model is based on the repeat collection of high loan fees from one borrower in successive transactions, without the extension of new principal.  The industry has a vested interest in legislation and regulations that allow the high fees and repeat borrowing cycle to continue.  As states work to balance the need for short-term credit with effective borrower protections, regulation of the payday lending industry presents a daunting challenge.

In 2004, The Department called on the states to support 10 key issues that would improve the quality of life for Service members and their families.  One of the ten issues requested that states enforce their usury laws to prohibit predatory payday lending.  To date, eleven states have met that standard by preventing triple-digit interest rates for payday loans including the States of Connecticut, Georgia, Maine, Maryland, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, Vermont, and West Virginia.  These states have been successful in maintaining strong usury laws and aggressively enforcing those laws.  Despite Arkansas's low constitutional usury cap, the state has permitted payday lenders to charge triple-digit interest rates, including to airmen stationed at Little Rock.

46

For example, the State of Georgia recently enacted a tough anti-payday loan law to close loopholes and strengthen penalties against lenders that exceed the state's 60% usury cap. The presence and testimony by Navy personnel before the Georgia State Legislature sparked its passage.  In North Carolina, state legislators refused to reauthorize its payday lending law following the 2001sunset of its original authorization.  Following the sunset, payday lenders tried to circumvent North Carolina's 36 percent APR small loan usury cap with the "rent a bank" model, i.e. affiliating with an out of state bank.  In December 2005, the North Carolina Commissioner of Banks ruled that Advance America was making illegal loans under this model, and ordered them to cease and desist.  Several months later, the State Attorney General reached consent agreements with the three payday chains still operating in the state, forcing them to also stop their payday lending in North Carolina.

In the other thirty-nine states, a variety of laws have been enacted to authorize loans based on checks drawn on insufficient funds and costing over 300 percent APR.  Many of these States that have legalized payday lending have included in their authorization statutes a variety of provisions purporting to lessen the harm of repeat borrowing that result from the design of these loans.  These provisions include mandatory databases, cooling off periods, attempts to stop rollovers and back-to-back transactions, and attempts to stop borrowing from multiple lenders.  Even with the addition of all these "consumer bells and whistles," these laws do not stop the debt trap.

For example, when some states banned "rollovers," meaning the borrower could extend the loan for another fee without paying it back, payday lenders attempted to circumvent this reform by offering back-to-back transactions. The borrower paid off the loan and immediately opened a new one for the same amount. This had the same detrimental effect on the borrower, and also allowed the payday lender to call the transaction a "new" loan, even though they were handing back the same amount of money. Even when the transactions are separated by a couple of days or a week, the borrower is still caught in the cycle of debt. If they were using these loans as an occasional boost to get to the next payday, they would have only a few loans a year, with weeks or months between.

As another example, the State of Florida limits borrowers to one loan at a time from all lenders, enforced by a data reporting system licensees must use.  Other states using databases include the States of Illinois, Oklahoma, North Dakota, and Michigan (in the near future).  Unfortunately these attempts have been unsuccessful; even with loan restrictions and enforcement tools, the average borrower in Florida takes out eight loans per year and the average borrower in Oklahoma takes out nine payday loans per year.

Some state payday loan laws include limits intended to prevent repeat borrowing but are easily circumvented.  For example, the recent Illinois payday loan law is widely touted by the payday loan trade association as a model of protections.  It permits total loans up to $1,000 or 25 percent of gross monthly income, caps rates at over 400 percent APR for

two-week loans, permits borrowers to have two loans at the same time, imposes a seven-day recovery period after borrowers have used loans for 45 days, and provides for an extended repayment plan only after repeat use of these loans.  Loan restrictions are monitored through a central database.  Illinois officials report that payday lenders are evading these limitations by getting another form of state license and making loans at similar rates for longer periods of time.

The State of Oregon recently enacted a law to cap payday loan rates at 36 percent interest and a fee of $10 per $100 borrowed with a minimum 31-day repayment period.  Similar limits were contained in a proposed referendum where advance polling showed 72 percent of the populace supported the protections in the Oregon ballot proposal. Although the new law will not take effect until mid-2007, payday lenders are already switching to a lender's license that does not cap rates or put any limits on repeat borrowing in order to avoid these restrictions.

**b.  State Legislative Recommendations**

The most effective state protections combine strict usury limits and vigorous enforcement.  The failure of numerous states to enforce their small loan laws and regulations with predatory lenders who target both resident and non-resident military personnel leaves these borrowers unprotected from loans with high rates and packed with extra fees and insurance premiums.  Effective state legislative and regulatory assistance that provides access to responsible and affordable credit that improves Service members' lives is needed.

**c.  Congressional Legislative Recommendations**

Effective Congressional legislation is also needed.  The following Congressional legislation has been introduced during this session, which has the potential to protect Service members and their families from predatory lenders:

(1).  Amendment to S. 2766, the Defense Authorization Bill of 2007.  This amendment was offered by Senators Talent (R-Mo) and Nelson (D-Florida) and passed the Senate unanimously on June 22, 2006.  It would cap interest rates for loans to Service members and their dependents at no more than 36 percent APR including all fees for credit related services EXCEPT bona fide credit insurance. If a state has a lower rate cap, that would apply.  This amendment is nearly identical to H.R. 97 listed below.

(2).  H.R. 97, introduced by Representative Graves (R-Mo), would place a 36 percent APR limit on loans made to Service members and restrict automatic renewal, refinancing, repaying or consolidation of loans using the proceeds of other loans.  The rate cap does not include the cost of ancillary products sold

with the loan or provide a private right of action to make the protections enforceable.

(3).    S. 1878, introduced by Senator Akaka (D-HI), and H.R. 5350, introduced by Representative Udall (D-NM), would prohibit loans secured through the use of checks, share drafts, or electronic access to bank accounts for all borrowers.  In addition, the bills prohibit depository institutions from directly or indirectly making payday loans.  Rep. Udall's bill also calls on the Federal Reserve Board to study better cost disclosure rules under Truth in Lending.

(4).    H.R. 458, introduced by Representative Davis (R-KY), contains a Title II that provides some limitations for a subclass of lenders termed "military lenders" (defined as either explicitly marketing to Service members or having more than 10 percent of customers in the military) and primarily targets military installment loan companies.  Title II applies to collection actions, including limits on garnishment, contacting unit commanders, requiring Service members to waive their Service Members Civil Relief Act (SCRA) rights, and restrictions on using military terms to market their products.  These restrictions are currently largely addressed in statute and DOD policy.  Title II does not limit the cost of loans or prohibit the solicitation of unfunded checks or pledge of car titles to secure loans.

Provisions that only impact collection actions of lenders fail to address the terms of loans that make them harmful to Service members, such as usurious interest rates, a requirement to write checks without funds on deposit or to sign over a car title or tax refund.  Garnishments are covered by federal statute and include due process requirements and restrictions.

## 8.  Recommendations for Statutory Controls

Given the problems with predatory lending practices that Service members have faced, particularly in light of states failing to enforce their own loan laws on behalf of non-resident Service members, the Department of Defense seeks additional protections against predatory lending to Service members.  The Department of Defense takes no position on the applicability of these recommended statutory approaches to civilian borrowers and their families.  These recommendations are based on the state and federal legislation reviewed and other information explored in this report:

**a.  Require that unambiguous and uniform price disclosures be given to all Service members and family members with regard to any extension of credit (excluding mortgage lending).**

(1).  Require all fees, charges, insurance premiums and ancillary products sold with any extension of credit to be included within the definition of finance charge for the computation and disclosure of the APR for all loans made to military borrowers.

(2).  Require that the finance charge and the APR be included in all advertising to Service members including on-line websites and be quoted verbally to prospective military borrowers prior to application.

(3).  It is understood that such special military disclosures may discourage lenders and limit the availability of credit to certain Service members, but the Department believes this risk is justified given the impact of predatory loans.

**b.  Require a federal ceiling on the cost of credit to military borrowers, capping the APR to prevent any lenders from imposing usurious rates.**

(1).  Lenders should be prohibited from directly or indirectly imposing, charging, or collecting rates in excess of 36 percent APR with regard to extensions of credit made to Service members and their families. This APR must include all cost elements associated with the extension of credit, including the "optional" add-ons commonly used to evade ceilings, such as credit insurance premiums.

(2).  It is understood that such an interest rate cap may limit the availability of credit to certain Service members.  Limiting high-cost options assists the Department in making the point clear to Service members and their families that high cost loans are not fiscally prudent.  A clear, unambiguous rate ceiling is justified given the high fees, interest and other charges associated with loans to Service members reviewed in this report, and the impact of those predatory loans on military readiness and troop morale.

(2). Lenders should not interpret the 36 percent cap as a target for small loans provided to Service members; it would be a ceiling, and often a lower rate would be more appropriate to the risk of a borrower.  The passage of such a protection should not be deemed an authorization for any lender to lend at a rate not otherwise authorized by applicable state or federal law.

**c.  Prohibit lenders from extending credit to Service members and family members without due regard for the Service member's ability to repay.**

(1). Prohibit lenders from using checks, access to bank accounts and car title pawns as security for obligations.  These methods provide undue and coercive pressure on military borrowers and allow lenders more latitude in making loans without proper regard for the Service member's ability to repay.  They also place key assets at undue risk.

(2). Restrict the ability of creditors and loan companies to require or coerce Service members into establishing allotments to repay their obligations.  Allotments must be at the convenience and discretion of the military borrower and not a prerequisite for obtaining a loan.

**d.  Prohibit provisions in loan contracts that require Service members and family members to waive their rights to take legal action.**

Service members should maintain full legal recourse against unscrupulous lenders. Loan contracts to Service members should not include mandatory arbitration clauses or onerous notice provisions, and should not require the Service member to waive his or her right of recourse, such as the right to participate in a plaintiff class.  Waiver is not a matter of "choice" in take-it-or-leave-it contracts of adhesion.

**e.  Prohibit contract clauses that require Service members to waive any special legal protections afforded to them.**

These proposed protections, and those provided to Service members through the Servicemembers Civil Relief Act, were intended to strengthen our national defense by enabling Service members to devote their entire energy to the defense needs of the Nation.  In the interest of our national defense, such protections should not be subjected to waiver (other than in circumstances currently stated in the Servicemembers Civil Relief Act), in writing or otherwise.

**f.  Prohibit states from discriminating against Service members and family members stationed within their borders, and prohibit lenders from making loans**

**to Service members that violate consumer protections of the state in which their base is located.**

(1). States should be prohibited from discriminating against Service members stationed within their borders and should be required to assure that such Service members are entitled to and receive the benefit of all protections offered to citizens of the state, including regulation of lenders located in the state or that provide loans via the Internet to Service members stationed there.

(2). States have a vested interest in assuring the financial safety and stability of Service members stationed within their borders.  States should be prohibited from authorizing predatory lenders to treat "non-resident" Service members stationed within the state's borders differently than the state would permit that lender to treat in-state residents.

(3). Lenders should be prohibited from charging Service members stationed within a state an APR higher than the legal limit for residents of the state, and should also be prohibited from violating any other consumer lending protections for residents of the state in which the base is located.

There may be other alternatives that could provide protections for Service members and their families which could safeguard them from falling into a spiral of debt.  However, effective provisions cannot be predicated on the conscientiousness of the lenders to comply, or borrowers' desires to protect their rights at the time they sign contracts. Clear, effective limitations that can be verified by oversight agencies and understood by borrowers are necessary. Options that favor opt-out provisions and extensions, which may not be fully disclosed by lenders or requested by ill-informed borrowers who fail to read the fine print, are ineffective in protecting our nation's Service members from abusive loans.

Also, provisions that only impact the collection actions of lenders fail to address the inherent problems associated with predatory loans.  Among many others, these problems include: usurious interest rates, lending without regard to ability to repay, and making loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.).  Issues such as garnishments are covered in federal statute and have due process requirements and restrictions associated with their use.  The actions of a commanding officer when contacted concerning an indebtedness are already defined in DoD policy.  In both situations, circumstances are weighed (by a judge or a commander) to determine whether action is warranted.

Predatory lending to Service members is best prevented by clear enforceable limitations that can be verified by financial regulators and understood by borrowers.  Self regulation, fine print, opt-out provisions and cosmetic "protections" are not effective.

## 9. <u>Conclusion</u>

The Department takes seriously the responsibility of the individual Service member to make prudent decisions and to manage personal finances well.  Education, counseling, assistance from Aid Societies, and sound alternatives are necessary but not sufficient to protect Service members from predatory lending practices or products that are aggressively marketed to consumers in general and to military personnel directly.

Predatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force.  The report outlines the prevalence around military installations of payday lenders and the overt marketing of some installment and Internet lenders.  The products they provide are of primary concern.

The report provides an overview of the efforts within the Department to educate, inform and influence Service members and their families to take control of their finances, build wealth and escape the cycle of debt – for their own well being and to enhance their military readiness.  The Department has a strategic plan that seeks to increase savings and decrease dependence on debt.  The strategic plan also focuses on improving the protection afforded Service members and their families in the market place – again to help assure their military readiness.

Service members are in agreement that there should be limits.  Commanders have made their positions known that limits should be established.  The Department sees this as an important issue with commanders, Service members and their families, for their well being and in support of military readiness.  Service members need better protections and enforcement from Congress and state credit regulators to prevent predatory lending abuses.

**APPENDIX 1**

Division for Legal Services
Access to Justice

Defending Liberty
Pursuing Justice

AMERICAN BAR ASSOCIATION

Standing Committee on
Legal Assistance for
Military Personnel
http://www.abalegalservices.org
321 North Clark Street
Chicago, IL 60610-4714
FAX: (312) 988-5483

2005-2006
CHAIR
General Earl E. Anderson
USMC, Retired
genanderson@msn.com
(703) 255-3619

MEMBERS
Patricia E. Apy
papy@parasapyreiss.com
(732) 219-9000

CPT William E. Brown
william.brown10@us.army.mil

Lester M. H. Goo
lester.goo@heco.com
(808) 543-4797

Patricia F. Halsey-Munroe
trishhalsey-munroe@abanet.org
(510) 435-2457

Gregory M. Huckabee
ghuckabe@usd.edu
(605) 677-5536

Thomas A. Morrison
tmorrison@law.gwu.edu
(202) 994-4774

BOARD OF GOVERNORS LIAISON
Burnham H. Greeley
greeley@hodlaw.com
(808) 528-8200

DEPARTMENT OF DEFENSE LIAISON
COL Christopher M. Garcia, U.S. Army
christopher.garcia@osd.mil
(703) 697-3387

ADVISORY COMMITTEE
COL Lisa Anderson-Lloyd
U.S Army
lisa.anderson-lloyd@hqda.army.mil

Christopher Dunne
U.S. Coast Guard
cdunne@comdt.uscg.mil

Chris Rydelek
U.S. Marine Corps
rydelekcb@hqmc.usmc.mil

LtCol Ferah Ozbek
U.S. Air Force
ferah.ozbek@pentagon.af.mil

CDR Jeff Fischer
U.S. Navy
jeff.fischer@navy.mil

CAPT Tom Greene
Naval Justice School
greenetw@jag.navy.mil

Col David C. Wesley
U.S. Air Force JAG School
david.wesley@maxwell.af.mil

COL Gregory O. Block
U.S. Army JAG School
gregory.block@hqda.army.mil

DIVISION FOR LEGAL SERVICES

STAFF COUNSEL
Paul Haskins
(312) 988-5755
haskinsp@staff.abanet.org

PROGRAM MANAGER
Ann Marie O'Donnell
(312) 988-5760
odonnea@staff.abanet.org

ADMINISTRATIVE ASSISTANT
Marsha Boone
(312) 988-5786
boonem@staff.abanet.org

By UPS Express Delivery

June 1, 2006

Leslye Arsht
Deputy Undersecretary of Defense
for Miltary Community and Family Policy
5A726
4000 Defense Pentagon
Washington, D.C. 20301-4001

Dear Ms. Arsht:

On behalf of the more than 400,000 members of the American Bar Association ("ABA"), I respectfully submit this statement of the ABA's position on predatory lending practices targeting our nation's servicemembers and their families. I direct this statement to you in your capacity as Principal of the ongoing Department of Defense study of predatory lending practices, conducted pursuant to Section 579 of the Fiscal 2006 Defense Authorization Act (the "Sec. 579 Study" or "Study"). I request all appropriate consideration hereof in the findings and recommendations to be presented in your final report to Congress pursuant to Section 579.

The ABA regards the panoply of abusive lending practices that have long burdened the nation's military men and women – particularly those many lower-income members who can least afford to be financially exploited – as harmful to servicemembers and their families and bad for military morale and readiness. Lending practices that prey on our military men and women, moreover, are an affront to a national business community that by and large not only lives by fair business practices but gratefully honors those who serve. That the sharp practices of a relative few continue to ensnare our military members in usurious debt, and that specific corrective Congressional action has not yet been taken against these abusive practices, is of concern to the organized bar of this nation.

The ABA believes that the ample record adduced to date with respect to the destructive impact of these practices on our servicemembers and their families speaks powerfully to an urgent need for remedial Congressional action, not limited to so-called payday loans but extending to other unfair consumer credit practices, such as deceptive auto financing, auto title pawn practices, and abusive installment loans. Indeed, we recognize that some of these other practices may now match the payday loan scandal in terms of overall harmful economic impact on our servicemembers. The ABA commends you and your Study staff for conscientiously assessing, in the course of the Study, the effects of these additional practices on the military, and we urge you to propose corrective action in all instances where warranted.

June 1, 2006
Page 2

At the same time, we do have concerns that broadening the scope of the Study and its report beyond payday loans not have the unintended result of legislative inaction once the final Sec. 579 Study report is submitted. The ABA therefore urges that the final Sec. 579 Study report prioritize those abusive practices identified, in terms of acuity and breadth of the practice, and offer guidance as to which of the identified problems are most ripe for corrective action by Congress, taking into account the real remedial value of particular prospective Congressional measures.

With respect to predatory payday loans, the ABA applauds your Study staff for according significant weight to research on the subject, including the widely cited Graves-Peterson study, which tends to establish that predatory lenders have deliberately exploited servicemembers by clustering their offices outside the gates of military installations.

The ABA also is aware that your Study staff has gathered empirical and anecdotal information from military lawyers and counselors with first-hand knowledge of the effects of predatory credit practices on their servicemember clients. We urge the Study staff to draw on this resource in a way that preserves and underscores the personal dimension of this problem in your final report to Congress. It must not be lost on those charged with addressing these issues that the greatest harm caused by predatory lending practices is damage done to the lives and dreams of servicemembers and their families by unremitting, unjust consumer debt.

Thank you for your consideration of the position of the American Bar Association on this important issue.

Sincerely,

Earl E. Anderson, Gen., USMC (Ret.)
Chair, ABA StC on Legal
Assistance for Military Personnel

For the American Bar Association

cc:  Mr. Marcus Beauregard (via email)



# Navy-Marine Corps Relief Society

875 North Randolph Street, Suite 225 • Arlington, Virginia 22203
Tel: (703) 696- 4904 • DSN 426-4904 • Fax: (703) 696-0144
www.nmcrs.org

June 27, 2006

Ms. Leslye Arsht
Deputy Under Secretary of Defense for Military Community and Family Policy
Room 5A726
4000 Defense Pentagon
Washington, DC 20301-4000

Dear Ms. Arsht:

For the past six months, the Navy-Marine Corps Relief Society has had the privilege of joining other organizations to help prepare the report to Congress required by Section 579 of the National Defense Authorization Act for Fiscal Year 2006. This report documents the alarming growth of the predatory lending industry, illustrates why members of the Armed Forces are prime victims and makes concrete recommendations on action required to fix the problem. The downward spiral of staggering debt associated with this industry can be summarized by the statistic from the Center for Responsible Lending that estimates that 91% of all payday loans are made to borrowers with five or more payday loans per year.

Education, consisting of effective personal financial management training, and an intensive, sustained publicity campaign to alert our military families can reduce the problems resulting from this legalized loan shark industry. Education, alone, however, is not enough. Responsible and reasonable alternative sources of short term loans by banks and credit unions are required, and Federal legislation will be necessary that, at a minimum provides the following:

- Caps interest rate at 36% APR (to include all fees and insurance)
- Eliminates all loan roll-overs or the ability for individuals to take out another loan to pay off the first loan which creates a vicious cycle of debt
- Requires all payday lending businesses to belong to a PDL association that will serve as a clearing house to ensure clients don't have outstanding payday loans from other payday lenders, and allows monthly payment plans
- Regulates on-line payday loan transactions. On-line predatory lending is a relatively new phenomenon that is particularly alarming because it is often impulsive, silent and unregulated since it bypasses state laws that restrict payday lending activities

Thank you for focusing attention on this significant problem that affects military readiness and the lives of our men and women in uniform. We hope that Congress will take prompt and effective action by drafting and passing effective Federal legislation.

Sincerely,

Steve Abbot
Admiral, U. S. Navy (Ret.)
President and Chief Executive Officer

*Since 1904 … Helping nearly four million Sailors, Marines, and their Families
with more than one billion dollars in interest-free loans and grants!*

56

APPENDIX 2



Banks and Predatory Lenders:
Fort Campbell Kentucky, Tennessee



Banks and Predatory Lenders:
Fort Hood, Texas: Eastern Gate

58



**Banks and Predatory Lenders:**
**Fort Lewis and McChord AFB, Washington**





Predatory Lenders:
Duval County, Florida



**APPENDIX 3**

### Survey on Internet Payday Loan and Installment Lenders

Military borrowers who search the Internet under typical loan terms are shown lenders that cater to the military and those that make loans uniformly to any borrower.  The military loan sites use military names, display official-looking seals or action pictures of people in uniform, and tout their understanding of Power of Attorney forms and ask for Leave and Earnings Statements as the basis for making loans.  Some sites disclaim official military endorsement in the fine print.  Payday loan web sites with little connection to military themes also pop up in searches for "military payday loans."

A small sample of Internet lenders visited for this report illustrates trends in loans to military borrowers.  Searches used the terms "military payday loans," "military cash advances," and "military loans."  Eight sites that offer installment small loans to military borrowers and ten payday lenders were selected from the top of the search results, sponsored links, and from referrals by military relief societies.  Some installment lenders appeared near the top of searches for payday loans.

**Findings:**

All installment lenders with information on their location are in Nevada, a state with no rate cap for consumer loans.  Online payday lenders that listed a location were either in Costa Rica or Delaware, a state that also does not cap rates for loans.

Loan size available from installment lenders ranged from $500 to $10,000.  Payday loan sizes were as high as $1,500 or 40 percent of monthly take-home pay.  One surveyed site provides a four payday installment schedule while other lenders set single-payment loan terms of 14 to 16 days.  Installment lenders usually make loans payable in twelve months or more.

Loan sites with heavy military focus require the applicant to submit Leave and Earnings Statements, require or encourage payment by allotment, and include graphics, links, or text designed to appeal to members of the armed forces.  Most payday loan sites have little emphasis on "military" beyond pages headed "military payday loans."

Borrowers have a hard time finding out the cost of loans before submitting an application.  Cost of loans was not disclosed on installment lender sites except for a calculator at one site that permits borrowers to enter loan amounts to see finance charges that do not include insurance premiums for credit insurance.  Installment lenders did not otherwise post annual percentage rates (APRs).  All but one payday loan sites listed APR

information somewhere on the web site which ranged from 391.07% to 782.14% APR for 14-day loans.

**Payday Loan Site Notes:**

**MyCashNow, www.mycashnow.com/military.php,** visited May 15, 2006.
This Internet lender has a section for military borrowers.  Official looking seals provide links to each of the Military Aid Societies.  The finance charge for loans is $18.62 for a $100 loan due in seven to fourteen days.  The APR disclosure required by Truth in Lending Act is buried at the bottom of a page of disclosures, not on the fee page.  Loans cost "485.450 percent APR…"

**Military Financial, Inc., www.militaryfinancial.com,** visited May 15, 2006.
Payday lender for military borrowers offers loans of up to 40% of monthly take home pay to personnel at E-2 through O-6 ranks.  No credit checks are made and loans are available anywhere in the world.  Repayment can be spread over four paydays.  The site accepts a Power of Attorney.  Loan is paid through electronic debit.  There is no cost to borrow information disclosed on the site.  The FAQ answers a cost question with "The actual amount you pay will be clearly stated on your loan paperwork."  Lender claims loans are subject to Delaware law which does not cap rates.

**www.payday-today.us/loans_military_payday_loans.php,** visited May 9, 2006.
Referral site says payday lenders loan up to 40% of take-home pay and lists 391.07% APR for loans.  FAQ states:  "Do Military Payday lenders run credit checks?  No, due to the high ethical codes of military personnel and the regulations of the Uniform Code of Military Justice, Military Payday lenders will not subject military personnel to credit checks."  The site warns that "According to the Uniform Code of Military Justice article 123a, military personnel that do not meet their financial commitments may be subjected to confinement, clearance, court marshal, transfer, or even discharge."

**www.nationalpayday.com/education/payday_loans/military,** visited May 9, 2006.
This general payday loan web site has a Military page.  "No credit, bad credit?  No problem!"  Lender charges $25 to borrow $100.  A separate chart lists the annual percentage rate for varying loan amounts of $100 to $300 with the highest APR at 1303% for a seven day loan.

**www.military-loan.info,** visited May 23, 2006.
Referral site for Nevada payday lenders promises Military Loans of $100 to $500 available overnight for service members.   Big print promises "If you're serving…you're pre-approved!"  The site manager claims to be a Sergeant in the US Army Reserves.

**www.paydayloansavings.com,** visited June 6, 2006.

64

Referral site includes a military page that links to the Cash Advance Network's regular payday loan site.  There are no military specific provisions for the application or loan.

**MyPaydayLoan.com, www.mypaydayloan.com/military-payday-loans.htm,** visited May 9, 2006.
Loans are offered to active duty and retired military by a company located in Costa Rica.  Minimum required is $1,000 per month income and a checking account open at least three months.  Borrowers can click on a loan increase feature that lets them increase the loan amount and get extra cash before the next due date.  Borrowers can roll over the loan by paying the finance charge of $25 per $100 borrowed without any limit on renewals.

**Installment Loan Notes:**

The two largest installment lenders to military personnel, Omni and Pioneer, are featured in ads and on multiple web sites.  For example, MilitarySpot.com runs a banner ad at the top of its home page for Pioneer's loans of up to $10,000, available "24/7 Worldwide."  Numerous sites feature "articles" or consumer advice with links back to Pioneer.  Both companies offer linking to other web sites as affiliates, paying a fee for completed, qualifying applications that originate from "your Military-friendly site!"

**Military Funding USA, www.loansmilitary.com,** visited May 23, 2006.
Repayment is by discretionary military allotments.  Applicants are asked if they can repay the loan in 12 months and if at least 18 months remain in the tour of duty.  A Leave and Earning Statement (LES) must be faxed to apply.  The site includes links to official U.S. military websites and urges other sites to link to Loansmilitary.com to improve search standings.

**Armed Forces Loans of Nevada, Inc., www.armedforcesloans.com,** visited May 15, 2006.
"We are a leading provider of loans to active duty military personnel serving in the army, navy, marines, air force and coast guards."  All active duty military personnel are eligible.  Applicants must email their LES.  Official-looking military seals are displayed on the site.  To qualify, military personnel need only be E-2 and active duty and have at least 18 months left on enlistment.  Payment is by allotments "to avoid late fees."   The site includes this message:  "The Sailor's and Soldiers Civil Relief Act is not applicable to our customers…The relief act is waved (sic) when you accept the loan."

**US Military Lending Corp., www.usmilitarylendingcorp.com,** visited May 23, 2006.
USMLC, based in Nevada, says a portion of every dollar earned is donated to the Armed Forces Relief Trust.  The site states that it is not affiliated with the U. S. military or the U.S. government.  Loan terms are not disclosed on the site but are provided on loan documents mailed to the applicant for signature.  Payment by allotment appears to be

required.  Borrowers must send a check for first payment in case the allotment is delayed.  A LES is required with the application.

**MilitaryLoans.com,** visited May 23, 2006.

Loans up to $10,000 are direct deposited into the military borrower's bank account wherever he or she is stationed worldwide.  This Internet-only lender is part of the Omni Financial group of loan companies, based in Nevada.  The site recommends payment by allotment.  In answer to the question "What interest rates does Militaryloans.com charge?" the site does not provide information on the finance charge or APR for loans.  A leave and earnings statement is required to process a loan application and the site provides step by step instructions to email the LES from the official DFAS site.

**Pioneer Military Lending of Nevada, Inc., www.pioneermilitaryloans.com,** visited May 22, 2006.

Pioneer's Internet lender offers loans up to $10,000 only to military personnel, retirees and Department of Defense employees.  An LES is required to apply.  The site does not provide loan cost information in chart form but gives a calculator to answer questions about payment size or loan amount based on monthly payment.  For a $500 loan with a 24% interest rate and twelve monthly payments, the finance charge is $122.02 and the APR is 36.48%.  According to its FAQs, Pioneer charges an origination fee to set up and service a loan and a prepayment penalty if the loan is repaid ahead of time.  Payment is by allotment or electronic funds transfer or credit card through Western Union.  To apply for a loan, the borrower must "consent to the Lender contacting my Commanding Officer in connection with the collection of the loan made hereby at any time when it is in default and until such time as the loan has been paid in full."

**Chart Notes:**

The following charts summarize information for payday loan and installment loan websites visited.  Loan terms and cost to borrow information is that available prior to formally applying for a loan.  Where information is not available on the lender's website, the space is left blank.

66

## Company

| Payday Lender | URL | Max Loan | Max Term | Fee/$100 | APR$/100 | APR Posted | Rollover |
|---|---|---|---|---|---|---|---|
| Military Financial | www.militaryfinancial.com | 40% of monthly take home pay | 4 paydays | | depends on amount and how long | No | Yes, Automatic up to 4times |
| Military Payday Loan | www.tendollarpaydayloan.com | $ 1,000 | 17 days | $30 | 782.14% | Yes | |
| National Payday | www.nationalpayday.com | $300 first loan $600 second loan and up | 16 days | $25 | 651.79% | Yes | |
| Instantly Approved | www.instantlyapproved.com | $ 1,000 | 14 days | | 684.38% | No | Yes, not beyond 12wks from inception of loan |
| Payday Today | www.payday-today.us | 40% of pay | 14 days | $10 to $30/$100 | 391.07% | Yes | Yes |
| My Payday Loan | www.mypaydayloan.com | $300 first loan $600 second loan and up | 14 days | $25 | 651.79% | Yes | Yes |
| Payday Loans Savings | www.paydayloansavings.com | | 14 days | $30 | 782.14% | Yes | 4 times |
| Cash Advance Network | www.cashadvancenetwork.com | $ 1,000 | 17 days | $30.00 | 782.14% | Yes | 4 times |
| My Cash Now | www.mycashnow.com | $ 1,500 | 21 days | $19 | 485.45% | Yes | 3 times |
| Online Military Loans | www.military-loans.info | $ 500 | | | | No | |

## Installment Lenders

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pioneer Military Lending | www.pioneermilitarylending.com | $ 10,000 | | | Calculator gives finance charge and APR. For $500 at 24% int. $122.02 fin chg. And 36.48% APR | determined by credit history, military rank, years of service and debt-to-income ratio | Only in calculator examples |
| US Military Lending Corp | www.usmilitarylendingcorp.com | $ 3,000 | 12 months | | | ability to repay the loan | No |
| Armed Forces Loans | www.armedforcesloans.com | $ 3,000 | 12 months | | | determined by credit report, cash flow, income and credit history w/ AFL | No |
| MilitaryLoans.com | www.militaryloans.com | $ 10,000 | | | | ability to repay the loan | No |
| Military Funding USA, Inc | www.loansmilitary.com | $ 3,000 | 12 months | | | ability to repay the loan | No |
| Military Loan Company | www.militaryloancompany.com | $ 10,000 | | | | ability to repay the loan | No |
| Military Payday Loans | www.militarypaydayloan.com | $ 10,000 | | | | ability to repay the loan | No |
| Omni Military Loans | www.yesomni.com | $ 10,000 | | | | ability to repay the loan | No |

APPENDIX 4

## DoD Strategy for Personal Finance

**Goal:**  Increase personal readiness by reducing the stressors related to personal finance.

**Objectives:**
- Increase awareness and abilities

- Build wealth and reduce dependence on credit

- Increase protection against predatory practices

**Seven primary strategies:**

1. Certify Service member and supervisor **core competency.**  Through evaluation, Service members and supervisors validate that they have the abilities necessary to manage their finances and to prevent predatory activities happening on installations.

2. Provide **resources to obtain core competency.**   Web-based, traditional lecture, and interactive resources will be provided to support Service members and supervisors attaining core competencies.

3. Create **awareness of personal finance resources.**  Multimedia campaigns will work to motivate Service members to act on their core competencies and to have Service members and their spouses seek additional information to support their financial needs throughout life events.

4. Provide **financial resources to support life events** for Service members and spouses. Through web-based, toll-free numbers and installation storefront resources, Service members and their spouses will be provided access to unbiased financial information and planning assistance to support life events.

5. **Provide interventions** for Service members and families in need of assistance. Support Service members and their families with quality counseling and assistance when they encounter financial distress.

6. **Protect** Service members and their families through information, assistance, limits on predatory practices, **and support** through better financial products.

7. **Track** significant of sections 1 – 6 above.  Develop reporting processes that inform leadership on the productivity and outcome of personal finance programs to support Service members and their families throughout their military career.

**1. Certify Service member and supervisor core competency.**



1.1.  The DoD Instruction 1342.17, Personal Financial Management for Service Members, prescribes the competencies that must be achieved in the following areas:

1.1.1.  Service members must be able to demonstrate basic understanding in: pay and entitlements, banking and allotments, checkbook management, budgeting and saving (to include thrift saving plan), insurance, credit management, car buying, permanent change of station moves and information on obtaining counseling and assistance on financial matters (DoDI 1342.17, paragraph E3.1.1.1).

1.1.2.  Service member must be able to establish an extended absence financial plan prior to any deployment that exceeds 4 weeks (DoDI 1342.17, paragraph E3.1.1.2).

1.1.3.  Supervisors must have a basic understanding of policies and practices designed to protect military Service members (DoDI 1342.17, paragraph E3.1.1.3).

1.1.4.  The policy requirement to *evaluate* Service members' competency changes the training model that ensured training was received, regardless of it's impact on competency.  Demonstrating competency requires Service members to show their ability to apply the acquired knowledge.

1.2.  Evaluation will require standards of competency.  DoD will develop these standards of competency by:

1.2.1.  Obtaining assistance from Financial Readiness Campaign partner organizations to develop the basic criteria for the issues listed in paragraph 1.1.1 – 1.1.3.

1.2.2   In addition to the basic criteria, these organizations could provide valuable input to the questions needed to test the basic understanding of the

topics listed in paragraph 1.1.1. – 1.1.3.  Sufficient numbers of questions would need to be developed to ensure each test would represent a sample and not the complete list of questions.

1.2.3.  The evaluation questions would focus on scenarios to evaluate capability to apply principles established through standards of competency.

1.3.  To facilitate efficient evaluation of standards of competency, DoD will develop a web-based evaluation process.

1.3.1.  The website could include requirements for registration to facilitate tracking of pass-fails and to ensure universal application.

1.3.2.  The web-based educational tool would allow "discovery" learners to test their competence before reading and experimenting with the learning tools provided in the website.

1.3.3.  DoD will use www.militaryhomefront.dod.mil as the primary platform for the evaluation and the educational materials to support the evaluation.  Core competency for Service members would be carried in the "Troops and Families" portion of the web portal, with the supervisory requirement carried on the "Commanders" portion.

1.3.4.  The web-based approach would be available as a paper test to allow the Military Services to administer the test in a proctored environment, such as following personal financial management training, or as part of formal military training.

1.4.  From the standpoint of compliance, Service members must be informed of the provisions of the Servicemembers Civil Relief Act (SCRA) as required by 50 U.S.C., Appendix, Section 515.  Compliance with this provision is not covered as part of this strategy.  Efforts to facilitate understanding by both the Service member and businesses is covered in part 3.5.3.

**2.    Provide resources to obtain core competency.**



2.1.  Service members are anticipated to either pass or fail the competency test.  If they pass, they fulfill the initial requirements established in policy.  If they fail, then they are obligated to learn sufficient information to pass the evaluation.

2.1.1.  The website would represent the initial and primary educational tool for Service members to use to learn the core principles about personal finance to pass the evaluation, since it will be available as part of the web-based evaluation.

2.1.2.  The educational materials in the "Troops and Families" portion of the www.militaryhomefront.dod.mil website would also be open to family members without a requirement to register for the evaluation.

2.2.  In addition to the educational materials available on www.militaryhomefront.dod.mil, Service members would be able to develop their understanding through established educational programs of the Military Services. The Military Services may still wish to provide education prior to administering a test. The Service member will be required to pass the evaluation regardless of whether they have received education.

2.3.  In addition to the resources available through the website and the Military Services, interactive computer-based games would be developed to provide Service members an alternative to computer-based educational materials and traditional lecture.

**3.  Create awareness of personal finance resources.**



3.1.  DoDI 1342.17 contains the following guidance for providing supplemental information on saving, investing, home purchase and other aspects of financial planning to Service members and families in addition to the basic competencies required for Service members and supervisors:

3.1.1.  "Instructional and informational materials shall be made available to Service members that assist them with critical life stages impacting personal finance (e.g., marriage, parenthood, college, and retirement)" (DoDI 1324.17, paragraph E3.1.2.).

3.1.2.  The Military Services shall provide information on personal finances to National Guard and Reserve personnel as an integral part of mobilization training (DoD 1342.17, paragraph E3.1.3.).

3.1.3.  Programs shall be established to encourage spouses of Military Service members to participate in Personal Financial Management Programs (DoD 1342.17, paragraph E3.1.5.).

3.2.  The initial requirement to fulfill the policies listed above will be to create awareness for the need to engage in additional financial education and personal financial planning.  Through campaigns that promote the benefits of these activities, Service members and their families will be encouraged take advantage of additional personal financial services. Awareness resources will include:

3.2.1.  The Military Saves Campaign is a grass-roots approach to encouraging Service members and their families to get out of debt and to save money. Groups such as Better Opportunities for Single Soldiers (BOSS) and the Single

Marine Program have agreed to promote this campaign with young troops. Other test sites in the Army, Navy and Air Force have used a coalition of support activities to promote the campaign.  Individuals sign up on line or can call Military OneSource to become a Saver.

3.2.2   *Moneywise with Kelvin Boston* is shown on Armed Forces Network.  The program focuses on low and middle income families succeeding in their financial efforts.  Kelvin Boston has agreed to do a tour of 15 CONUS installations in 2005 – 2006.

3.2.3.  The InCharge Institute sends out 250,000 copies of its *Military Money Magazine* to CONUS and overseas installations quarterly for distribution in commissaries, exchanges, family support centers, hospitals, and direct mail to homes.  It is oriented towards the interests and needs of military spouses. InCharge also sponsors the *Military Money Minute*, which is heard on Armed Forces Radio and Television Service.

3.2.4.  The National Association of Securities Dealers (NASD) Foundation is establishing an investor education program as a result of the settlement with 1st Command Financial Services.  The program will include awareness efforts and point Service members towards a website, Military OneSource and Family Support Programs to obtain fulfillment.

3.2.5.  Efforts to currently promote Military OneSource can also be used to emphasize the resources available to help Service members and their families to get out of debt and to get on the road towards building wealth.

3.2.6.  Websites that are used by Service members and their families, such as www.military.com and www.militaryhomefront.dod.mil, can market available assistance as well as provide additional educational information.

3.2.7.  Financial fairs are being accomplished at various military installations to expose Service members and their families to resources available through federal and government agencies, nonprofit groups and Military Service resources

**4. Provide financial resources to support life events for Service members and spouses.**



4.1.  A variety of media resources will be used to support the financial information needs of Service members and their spouses.  Awareness efforts will direct potential users to these resources, which will include:

4.1.1.  Web-based resources to provide information on a wide array of life skills efforts (in addition to the basic skills covered as part of the competency requirement) would be provided on www.militaryhomefront.dod.mil with links to other excellent sources of information, such as the Federal Reserve website, Securities and Exchange Commission (SEC) website, www.mymoney.gov (which also sends literature to the requester), and the National Endowment for Financial Education (NEFE) website.

4.1.2.  The www.militaryhomefront.dod.mil, and www.military.com websites will direct individuals to the Military OneSource toll-free number for an opportunity to ask questions and find out more information concerning their topic in question.   Alternatively, these websites have email capability that refer questions to the experts at Military OneSource, or to other partner organizations under expressed agreement (such as the SEC, NEFE, InCharge Institute, and NASD Investor Education Foundation).  The Military OneSource will also send information upon request to fulfill questions on all aspects of personal finance.  Through a direct link with the Mymoney help center, information will be forwarded to Service members as a result of a single call to the Military OneSource toll-free number.

4.1.3.  Seminars and educational events that can be provided through partner organizations, such as the USDA Cooperative Research, Education and Extension Service (CREES), the Better Business Bureau and the NASD Investor

Education Foundation.  This includes seminars provided using partner furnished materials and train-the-trainer support, such as the FDIC Money Smart program.

4.2.  In addition to providing information, Service members and their families will be able to receive follow-on guidance and assistance to help them go beyond comprehension to be able to take action.  Through the efforts of awareness and educational programs, Service members and their family members are led to resources that can help them develop individual plans and actions to improve their personal finances.

> 4.2.1.  Military OneSource will be seen as the primary fulfillment for awareness programs and web-based education programs.  Military OneSource, the Storefront Financial Resource Centers, and the Family Assistance Centers will be the primary conduit for Service member and families to receive additional assistance and support.  Appointments with financial planners (pro bono or on a fee basis) will be provided through these primary resources.

> 4.2.2.  The Project for Financial Independence, sponsored by NEFE and incorporating financial planning professionals from four national societies can provide pro-bono, face-to-face financial planning assistance for Service members and their families, particularly for National Guard and Reserve members who do not have direct access to military installations to obtain assistance from Family Support Programs.  Financial planning is provided upon referral from Military OneSource or from the Family Support Center.

> 4.2.3.  The National Military Family Association (NMFA) is developing a scholarship for military spouses to obtain the educational portion of becoming certified as an Accredited Financial Counselor (AFC).  To assist spouses in completing the two-year experience requirement for the AFC, installations offer volunteer opportunities to work in personal finance.  Opportunities would include managing "Military Spouse Financial Networks" that bring together small groups of spouses to learn about personal finance, manage a Military Saves Campaign on an installation, and providing personal financial education in DoD schools and youth programs for children of military families.  After volunteering on the installation, spouses would network with banks, credit unions, credit counseling centers, hospitals (client services), and colleges (student services) to find paid positions.

**5.  Provide interventions for Service members and families in need of assistance.**



5.1.  Service members and their families who often fall into debt, require assistances with tax issues and are often victims of unscrupulous companies which take advantage of them.  To assist these Service members and families in need, awareness materials will feature where help can be obtained, and information sources will direct them to the appropriate source of assistance.

5.2.  Military OneSource, the Storefront Financial Resource Centers, and the Family Assistance Centers provide Service member and families direct counseling support or refer them to other organizations specializing in resolving financial concerns.

5.2.1.  Directly, or through a "warm handoff" from Military OneSource/Family Assistance Centers, Service members and their families can obtain quality debt management assistance through the InCharge Institute.  InCharge provides debt consolidation, assistance with family budgeting and follow-up assistance to ensure the Service member and family stay on track.

5.2.2.  The Federal Trade Commission modified a portion of their "Consumer Sentinel" website to "Military Sentinel" to allow Service members and their families to register instances of what they believe to be fraudulent or unfair business practices.  The information is shared with state, local and military justice officials so that unscrupulous businesses can be brought to court, their practices can be stopped, and consumers can be compensated.

5.2.3.  The Council of Better Business Bureaus (CBBB) has established a website: military.bbb.org to allow Service members and their families to register instances of unfair business practices.  CBBB relays instances of unfair practices to their network of local bureaus to review the situation and aid the military consumer through mediation to resolve disputes with companies.  Also as part of this initiative, CBBB is establishing local programs that will educate military

consumers on protecting themselves in the marketplace, and they are establishing ethics agreements with local vendors to ensure military consumers obtain a fair deal.

**6. Protect Service members and their families through information, assistance, limits on predatory practices and support through better financial products.**



6.1.  As already described in 5.2., the Federal Trade Commission Military Sentinel and the Council of Better Business Bureaus provide information and assistance for Service members and their families concerning predatory practices.  In addition to these organizations, the following organizations have committed to assisting Service members and their families:

6.1.1.  The Center for Responsible Lending provides support by articulating issues of predatory practices to state-level legislators and by providing information to Service members and their families on predatory practices within their state.

6.1.2.  The California Corporations Division has established a program called Troops Against Predatory Scams (TAPS) that is being distributed at all military installations in California.  The program provides tips and a hotline to report concerns.  The California Corporations Division plans to identify their program as a best practice at national conferences in the hope that other states will do likewise.

6.2.  The Government Accountability Office has recommended DoD use the Armed Forces Disciplinary Control Board (AFDCB) to place payday lending establishments outside military installations off-limits.  Although this will be a difficult undertaking (AFDCB actions require due-process and there are tens of outlets around military installations), DoD will have installation AFDCBs meet on a quarterly basis to engage the issue of payday lending.

6.3.   In addition to the use of the AFDCB, DoD is working with state governments to review policies and statutes to place adequate controls on payday lending practices through the following measures:

6.3.1.  Limits on interest rates and fees.  Payday loans have annual percentage rates of over 300 percent.  Many states have interest rate caps, but make an exception for payday loans.  DoD has informed states of the impact of high interest rates on Service members and their families and of efforts of other states to limit rates.

6.3.2.  Limits on having multiple loans and rolling over payday loans (rolling over a payday loan involves paying for a loan with another loan).  Multiple loans and rollovers build high interest rates that create spiraling debt.  Surveys show Service members rollover loans an average of 4 times per year.  Some states have statutes that prohibit rollovers and multiple loans and have established databases to ensure the prohibition is enforced.  DoD has informed states of the practice and impact it has in reducing spiraling debt.

6.4.  New products and services are becoming available in the financial services market.  Without creating endorsement of any commercial products, there are opportunities for contracting services, or for advocating the market place to provide certain products and services to support the military community.

6.4.1.  The Pentagon Federal Credit Union Foundation has established a program called the "Asset Recovery Kit (ARK)," that provides a small, short-term loan to Service members (regardless of their credit worthiness), up to $500 for a flat fee of $6.  Service members are limited to two loans per year and must receive personal financial training after receiving the loan.  Other defense credit unions have implemented similar efforts as viable alternatives to payday loans.

6.4.2.  The U.S. Central Command provides two phone services in addition to email and Internet services to assist Service members communicating with family and businesses back home.  Service members receive two official15-minute Health, Morale and Welfare (HMW) calls per week, plus they have access to unofficial telephone, Internet and email resources through the Armed Services Exchange Services.  Service members have free prepaid phone cards available through "Help Our Troops Call Home."

6.4.2.1.  Armed Services Exchanges have launched an information campaign to assist Service members, their families and friends to understand the unique challenges of communicating during deployment, special programs supporting HMW and unofficial telecommunications,

78

and lowest cost options available.  The information has also been carried on DoD websites, Armed Forces Information Service and in DoD Public Affairs news releases.

6.4.2.2.  In addition, DoD will provide Service members information on the Service member Civil Relief Act (SCRA), tips on dealing with credit issues while overseas, and information on using Military OneSource toll-free assistance while deployed to limit the number of phone calls needed to resolve personal finance issues.

6.4.2.3.  DoD will participate in a teleconference with members of the American Bankers Association to explain the DoD implementation of the SCRA, and to inform them of the impact deployments have on Service members and their families.

**7.  Track significant aspects of 1 – 6 above.**



7.1   Evaluating core competency and supervisor understanding will become a compliance issue.  As part of the documentation of formal training, Service members will be required to take the on-line test, which will provide documentation of pass/fail.

7.1.1.  Core competency:  The Military Services currently provide training on the core personal financial management issues listed in DoDI 1342.17.  Through the

on-line test, Service members entering the Military Services (officer and enlisted) can demonstrate their proficiency.  The online test also creates a record that can be matched against their personnel file at their first duty station to ensure they have passed the test.  Results of the test would be accessible by the Military Service headquarters to ensure the test is being required and follow-up action is taken.  The Military Services would be required to report results to the Office of the Secretary of Defense (OSD) on a quarterly basis.

7.1.2.  Supervisory understanding:  The Military Services would require all officers upon assignment to their first duty station to demonstrate proficiency (since all officers are or will be in some supervisory role).  The Military Services can document any exceptions to this rule.  For non commissioned officers, the test could be administered as part of their initial formal leadership training, which generally precedes supervisory responsibilities.  Either a web-based or paper test can be used to ensure compliance.  As an alternative, the Military Services can make the evaluation part of the documentation for supervisory responsibilities within the unit.  In any event, the Military Service headquarters would evaluate statistics to ensure the test was administered and prospective supervisors passed the evaluation.  The Military Services would be required to report results to OSD on a quarterly basis.

7.2.  Tracking use of core information and training sources:  The number of visits to the website and the number of individuals trained are secondary measures to ensuring all Service members reach the standard level of competency.   Usage of information and training sources will be tracked to determine which are most used by Service members to obtain the information needed to pass the competency test.

7.3.  Tracking awareness activities:  Implementation of these activities can be tracked through the units of distribution:  number of TV and radio spots, the number of *Military Money Magazines* circulated, and the number of participants in Military Saves events and Financial Fairs.

7.4.  Tracking information and assistance:  The web will be the main method for providing information, so tracking hits on the major websites will provide feedback on the number of individuals seeking information.  Additionally, the number of individual contacting Military OneSource and the number participating in seminars and education of events can provide a sense of the use of these sources of information.  The number of financial planning sessions will similarly be tracked through the usage of these services.

7.5   Tracking interventions:  These services are provided by organizations that track the services they provide.  DoD will request these organizations provide a quarterly review of usage.

80

7.6.  Tracking actions to support a fair business environment should measure support provided to individual consumers, the number of actions taken to improve the business environment, and the number and productivity of favorable business products that have been made available to Service members and their families.

7.6.1.  The activities of the Federal Trade Commission, state efforts such as the California TAPS program and the efforts of the Better Business Bureau can be measured through the number of individuals that have contacted the agency and the action taken to remedy the consumers' complaints.  DoD can request these agencies provide a quarterly report of usage and actions taken.

7.6.2.  The actions taken by the AFDCB can be tracked, on at least an annual basis to determine the number of actions taken and completed.

7.6.3.  The activity of DoD to work with state governments can be chronicled during the legislative sessions.  The number of contacts and the outcome of all legislative activity (regardless of DoD contact) can be monitored on an annual basis.

7.6.4.  The number of beneficial financial products brought to the market can be reviewed annually to determine progress.  For those products and services that are provided through contract, or through a military bank or defense credit union, OSD can request usage information to determine benefit to Service members over the course of a year.

**APPENDIX 5**

# ALMAR 060/05

| | | | |
|---|---|---|---|
| **Date signed:** | 12/02/2005 | **MARADMIN Number:** | 060/05 |

**Subject:**            FINANCIAL READINESS ADMINISTRATION
R 021000Z DEC 05
FM CMC WASHINGTON DC(UC)
UNCLASSIFIED//
ALMAR 060/05
MSGID/GENADMIN/CMC WASHINGTON DC JA//
SUBJ/FINANCIAL READINESS ADMINISTRATION//
GENTEXT/REMARKS/1.  A MARINE'S FINANCIAL READINESS DIRECTLY IMPACTS
UNIT READINESS AND, CONSEQUENTLY, THE CORPS' ABILITY TO ACCOMPLISH
ITS MISSION.  WE MUST ACT TO ENSURE OUR MARINES AVOID FINANCIAL
PITFALLS AND MAKE WISE DECISIONS.
2.  RECENT STUDIES INDICATE THAT APPROXIMATELY SEVEN PERCENT OF
MILITARY PERSONNEL USE PAYDAY LOANS.  PAYDAY LOANS ARE ATTRACTIVE TO
MARINES FACING FINANCIAL DILEMMAS BECAUSE THEY ARE EASILY OBTAINED.
SUCH LOANS ARE USUALLY SMALL, SHORT-TERM ARRANGEMENTS DESIGNED TO
TIDE OVER CASH-STRAPPED BORROWERS UNTIL THEIR NEXT PAYCHECK.
HOWEVER, THEY ARE HIGH INTEREST, RAPIDLY COMPOUNDING LOANS THAT CAN
DEVASTATE A MARINE'S PERSONAL FINANCES - ESPECIALLY SINCE MOST
PAYDAY LOANS ARE NOT IMMEDIATELY PAID OFF.  NOTABLY, THE INTEREST
AND FEES FOR PAYDAY LOANS AVERAGE MORE THAN 300 PERCENT ABOVE THE
LOAN AMOUNT.  THERE ARE BETTER OPTIONS FOR MARINES EXPERIENCING
FINANCIAL DISTRESS.
3.  PERSONAL FINANCIAL MANAGEMENT PROGRAMS PROVIDED BY MARINE CORPS
COMMUNITY SERVICES STAND READY TO EDUCATE AND COUNSEL MARINES AND
THEIR FAMILY MEMBERS REGARDING PERSONAL FINANCES.  COMMANDERS SHOULD
ALSO ENCOURAGE MARINES TO SEEK LEGAL ASSISTANCE PRIOR TO SIGNING
LOAN DOCUMENTS OR OTHER CONTRACTS.  LASTLY, WE MUST TAKE FIRM AND
FAIR ACTION THROUGH THE ARMED FORCES DISCIPLINARY CONTROL BOARD AND
OTHER MEANS TO DENY ACCESS TO LENDERS WHO TAKE UNFAIR ADVANTAGE OF
MARINES.  YOU CAN FIND MORE INFORMATION REGARDING THE DEPARTMENT OF
DEFENSE'S PAYDAY LENDING INITIATIVES AT
WWW.MILITARYHOMEFRONT.DOD.MIL BY FOLLOWING THE "LEADERSHIP" LINK TO
THE "FINANCIAL READINESS" LINK.
4.  THROUGH YOUR CONTINUED EMPHASIS OF PERSONAL FINANCIAL EDUCATION
AND LEGAL ASSISTANCE FOR OUR MARINES, WE CAN IMPROVE THE FINANCIAL
READINESS OF OUR MARINES AND CURB THE USE OF PAYDAY LOANS.  ENSURE
ALL MARINES ARE MADE AWARE OF THIS MATTER, AND IMMEDIATELY REFER
THEM TO THE INSTALLATION PERSONAL FINANCIAL MANAGEMENT PROGRAM,
LEGAL ASSISTANCE OFFICE, OR STAFF JUDGE ADVOCATE FOR ASSISTANCE.
5.  KEEP ATTACKING, M. W. HAGEE, GENERAL, U.S. MARINE CORPS,
COMMANDANT OF THE MARINE CORPS.//

RAAUZYUW RUENAAA0300 1232305-UUUU--RUCRNAD.

ZNR UUUUU ZUI RUEWMCS1681 1232253

R 032305Z MAY 06 PSN 851880K30

FM CNO WASHINGTON DC//N1NT//

TO NAVADMIN

INFO RHMFIUU/CNO WASHINGTON DC//N1NT//

RUENAAA/CNO WASHINGTON DC//N1NT//

BT

UNCLAS //N01740//

NAVADMIN 128/06

MSGID/GENADMIN/CNO WASHINGTON DC/N1NT/MAY//

SUBJ/PREDATORY LENDING PRACTICES//

GENTEXT/REMARKS/1.  A SAILOR'S FINANCIAL READINESS DIRECTLY IMPACTS

UNIT READINESS AND THE NAVY S ABILITY TO ACCOMPLISH ITS MISSION.  I

AM CONCERNED WITH THE NUMBER OF SAILORS WHO ARE TAKEN ADVANTAGE OF

BY PREDATORY LENDING PRACTICES, THE MOST COMMON OF WHICH IS THE

PAYDAY LOAN.  OTHER PREDATORY-TYPE LOANS INCLUDE AUTOMOBILE TITLE

PAWN, TAX REFUND, AND RENT-TO-OWN FURNITURE.  A RECENT SURVEY BY THE

DEFENSE MANPOWER DATA CENTER INDICATES THAT 13 PERCENT OF SAILORS

HAVE USED A PREDATORY LOAN IN THE PREVIOUS 12 MONTHS.

2.  PREDATORY LOANS ARE USUALLY SMALL, SHORT-TERM ARRANGEMENTS

DESIGNED TO BRIDGE CASH-STRAPPED BORROWERS UNTIL THEIR NEXT

PAYCHECK.  HOWEVER, THEY ARE EXPENSIVE, HIGH-INTEREST LOANS THAT

OFTEN COST 10-44 DOLLARS PER WEEK PER 100 DOLLARS BORROWED, PLUS

FEES.  THE ANNUAL INTEREST RATE ROUTINELY EXCEEDS 1,000 PERCENT.

PREDATORY LOANS CAN FURTHER DEVASTATE A SAILOR S PERSONAL FINANCES,

ESPECIALLY SINCE MANY OF THESE LOANS ARE NOT PAID AT THE ORIGINAL

PAYMENT DUE DATE AND ARE ROLLED-OVER TO THE NEXT PAYDAY.  THE

ROLLOVERS ARE OF GREAT CONCERN SINCE MULTIPLE ROLLOVERS QUICKLY LEAD

TO A SITUATION WHERE MOST SAILORS CANNOT PAY OFF THE LOAN.

3.  THERE ARE BETTER OPTIONS FOR SAILORS EXPERIENCING FINANCIAL

CHALLENGES.  FOR EXAMPLE, PERSONAL FINANCIAL MANAGEMENT TRAINING AND

INFORMATION PROGRAMS ARE AVAILABLE FROM THE COMMAND FINANCIAL

SPECIALIST (CFS), THE LOCAL FLEET AND FAMILY SUPPORT CENTER, THROUGH

NAVY KNOWLEDGE ON-LINE (NKO), AND NAVY-MARINE CORPS RELIEF SOCIETY

(NMCRS).  THEY EACH STAND READY TO EDUCATE AND GUIDE SAILORS AND

THEIR FAMILIES REGARDING PERSONAL FINANCES, INCLUDING ISSUES RELATED

TO PREDATORY LOAN USE.  NAVY LEADERSHIP, AT ALL LEVELS, MUST

ENCOURAGE SAILORS TO SEEK LEGAL ASSISTANCE PRIOR TO SIGNING LOAN

DOCUMENTS OR OTHER FINANCIAL-RELATED CONTRACTS.  WE MUST ENCOURAGE

OUR SHIPMATES WHO ARE USING PREDATORY LOANS TO STOP AND, WHEN

NECESSARY, SEEK IMMEDIATE ASSISTANCE FROM THE NAVY'S AVAILABLE

RESOURCES TO STABILIZE THEIR PERSONAL FINANCES.

4.  EACH OF US HAS PROBABLY EXPERIENCED A FINANCIAL HARDSHIP AT ONE

TIME OR ANOTHER IN OUR LIVES.  THERE IS NO SHAME IN DISCUSSING OR

SEEKING HELP FROM YOUR SHIPMATES AND LEADERS.  IT IS BETTER TO ASK

FOR ASSISTANCE BEFORE SOME RELATIVELY MINOR FINANCIAL ISSUE BECOMES

A SERIOUS DIFFICULTY IN YOUR PERSONAL AND PROFESSIONAL LIFE.

ADDITIONALLY, WE MUST DISCUSS THE DANGERS AND AVAILABLE

ASSISTANCE/RESOURCES RELATED TO PREDATORY LOANS WITH OUR SPOUSES AND

OTHER FAMILY MEMBERS.  INFORMATION ABOUT THE DANGERS AND

CONSEQUENCES OF SHORT-TERM, HIGH-INTEREST LOANS IS AVAILABLE AT

WWW.NKO.NAVY.MIL AND WWW.LIFELINES.NAVY.MIL WEBSITES.

5.  TO THOSE OF YOU WHO ARE COMMAND FINANCIAL SPECIALISTS, YOUR WORK

IS ESSENTIAL.  YOU ARE ON THE FRONT LINES IN THE BATTLE AGAINST

PREDATORY LOANS AND YOUR CONTINUED EFFORTS TO EDUCATE MEMBERS OF

YOUR COMMAND ON THIS ISSUE ARE CRITICAL TO ACHIEVE SUCCESS.

CONTINUED FOCUS ON PERSONAL FINANCIAL MANAGEMENT TRAINING, COMBINED

WITH SAILORS REGULARLY TAKING ADVANTAGE OF NAVY LEGAL SERVICE

OFFICE FREE LEGAL ASSISTANCE BEFORE SIGNING A LOAN AGREEMENT WILL

INHIBIT THE USE OF PREDATORY LOANS AND IMPROVE PERSONAL AND FAMILY

READINESS AS WELL AS MISSION READINESS.

6.  RELEASED BY VADM J. C. HARVEY, JR., N1.//

BT

#0300

STATEMENT BY CAPT MARK D. PATTON, USN
COMMANDING OFFICER, NAVAL BASE POINT LOMA, CALIFORNIA
HEAD, TASK FORCE PREDATORY LENDING (SOUTHWEST)
BEFORE
THE CALIFORNIA STATE SENATE JOINT ASSEMBLY
SUNSET REVIEW / CONSUMER PROTECTION
23 MAY 2006

Good morning, Madam Chairman and members of the committee.  I appreciate the opportunity to appear before you concerning protection of the financial health of  90,000 active duty sailors serving our Country in the State of California - and the very real problem of Predatory Practices that directly impact the readiness of our Armed Forces.  I realize this body is familiar with the statistics, and I appreciate the California Car Buyers Bill of Rights as an example of how legislation can help combat predatory practices and their impact on our Sailors.  But  recently there has been an explosive increase in the number of  predatory  establishments that encourage deferred deposit transactions with single balloon payments and easy – even encouraged – loan flipping policies. This is a direct threat to military readiness.  There are nearly four Payday Lenders for every McDonalds in California.[38]

Additionally, established so-called military loan companies, often utilizing retired service members and out of state home offices, manipulate California legal oversight by targeting our non-resident sailors. They sell complex high interest loans and life insurance policies that are virtually worthless to unsuspecting military members. These predatory practices place many in a hopeless spiral of debt.  An estimated $80 million a year in abusive fees and interest - taken from the pockets of our active duty military and their families nationwide - drain our relief organizations of needed funds as they help our sailors financially recover.[39]

I am concerned that many do not understand why military service members - and their families - require special consideration when it comes to these predatory establishments. We MUST protect our protectors.

The average age of sailors at my last command, the fast attack nuclear submarine USS Topeka, was 22. Today's young military member, often right out of high school or junior college, is placed almost immediately into a position of tremendous responsibility. He or she operates and maintains equipment worth millions -- sometimes billions -- of dollars. Our young men and women manage and maintain live ordnance, fighter aircraft and nuclear reactors – and the lives of many others are routinely placed in their hands.  Obviously I must have utmost confidence in my troops to entrust such positions and equipment to them. Many of our youngsters must attain and maintain security clearances that demand complete and unquestionable integrity.  A service member saddled with debt, fear, and considerable stress, could suddenly find his integrity compromised.  His job performance will probably suffer, and he most likely will lose his security

---

[38] California State University Northridge / University of Florida, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, April 2006, at
http://www.law.ufl.edu/faculty/prererson/publications.shtml
[39] Ozlem Tanik, Financial Service Analyst, Payday Lenders Target the Military, Center for Responsible Lending Issue Paper No. 11, September 29, 2005, at http://www.responsiblelending.org

clearance and be temporarily removed from his assignment.  Between 2000 and 2005, revoked or denied security clearances for Sailors and Marines due to financial problems have increased 1600 percent.[40]

At a time when we are at war, this is an unacceptable loss of valuable talent and resources.

As we gather more and more data from organizations like Navy and Marine Corps Relief Society and the Center for Responsible Lending, we are gaining a greater understanding of the true impact of Predatory Lending Practices.  But the recent tasking provided by the highest levels of the Department of Defense provides the best evidence that the military believes this is a very real and emergent threat.  The Secretary of Defense has listed Payday Lending as one of his top ten key issues for The Department of Defense/States Partnership.[41]  The Vice Chief of Naval Operations recently sent a personal message to all Commanders, Commanding Officers and Officers in Charge that stated Predatory Lending practices demanded "Intrusive Leadership" and that the Navy Enterprise must establish "a sustained, long term effort employing all of the financial assistance available in our institutions".[42]  In response to this direction, and others from our leadership, Commander, Navy Region Southwest has formed Task Force Payday Lender – a dedicated group of senior enlisted and officer leaders.  They are aggressively addressing Education, Culture and Business Partnering to meet this threat to our sailors.

The Navy also does *not* accept the popular argument that these financial lending institutions are doing a service  for our sailors.

*** It is not a *service to our sailors* to mask triple digit interest rates by applying "service fees" scaled to the dollar amount of a single balloon payment loan.

*** It is not a *service to our sailors* to deny a sailor options for multi-payment financing at reasonable rates for a deferred deposit transaction.

*** It is not a *service to our sailors* to allow simultaneous borrowing from multiple lenders or not verify a sailor's ability to repay a loan before it is made.

*** It is not a *service to our sailors* to build entire business models around out of state financial organizations that ply high interest loans and near-worthless insurance products to the particular demographic of non-resident junior enlisted men and women in order to avoid State and Local regulation.
The Center for Responsible Lending has identified nine signs of predatory financial practices and the State of California permits all nine practices against most of the sailors assigned to California.[43]

---

[40] Seapower Magazine, Double Whammy – Payday Loan Victims Face Security Clearance Problems, Vol 49, No 9, Amy Klamper, Jun 06.  www.navyleague.org/sea_power
[41] Department of Defense publication *Key Issues – Department of Defense/States Military Partnership*. www.USA4MilitaryFamilies.org.
[42] CNO Washington DC message 212330Z APR 06 *Predatory Lending Practices*, Personal for Commanders, Commanding Officers, and Officers in Charge from Admiral Willard.
[43] Center for Responsible Lending. *Payday Lending in California, California Deferred Deposit Transaction Law Codifies the Payday Debt Trap*.  2005.  www.responsiblelending.org

Congress appropriates resources to the Navy to provide counseling and assistance to sailors in need.  Millions of dollars are donated every year to military relief organizations.  Tens of thousands of volunteer hours are dedicated to helping our sailors.  And yes, there ARE MANY patriotic businesses and institutions that stand ready to assist the young men and women who dedicate their lives to the defense of our country.  We do not need the so-called services of predators outside our gates who are little more than legalized loan sharks.

There is no Enemy that our Navy is more passionate about defeating than one who targets our own sailors.  We will do everything WE possibly can to turn this trend around and defeat unscrupulous practices that prey on our sailors.  But these efforts demand tremendous resources; both in manpower and available funds.  These are resources we cannot afford to waste in a time of War.

This legislature, by partnering with us, can strengthen the laws and close the loopholes that allow these predatory practices.  Our service members are already stretched thin, balancing increased operational requirements with the demands of personal and family life. We need to protect our protectors. YOU can help us achieve this victory.

And the Navy is not alone in facing this challenge.  We are fighting this problem because we have a safety net for our sailors to fall back on.  It is estimated that only 1 in 5 individuals using Payday Loan institutions come from the military.

# EXHIBIT

# B

un Francisco County Superior Court

MAR 1 0 2017

CLER \ OF THE COURT

Deputy Clerk

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

PATRICIA WILLIAMS,

Plaintiff,

vs.

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION RESORTS,
INC.,

Defendants.

Case No. CGC-12-526187

**RULINGS ON DEFENDANTS' POST-
TRIAL MOTIONS**

Defendants move for a new trial and judgment notwithstanding the verdict ("JNOV").

Save for a reduction in the amount of punitive damages, the motions are DENIED.

## Summary of Trial Evidence

With a net worth of $3.7 billion, Wyndham Vacation Ownership, Inc. is one of the

world's largest timeshare companies. In 2010, Wyndham's[1] San Francisco site was defrauding

many customers, mainly the elderly. Wyndham's salespeople called the fraudulent practices

"pitching heat." The fraud took many forms. "Buy back fraud" was to make a sale by falsely

telling a prospect that Wyndham guaranteed to buy back timeshares. Wyndham's salespeople

also financed timeshares by opening credit cards in customers' names without their knowledge.

They falsely stated that monthly maintenance fees could not be raised, and sold the elderly more

---

[1] Wyndham Vacation Ownership, Inc. and Wyndham Vacation Resorts, Inc. are affiliated. At trial, its counsel called
the two "Wyndham" and rarely distinguished between them. I follow Wyndham's convention in this order.

1

time than they could reasonably use before death. When timeshare sales were off, Wyndham had "TAFT Days" – "Tell Them Any Frigging Thing."

Led by site manager Tara Dow, Wyndham incentivized the fraud in its fast-talking high-pressure commission-sales environment with "The Wheel." Using it, Dow assigned salespeople who sold timeshares by "pitching heat" on one day to prey on prime prospects the next day. Conversely, Dow assigned salespeople who refused to commit fraud to "one-leggers" – a wife or husband whose spouse was not present to enable a sale.

The most egregious fraudster, Anita Howell, bragged to co-workers that she "sold my soul to the Devil." Wyndham received 39 customer complaints against Howell.

Patricia Williams, a Wyndham salesperson in Virginia, was recruited to join Wyndham-San Francisco and moved herself cross-country. Confronted with the rampant fraud, Williams refused to join in and blew the whistle, reporting the fraud internally at Wyndham and then to the National Labor Relations Board. Wyndham fired Williams in retaliation. The Wyndham human resources officer who investigated her case and questioned the propriety of Williams' pretextual firing was then himself fired.

Meanwhile, as Howell continued to amass customer complaints, Wyndham lavished her with steak dinners, lobsters delivered to her home and tropical vacations.

Back in Virginia, Williams sought solace in alcohol, drinking herself to sleep most nights. At middle age, she was reduced to a restaurant greeter job and moved in with her mother.

## New Trial Motion

**Whitney Testimony.** Wyndham's lead argument regards Marty Whitney, a Williams co-worker. Formerly a co-plaintiff with Williams in this case, Whitney became unhappy when Williams did not settle along with her, believing that cost Whitney more money. Whitney thus

delivered on a written threat to turn coat and testify against Williams at trial. Among Whitney's testimony were details of what Williams would seek in mediation and settlement.

Wyndham claims Williams' counsel violated my orders on mediation and settlement. I ruled that, if former co-plaintiff witnesses (*e.g.,* Whitney) showed animus toward Williams in their testimony, they could be asked "whether they're unhappy that Ms. Williams would not settle thus costing them more money, but without saying settlement amounts." Whitney was thus asked in cross-examination: "Didn't you communicate if you had to settle for that [unstated] small amount, you were going to be a witness for Wyndham against Trish [Williams]?" This did not violate my orders.

Nor was it error. Wyndham opened the door to mediation-related matters with Whitney's testimony about her pre-mediation discussions with Williams. To not allow impeachment of Whitney with her post-mediation threat could only have misled the jury and violated due process. The Legislature's intent in enacting mediation laws was not to promote gamesmanship or perjury. (*See Rojas v. Sup. Ct.* (2004) 33 Cal.4th 407, 416-18.)[2]

Moreover, had any error occurred, it would have been harmless. Questioning about Whitney's threat took roughly one minute of a three-week trial. The rest of Whitney's spiteful testimony was self-contradictory, hyper-partisan, lacking in credibility and just plain bizarre.[3] Wyndham deems Whitney's testimony "devastating" to Williams, but it actually hurt Wyndham's case far more than it helped.

**Amount of Noneconomic Damages.** Williams sought noneconomic damages for "past physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience,

[2] Wyndham says it wanted Whitney to make "a forceful and complete denial" of her threat against Williams; that would have been a falsehood.

[3] Early on, for example, Whitney announced to the jury that she was "a domestic goddess."

grief, anxiety, humiliation, and emotional distress." The testimony of Williams and her former fiancé (set out on pages 5 and 6 of her opposition) was detailed and convincing.

The jury was instructed: "No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your commonsense." (California Civil Jury Instructions (CACI) 3905A.) This was, in fact, a commonsense jury. Jurors posed many intelligent written questions to witnesses and made cogent queries while deliberating. (*See* CACI 5009, 5019.)

Wyndham claims the jury's noneconomic damages verdict was "excessive" and based on "inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct." But Wyndham points to nothing persuasive. Its lead is again the minute of Whitney testimony – a weak reed. Wyndham next says the evidence of its sales fraud was "misconduct" by Williams' counsel. However, that evidence tracked my rulings and was relevant to the reasons for Williams' whistleblowing, to the motive for Wyndham's retaliation and to Wyndham's disparate treatment of Howell and Williams.

Wyndham also argues that awards in other cases mandate reversal of our jury's verdict. The California Supreme Court teaches otherwise: "The vast variety and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries award to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of fact finding." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65 n.12.)

No cause for a new trial on noneconomic damages exists.

4

**Jury Question.** During Phase I deliberations in this bifurcated punitive damages trial, the jury sent out a written question: "Regarding [CACI] 3946, punitive damages may apply if Wyndham engaged in malice [,] oppression or fraud. Must we consider only malice, oppression or fraud conduct towards Ms. Williams, or malice, oppression or fraud in general (i.e., defrauding the elderly)." (emphasis in original).

CACI 3946 is a lengthy instruction, but its first sentence answered the jury's query: "If you decide that Wyndham's conduct caused Patricia Williams harm, you must decide whether that conduct justifies an award of punitive damages" – *i.e.,* the jury must consider only conduct toward Williams, as the sentence mentioned no one else. I thus answered the jury question: "Please see first sentence of CACI 3946."[4]

Wyndham advocated that I instead clip a sentence from CACI 3949 – an instruction not to be given until Phase II of a bifurcated punitive damages trial. In any event, the two sentences' import is the same. This was no error.

**Amount of Punitive Damages.** In Phase II, the jury was instructed: "The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future." (CACI 3949.) As to "the amount of punitive damages," the jury was instructed to consider "[h]ow reprehensible" Wyndham's conduct was and, "[i]n view of" the "defendant's financial condition, what amount is necessary to punish it and discourage future wrongful conduct?" (*Id.*)

Wyndham's conduct was highly reprehensible; Wyndham fleeced elderly people rampantly. When Williams blew the whistle on the fraud, Wyndham retaliated against the "financially weak" and "vulnerable" single woman, who arrived in San Francisco with too little money to pay first month's rent. (*See* CACI 3949.) When Wyndham's own human resources

_____

[4] This is unlike Wyndham's cited cases, in which instructions did not already state the requisite legal standards.

5

officer questioned Wyndham's conduct, it fired him too, showing "a pattern or practice" of retaliation. (*See id.*)[5]

The question for the jury thus became how much money, in view of Wyndham's "financial condition," was "necessary to punish" its highly reprehensible past misconduct and to "discourage future wrongful conduct." (*See* CACI 3949.) Wyndham is a $3.7-billion concern. The $130,000 in punitive damages it now proposes to pay would be a rounding error to Wyndham, not punishment.

Wyndham finds "passion and prejudice" in the jury's verdict based on no more than its amount. However, given the evidence and the CACI instructions the jury followed, the verdict is dispassionately sound. Wyndham's conduct was highly reprehensible; $18.6 million might well be necessary to actually punish, and deter future misconduct by, a company worth $3.7 billion.

Wyndham again cherry-picks awards from other cases. However, our Supreme Court's teaching is again wise: comparison to other awards in other cases to other plaintiffs based on other facts and other law seldom proves fruitful. (*See Bertero,*13 Cal.3d at 65.) The evidence and instructions in *this* case are primary; they warranted the jury's punitive damages award.

That said, the U.S. Supreme Court has set "due process" limits on punitive damages. As stated in *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 410, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy

---

[5] Other Wyndham employees also testified to its retaliatory practices and fraud:

  (1) Salesperson: After she complained of the fraud, "The managers wouldn't even look at me. They would skip me on the rotation. They did...everything they could so I wouldn't get sales."

  (2) Salesperson: When she complained to Wyndham about the fraud, site manager Dow told her to "keep my mouth shut or I'd be fired."

  (3) Manager: After he protested the fraud in a letter, Wyndham vice president Jim White told him he had to transfer out of San Francisco or be fired.

  (4) Salesperson: She was afraid to report fraud "because I would be fired"; Wyndham "was like the Mafia."

  (5) Quality control officer: She was shunned by fraudster salespeople after arriving in San Francisco because they could not "get away with as much"; after she reported a pattern of fraud, Wyndham did not take responsive steps.

6

due process." The punitive damages award is therefore reduced to $12.8 million – a less than 9:1 ratio between punitive and compensatory damages. (*See Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 375) ("appropriate order is for an absolute reduction," not remittitur).)[6]

## JNOV

**Labor Code §1102.5 Claim.** Williams had to prove that Wyndham discharged her in retaliation for (1) disclosure of information to a government agency or (2) refusal to participate in unlawful acts. The disclosure or refusal need have been only one "motivating reason" for the discharge decision. (11/14 Tr. 53.) There was substantial evidence on both grounds.

*First,* it was not seriously disputed that Williams informed the National Labor Relations Board that Wyndham committed sales fraud and told Wyndham of that disclosure before it fired her. Wyndham maintained Williams' statement in a business record that it concedes was admissible. That record established Williams' disclosure and Wyndham's knowledge of it.[7]

*Second,* after arriving at Wyndham-San Francisco, Williams soon learned the site was rife with fraud. She refused to participate in the unlawful acts and blew the whistle on them. This put Williams firmly on the wrong side of site manager Dow, who profited from the fraud.

Wyndham argues that Williams was not directly ordered to commit fraud, but it cites no authority holding that a direct order is required, and Wyndham management's actions spoke louder than words. For example, as detailed above, Dow rewarded fraudster salespeople with the prime spots on Wyndham's "Wheel." Those, such as Williams, who refused to participate in

---

[6] To the extent other opinions are relevant, three regarding punitive damages in employment cases have been published since *State Farm.* (1) *Gober v. Ralph's Grocery* (2006) 137 Cal.App.4th 204, 223 reduced a ratio to 6:1 given – unlike here – "only a modest degree of reprehensibility." (2) *Wysinger v. Automobile Club of Southern Calif.* (2007) 157 Cal.App.4th 413, 429 upheld a 3.6:1 ratio. (3) *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 719, reduced a ratio to 1:1 given – unlike here – a "relatively low degree of reprehensibility." *See also Nickerson,* 63 Cal.4th at 370 (10:1 ratio); *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1189 (10:1 ratio).
[7] Because the fact of Williams' disclosure to the board was not seriously disputed, the board's handling of the disclosure was excluded from trial as unduly time-consuming and likely to confuse issues. (*See* Evid. Code §352.) Likewise excluded, at Wyndham's request, was the later firing of Tara Dow for drug-abuse allegations, including snorting cocaine off another woman's breast. (*See id.*)

unlawful acts, had their compensation slashed by "one-legger" assignments and the like. Wyndham's clear directive: commit fraud.

Wyndham also isolates Williams' refusal to commit the fraud from her whistleblowing about the fraud. But the two were of a piece, and Wyndham cites no authority for such parsing.

**Wrongful Termination Claim.** Wyndham now argues that it is not a violation of public policy to discharge an individual because she disclosed information to her employer. However, Wyndham itself proposed a jury instruction stating: "It is a violation of public policy to discharge an individual because she disclosed information to her employer." The instruction Wyndham advocated – and the instruction given to the jury – correctly stated the law. (*See, e.g., Green v. Ralee Eng'g Co.* (1998) 19 Cal.4th 66, 80; *Gould v. Maryland Sound* (1995) 31 Cal.App.4th 1137, 1150; *Collier v. Sup. Ct.* (1991) 228 Cal.App.3d 1117, 1123-24.)

**Wyndham's Managing Agents.** Wyndham claims its executives who wronged Williams were not "managing agents" for punitive damages purposes. Jim White was vice president of Wyndham's western region, responsible for $275-300 million in annual sales and for sales practices of Wyndham employees in at least 16 sites. Kimberly Barber was Wyndham's Director of Human Resources for all of California, Nevada and Colorado. Karen Case was Area Vice President for Human Resources. Wyndham concedes Tara Dow "was the most senior person in the San Francisco operation," and, as detailed above, Wyndham gave Dow substantial independent authority.

People with authority equal to or less than these Wyndham executives are routinely held to be managing agents for punitive damages purposes. (*See, e.g., White v. Ultramar, Inc.* (1999) 21 Cal.4th. 563, 577-78 (zone manager); *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 373 (equal opportunities officer); *Powerhouse Motorsports Ground, Inc. v. Yamaha Motor*

*Corp.* (2013) 221 Cal.App.4th 867, 886 (regional sales manager); *Major v. Western Home* (2009) 169 Cal.App.4th 1197, 1220-21 (regional claims manager); *Wysinger*, 157 Cal.App.4th at 428-29 (vice president of district office); *Gober*, 137 Cal.App.4th at 221 (district manager); *Hobbs v. Bateman, Eichler, Hill Richards* (1985) 164 Cal. App.3d (1985) 174, 193 (office manager).)

Wyndham says in a single-sentence argument that Williams "was not wronged" by its managing agents. The treatment is abbreviated for a reason: the clear and convincing evidence established that the four Wyndham executives all participated in Williams' retaliatory firing and thus (1) "committed" the misconduct themselves, (2) "authorized" it and/or (3) knew of the misconduct "and adopted or approved that conduct after it occurred." (*See* CACI 3946.)

**Amount of Noneconomic Damages.** Wyndham seeks a "partial JNOV" on noneconomic damages. This is denied for the reasons already stated above.

**Amount of Punitive Damages.** Wyndham's arguments on the amount of punitive damages – incorporated into its new trial motion – are also addressed above.

Dated: March 10, 2017

Richard B. Ulmer Jr.
Judge of the Superior Court

9

# EXHIBIT

# C

# WYNDHAM VACATION RESORTS, INC.
## CLUB WYNDHAM® DISCOVERY
## MEMBERSHIP AGREEMENT

Date  03-19-2019                                        Location  Wyndham Bonnet Creek
Representative Name  Joseph Garcia                      Representative Number  645019

**MEMBER INFORMATION (*"Member"*)**

Member #  ███71664
Name(s)  BRIAN MICHAEL  CARROLL and ASHLEY NICHOLE  CARROLL
Address
City                                    State  **FL**        Zip  **32724**
Home #  ██████████        Work #

**PROGRAM INFORMATION**

**Accommodations.** Wyndham Vacation Resorts, Inc., a Delaware corporation (*"Wyndham"*), agrees to sell and Member agrees to purchase the right to use accommodations during the Use Year specified below. The accommodations are described in the CLUB WYNDHAM Discovery Member's Directory (*"Member's Directory"*).

| | | | | |
|---|---|---|---|---|
| Membership Type | Discovery VIP | Point Value  400,000 | Processing Fee | $  149.00 |
| Date of Enrollment | 03-19-2019 | | Purchase Price | $  3,375.00 |
| Use Year Start Date | 04-18-2019 | | Down Payment | $  3,753.06 |
| Use Year End Date | 24 months from Date of Enrollment | | Amount Financed | $  0.00 |

**DOWN PAYMENT METHOD**

__Y__  Check Attached

__N__  Credit Card

**INSTALLMENT NOTE** (*Complete only if financing*)

For value received the Member, jointly and severally, promises to pay to the order of Wyndham the sum of **$0.00** together with interest at the ANNUAL PERCENTAGE RATE OF **0.00%** payable over **1** installments at **$0.00** per month, beginning **03-19-2019** and on the same day of each successive payment period thereafter until the whole amount is fully paid. Payments are applied first to interest, then to reduce the principal balance due. **Interest will begin to accrue on the day after the Contract Date.**

PURCHASE PRICE  **$3,375.00**          CASH DOWN PAYMENT  **$3,753.06**          SALES TAX  **$229.06**
Wyndham is the creditor. The *"Amount Financed"* noted below is the total of the PURCHASE PRICE and SALES TAX, less the DOWN PAYMENT.

The following is the Member's "Truth-in-Lending Disclosure Statement":

| ANNUAL PERCENTAGE RATE* The cost of your credit as a yearly rate: | FINANCE CHARGE The dollar amount the credit will cost you: | Amount Financed The amount of credit provided to you on your behalf: | Total of Payments The amount you will have paid after you have made all payments as scheduled: | Total Sale Price The total cost of your purchase on credit including your down payment of: $3,753.06 |
|---|---|---|---|---|
| 0.00% | $.00 | $.00 | $.00 | $3,753.06 |

| Your payment schedule will be: | | |
|---|---|---|
| Number of payments | Amount of payment: | When payments are due |
| 1 | $0.00 | 03-19-2019 |

*The ANNUAL PERCENTAGE RATE disclosed is a fixed rate.

**INSTALLMENT PAYMENT METHOD**

__N__  Auto Pay Plan**
        I authorize Wyndham to draft the monthly installment amount from the account indicated.

__N__  Credit Card **
        I authorize Wyndham to charge the monthly installment amount to the credit card indicated.

**I/We agree to the monthly payment on Auto Pay Plan or credit card. In the event it is discontinued or dishonored, the remaining balance is due in full.

Dishonored checks are subject to a returned item fee of $15.00.

No. 1282/Rev. 9-18

## CLUB WYNDHAM® Discovery Vacations by Wyndham Membership Terms and Conditions

CLUB WYNDHAM Discovery (*"Discovery"*) is a program offering access and use of CLUB WYNDHAM Discovery accommodations and other travel benefits. An individual becomes a Member of Discovery upon receipt of this completed and fully signed CLUB WYNDHAM Discovery Agreement (*"Agreement"*) and by paying the applicable Membership Fees and Expenses, subject to the following terms and conditions.

**1. Membership.** Membership in Discovery is available to individuals for personal use. A Member is responsible for following the procedures and guidelines for Discovery which are described in this Agreement and the CLUB WYNDHAM Discovery Member's Directory (*"Member's Directory"*). Discovery Member benefits are different than membership in CLUB WYNDHAM Plus and are set forth in the Directory. Membership in Discovery is non-transferable and may not be rented or sold.

**2. Term.** Membership is valid for no more than twenty-four (24) consecutive months beginning on the Enrollment Date. Membership in Discovery expires on the Use Year End Date, at which time all reservations and occupancy must be complete.

**3. Expenses and Release.** The Member is responsible for payment of any personal expenses and incidental charges incurred while utilizing any Discovery program or benefit. The Member may be responsible for any taxes related to their usage of units, such as sales tax or transient occupancy tax. The Member hereby agrees to release and hold harmless Wyndham, its subsidiaries, their advertising agencies, printers and other suppliers, as well as its officers, directors, employees and agents for any injury, liability, expense, damage or loss incurred by a Member, the Member's family or guest during any trip or utilization of any Discovery program or benefit and for any related damage, theft or loss caused or incurred by the Member, the Member's family or guest.

A Discovery VIP Member is an individual who purchases a Discovery membership of 400,000 points.

**4. Reservations.** Reservations of accommodations under this Agreement may be made any time after the Use Year Start Date, however, a minimum of **$1,400.00** in total principal must be paid toward the Discovery Membership before occupancy of accommodations may occur. **Total principal excludes taxes, interest and processing fee.** Accommodations are subject to availability and there is no guarantee that a Member will be able to obtain specific accommodations during a specific time period. The earlier the member requests a reservation, the greater the opportunity to receive a confirmed reservation. A Member may cancel a reservation for accommodations without loss of points if notice is provided to and received by Wyndham at least fifteen (15) days prior to the check-in date. If a reservation for accommodations is cancelled less than fifteen (15) days prior to the check-in date, a Member will forfeit the points applied for such reservation of accommodations. If a Member has a confirmed reservation for accommodations and does not check-in before 5:00 p.m. on the check-in date, Wyndham has the right to rent out the accommodations subject to such reservation or otherwise use the accommodations for its own account. CLUB WYNDHAM Discovery resorts are subject to change without notice. Only the Member may book reservations and the Member must be present at check-in.

**5. Membership Suspension and Termination.** This Agreement, together with Member status, may be suspended or terminated by Wyndham, its successors or assigns, without further obligation if the Member fails to make installment payments on the Purchase Price, as set forth above, or fails to comply with the terms and conditions of this Agreement and/or the terms and conditions of the various programs and benefits of Discovery. The terms and conditions of this Agreement and of the Discovery programs and benefits may be changed from time to time at the sole discretion of Wyndham, its successors or assigns.

**6. Date Agreement Effective/Controlling Law.** This Agreement is effective when signed by the Member and the Discovery representative and shall be governed exclusively by the laws and courts of the State of Florida.

**7. Membership in Perks by CLUB WYNDHAM.** Perks by CLUB WYNDHAM is a program that provides various travel-related benefits and privileges to its members. The Discovery Member automatically receives a complimentary twenty-four (24) month membership in Perks by CLUB WYNDHAM which shall begin on the date the Perks by CLUB WYNDHAM Membership Agreement is signed by the Member and a Wyndham representative. The Member must activate the Perks by CLUB WYNDHAM membership as indicated on the Perks by CLUB WYNDHAM Savings Card before commencing use. If the Member delays activation of the Perks by CLUB WYNDHAM Savings Card, the period of time between the beginning of the complimentary twenty-four (24) month period and the activation date shall be lost. In the event that the Discovery Membership is terminated or cancelled pursuant to Paragraphs 5 or 9 of this Agreement, the Member's Perks by CLUB WYNDHAM Membership shall also be cancelled simultaneously. Perks by CLUB WYNDHAM program features, price and restrictions are subject to change and are explained in greater detail in the Perks by CLUB WYNDHAM Membership Agreement and the Benefit Guide.

**8. Land and Sea Cruise Option.** For a Discovery Member who chooses to exercise the Land and Sea Cruise Option, the following will apply:

a.      Member shall be responsible for port fees, government fees, and taxes in effect and to be paid for at time of booking (approximately $99.00 per person on featured Land and Sea Cruise Option at time of printing).

b.      Land and Sea Cruise Option allows two (2) persons to travel together in the same studio, 1-bedroom suite and same cruise cabin. Up to two (2) additional persons (maximum of four (4) persons per cabin) may travel for an additional fee, subject to availability of accommodating cabin. Member is required to consult cruise counselors for the current additional person charges when making reservations. To ensure the best selection, reservations should be made well in advance, up to ten (10) months prior, to the desired sailing date.

c.      Member must reserve a four (4) night condominium stay in Orlando, Fort Lauderdale or Daytona Beach, Florida, immediately prior to three (3) night cruise. Cruise must immediately precede condominium stay and Member may not take cruise portion of vacation separate from condominium stay.

d.      Member who wishes to choose upgraded room or cabin accommodations or reverse the travel days and use three (3) nights condominium stay immediately followed by four (4) nights cruise may choose to do so for an additional cost to Member. Cost will vary by type of accommodation, day of check-in, and date of sailing. Please check with your cruise counselor for your specific charge.

e.      All requests for changes, such as change of name, must be submitted in writing via certified mail (Attention: CLUB WYNDHAM Travel, 6277 Sea Harbor Drive, Orlando, Florida 32821). Notices received 60 to 46 days prior to scheduled arrival date will be charged a minimum of $100.00 per person. Notices received 45 to 8 days prior will be charged a minimum of $150.00 per person. Some changes, such as change of sailing date, can require a complete cancellation and loss of points used to book the original reservation. Any changes sixty (60) days or less will result in a complete forfeiture of points used for booking the Land and Sea Cruise Option. Wyndham recommends the purchase of trip cancellation insurance.

f.      All benefits, programs, fees and costs of Land and Sea Cruise Option are subject to change and to the individual terms and conditions of the independent suppliers of those respective benefits or programs.

**9. Cancellation.** In the event of cancellation during the ten (10) day cancellation period, Wyndham will refund to Member all payments made under this Agreement, reduced by the proportion of any contract benefits the Member has actually received under this Agreement prior to the effective date of the cancellation, within twenty (20) days after receipt of notice of cancellation, or within five (5) days after receipt of funds from Member's cleared check, whichever is later. The specific value for each benefit received by the prospective Member under the Agreement will be agreed to between the prospective Member and Wyndham.

**10. Future Purchase.** <u>**Member agrees to attend a Wyndham sales presentation during the member's first stay at a CLUB WYNDHAM accommodation (*"Scheduled Sales Presentation"*)**</u>. In the event Member purchases from Wyndham or its subsidiaries an interest in a Wyndham vacation ownership plan that is allocated at least 84,000 CLUB WYNDHAM Plus points (*"Wyndham Timeshare Interest"*) prior to the Use Year End Date set forth in this Agreement (for purposes of this Section 10, *"Discovery Use Year End Date"*), Member will be eligible to receive a credit toward the purchase price of a Wyndham Timeshare Interest in the amount of the total principal paid by Member toward the current Discovery Membership (**excluding taxes, interest, and processing fee**). A Member becomes eligible and will receive a credit in the amount of the total principal paid by Member once Member has paid the minimum identified in Section 4 above. If the Member purchases a Wyndham Timeshare Interest using the credit as described above, any unused Discovery points shall be transferred to Member's Wyndham Timeshare Interest account for Member's use. Discovery points transferred to Member's Wyndham Timeshare Interest account shall expire on the expiration of Member's first Wyndham Timeshare Interest Use Year End Date. The Discovery points transferred do not count towards VIP status.

**11. Price Guarantee.** If Member purchases an interest in a Wyndham vacation ownership plan within one (1) year from the date listed at the top of this form, Wyndham shall, subject to availability, offer it to Member at the pricing identified on the Guaranteed Discount Form received on the Enrollment Date of this Agreement. The price freeze does not apply to a future purchase of an interest that is eligible for the CLUB WYNDHAM Plus Presidential Reserve exchange benefit.

**12. Credit Information.** Member authorizes Wyndham to obtain credit information about the Member from a Consumer Reporting Agency, which Wyndham may use as permitted by applicable law.

**13. Notice.** **Any holder of this consumer credit Agreement is subject to all claims and defenses that the debtor could assert against the seller of goods or services, obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.**

**You May Cancel This Agreement Without Any Penalty Or Obligation Within ten (10) Calendar Days After You Sign This Agreement. If You Decide To Cancel This Agreement, You Must Notify Wyndham In Writing Of Your Intent To Cancel. Your Notice Of Cancellation Shall Be Effective Upon The Date Sent And Must Be Sent To: Wyndham Vacation Resorts, Inc., Attention: Account Servicing Operations-Rescission Department at P.O. Box 94443, Las Vegas, Nevada 89193 or 10750 West Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135. Any Attempt To Obtain A Waiver Of Your Cancellation Right Is Unlawful.**

**If you execute a purchase contract for a timeshare period, Section 721.08 Florida Statutes (escrow accounts) will apply to any new funds or other property received from you or on your behalf. Section 721.10 Florida Statutes (cancellation) will apply to the purchase and you will not be entitled to a cancellation refund of the short-term product.**

AUTHORIZATIONS

MEMBER: _____          WYNDHAM VACATION RESORTS, INC.
Brian Michael Carroll

MEMBER: _____          BY: _____
Ashley Nichole Carroll                                    AUTHORIZED REPRESENTATIVE

MEMBER: _____

MEMBER: _____

*This advertising material is being used for the purpose of soliciting sales of a vacation ownership plan.*

No. 1282/Rev. 9-18

| | |
|---|---|
| Date: 03-19-2019 | Contract No. 00065-1904418 |
| Purchaser(s): BRIAN MICHAEL CARROLL and ASHLEY NICHOLE CARROLL | Member No. 00203571664 |

<div align="center">

**CLUB WYNDHAM® Discovery**
**STATEMENT OF UNDERSTANDING**

</div>

Congratulations and welcome to CLUB WYNDHAM Discovery (**"Discovery"**). Prior to submitting your CLUB WYNDHAM Discovery Agreement (**"Agreement"**) for acceptance, we want you to have an understanding of the Discovery Program. Please review the following statements, initial your understanding beside each item, and sign in the space provided.

 1. I understand that I am purchasing a twenty-four (24) month Discovery membership which entitles me to **400,000 points**.

 2. I understand that the Discovery membership is not an interest in real property.

3. I understand that prior to my first resort stay I must have paid a minimum of **$1,400.00** in total principal toward the balance of my membership.

4. I understand that the accommodations available are at select Wyndham Vacation Resorts, Inc. (Wyndham) locations or at a Wyndham location and cruise combination package, as listed in the current CLUB WYNDHAM Discovery Member's Directory.

 5. I understand that all reservations may be requested up to ten (10) months in advance of the check-in date and are confirmed on a space available basis. In order to have the best opportunity to receive a confirmed reservation, I should request my reservation as soon as possible, after the Use Year Start Date. I further understand that demand is higher for holiday, summer and special event time periods. There is also a minimum three-consecutive night stay required for any reservation.

 6. **I understand that I am required to attend a scheduled sales presentation during my first resort stay using my Discovery Points.**

7. I understand that this membership does not include an option to book airfare, car rental, or exchanges through an external exchange company (such as RCI or II) using my points.

8. I understand that interest will begin to accrue on the date of this Agreement.

9. I understand that only I may book reservations and that I must be present at check-in.

 10. I understand that my Discovery membership includes a twenty-four (24) month membership to the Perks by CLUB WYNDHAM program and that this program does not use my points, but does entitle me to discounts on many travel related products including rental car, and cruises. I understand that Perks by CLUB WYNDHAM membership is voluntary and that any renewal will be my responsibility. I understand that I must activate the membership as indicated in the Perks by CLUB WYNDHAM Savings Card. I understand that my membership in Perks by CLUB WYNDHAM will automatically terminate if I am no longer a Discovery member.

11. I understand that my ability to occupy accommodations shall expire on my Use Year End Date or upon completion of use of all points purchased, whichever occurs first.

12. I understand that if I should decide to purchase a vacation ownership interest from Wyndham before my Use Year End Date, I will be entitled to the following benefits:

- Purchase Credit: If I purchase a minimum of 84,000 CLUB WYNDHAM Plus points, then once I have paid a minimum of **$1,400.00** in total principal toward my current Discovery membership, I can use the total principal paid towards the Discovery membership as a credit towards the purchase price of a Wyndham vacation ownership interest. **Total principal excludes taxes, interest and processing fee.**

- Price Guarantee: I received the Guaranteed Discount Form identifying the Price Freeze options available to me on a future vacation ownership purchase with Wyndham Vacation Resorts.

- CLUB WYNDHAM Discovery points: Any unused Discovery points will be transferred to my vacation ownership account for continued use. The Discovery points transferred do not count towards CLUB WYNDHAM VIP status. The expiration of the Discovery points/reservations will coincide with the end date of the first use year of my vacation ownership contract.

| | |
|---|---|
| Purchaser Signature **Brian Michael Carroll** | Discovery Representative Signature |
| Purchaser Signature **Ashley Nichole Carroll** | *Joseph Gorcic* Discovery Representative (Print Name) |
| Purchaser Signature | |
| Purchaser Signature | |

No. 2254/Rev. 9-18

# EXHIBIT

# D

## WYNDHAM
VACATION OWNERSHIP

### New Proposal: Reference # ████ 725-1 Selected

**Summary**

**Names of Owners:**

_____    _____          **Accept**      **Decline**

**Proposal**

**84,000** Total CWP Points

**Inventory** Club Wyndham Access

| | | | |
|---|---|---|---|
| $21,300.00 | Gross Purchase Price | Exchange Membership: | RCI    II |
| $4,800.00 | Discount | Enroll in "Plus Partners": | $2,395   YES   NO |
| $349.00 | Processing Fee | Conversion to CWP: | $2,395   YES   NO |

**$16,849.00 Total Package**

**$3,982.50 Total Deposit**

**Financing**

**$12,866.50** Amount Financed

**120** Term (months)
**17.99%** Interest Rate
**05/03/2019** Approximate 1st Payment Date

**$233.62** Monthly Payment Amount

**Total Points**

**84,000** Total CWP Points  **Annual**

**116,000** Bonus Points

**$254.00** Gross Price / 1000 Pts:
**$196.00** Today's Price / 1000 Pts:

**Assessment Fee**

**$54.85** Total Monthly Assessment
**$0.00** Calculated Monthly Credit

**Closing Costs**

**$25.00** Filing Fees
**$0.00** Title Insurance

**$25.00** Total

Copyright © 2019 Wyndham Worldwide. All rights reserved. usflwap0.wst.corproot.com 03/19/19 2:14:30 PM