**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| BRIAN CARROLL and | ) | |
| ASHLEY CARROLL, | ) | Civil Action No. 20-CV-00028 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WYNDHAM VACATION RESORTS, | ) | |
| INC. and COMENITY LLC d/b/a | ) | |
| COMENITY BANK, | ) | |
| | | |
| Defendants. | | |

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, allege Wyndham Vacation Resorts, Inc. ("Wyndham") violated the Truth in Lending Act  15 U.S.C. § 1601 *et seq.* ("TILA")  and its implementing regulations 12 CFR § 1602 ("Regulation Z"); the Florida Consumer Collection Practices Act, Fla. Stat. § 559.55 *et seq.* ("FCCPA"); and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.203(3), 501.204 ("FDUTPA"). Plaintiffs, on behalf of themselves and all others similarly situated, also allege Comenity, LLC ("Comenity") (collectively "Defendants") violated the Fair Credit Reporting Act 15 U.S.C. § 1681 *et seq.*  ("FCRA"), the TILA and Regulation Z, and the FCCPA. Plaintiffs, on behalf of themselves and all others similarly situated, also seek relief under the Declaratory Judgment Act 28 U.S.C. § 2201(a).

## I.      INTRODUCTION

1.      Predatory lending causes thousands of consumers needless harm. In fact,

the harm predatory lending causes is so bad that, according to the Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents,[1] it even "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all-volunteer fighting force."

2.      Wyndham "is the world's largest timeshare business, with 224 resorts and approximately 880,000 owners."[2] As of December 31, 2018, Wyndham had over 24,500 employees, 18,800 of whom were involved in the timeshare business. *Id*. Wyndham offers in-house financing to consumers buying timeshares.

3.      In 2018, Wyndham generated "$1.5 billion of new receivables on $2.2 billion of gross vacation ownership sales … resulting in 68% of our vacation ownership sales being financed."[3] Wyndham also works with Comenity to offer and sell Wyndham branded credit cards to pay for timeshare purchases.

4.      Comenity is a wholly owned subsidiary of Comenity LLC, which is a subsidiary of Alliance Data Systems. Comenity is a Utah industrial bank and a major credit card issuer with over 50 million cardholders.[4] Comenity has over 8,500 employees. *Id*. pg. 11.

5.      These corporate giants sustain themselves, in part, by pressuring their employees with unrealistic sales goals, which in turn cause them to use predatory lending practices, like opening unauthorized credit accounts, to sell and finance thousands of timeshares nationwide.

---

[1] http://www.defense.gov/pubs/pdfs/report_ to_congress_final .pdf
[2] https://s22.q4cdn.com/457996430/files/doc_financials/quarterly_reports/2018/q4/WYND-2018-10K.pdf
[3] https://s22.q4cdn.com/457996430/files/doc_financials/quarterly_reports/2018/q4/WYND-2018-10K.pdf
[4] https://d18rn0p25nwr6d.cloudfront.net/CIK-0001101215/51b9a5ed-2b35-4486-bb1a-d12cbe3c127b.pdf

6.      Unfortunately, opening unauthorized credit accounts is a familiar narrative. In January 2019, the Consumer Financial Protection Bureau ("CFPB") sued Sterling Jewelers for submitting unauthorized credit applications and opening unauthorized credit card accounts, alleging Sterling violated, in part, TILA and Regulation Z.[5]

7.      For example, the CFPB specifically alleged that Sterling's salespersons obtained consumers' personal financial information "by purporting to sign up consumers for a store rewards card, loyalty program, newsletter, or mailing list." [6]   Instead, the salesperson used the personal financial information to submit a credit application without the consumers' knowledge or consent. This conduct, according to the CFPB, resulted from "Sterling's company culture, reflected in its training materials and sales performance standards" that pressured "employees to enroll consumers in company credit cards and to sell its financing plans and payment-protection insurance."[7]

8.      In the end, the CFPB and Sterling entered into a Stipulated Final Judgment and Order where, among other relief, Sterling paid a $10 million civil money penalty to the CFPB and a $1 million civil penalty to the State of New York.[8]

9.      In a more notable case, the CFPB fined Wells Fargo $100 million for its "widespread illegal practice of secretly opening unauthorized deposit and credit card accounts."[9] According to the CFPB's Consent Order with Wells Fargo, in part, the

---

[5] *Id*. pg. 1.
[6] *Id*. ¶ 18 (internal quotations omitted).
[7] *Id*. ¶ 5.
[8] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-settles-claims-against-sterling-jewelers-inc/
[9] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100-million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/

employees were pressured into opening "unauthorized deposit accounts for existing customers" and transferring funds from other accounts without their customers' knowledge or consent and submitting applications for credit cards in consumers' names using consumers' information without their knowledge or consent.[10] In all, the employees opened "more than two million deposit and credit card accounts" that were unauthorized.[11]

10.     Defendants' conduct is no different than Wells Fargo or Sterling Jewelers' conduct. Defendants have every incentive to continue. Their scheme generates enormous profit at the expense of consumers.

11.     Class action lawsuits, like this one, deter and redress consumers needlessly harmed by corporate misconduct. As such, the Plaintiffs, on behalf of themselves and all others similarly situated, therefore, look to hold Defendants accountable for violating TILA, the FCRA, the FCCPA and FDUTPA in connection with Defendants' unfair, deceptive, and unconscionable sales and collection conduct.

## II.     JURISDICTION AND VENUE

12.     The Court has personal jurisdiction over Defendants because they conduct business in Florida and the acts and transactions complained of occurred in Florida.

13.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 because the Plaintiffs allege Defendants violated the MLA, a federal statute.

14.     This Court has supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims arise from the same illegal

---

[10] *Id.*
[11] *Id.*

conduct as the federal claim.

15.    Venue is proper because this is where the cause of action accrued.

## III.    PARTIES

16.    Brian Carroll is a natural person who lives in Florida.

17.    Ashley Carroll is a natural person who lives in Florida.

18.    Wyndham is a foreign profit corporation with its principal address at 6277 Sea Harbor Dr., Orlando, FL 32821. Wyndham is a wholly owned subsidiary of Wyndham Destination, Inc.

19.    Comenity is a wholly owned subsidiary of Comenity LLC. Comenity is a Utah industrial bank.

## IV.    APPLICABLE LAW

### A.  The Truth in Lending Act and Regulation Z

20.    Congress enacted TILA "to assure a meaningful disclosure of credit terms" and "to protect [ ] consumer[s] against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

21.    TILA is implemented through Regulation Z 12 C.F.R. § 1026.1.

22.    Any "card issuer" of a "credit card" is a creditor for purposes of TILA, regardless of whether the open-end credit is subject to a finance charge or is payable in more than four installments. 15 U.S.C. § 1602(g); Reg. Z § 1026.2(a)(17)(iii).

23.    "[C]ard issuer" means "any person who issues a credit card, or the agent of such person with respect to such card." 15 U.S.C. § 1602(o); 12 CFR 1026.2(a)(7).

24.    A "credit card" is defined as "any card, plate, coupon book or other credit

device existing for the purpose of obtaining money, property, labor, or services on credit." 15 U.S.C. § 1602(l); 12 CFR § 1026.2(a)(15).

25.     TILA and Regulation Z states that no credit card may be issued to any person except in response to an explicit oral or written request or application for the card. 12 C.F.R. § 1026.12(a)(1); 15 U.S.C. § 1642 (collectively "Unsolicited Issuance Rule").

26.     The Unsolicited Issuance Rule applies to "card issuers" defined as the person who issues a credit card or the agent of the person who issues a card with respect to that card. 15 U.S.C. § 1602(o); Reg. Z § 1026.2(a)(7); Official Interpretations § 1026.2(a)(7)-1

27.     A violation of the Unsolicited Issuance Rule provides for actual damages, along with attorneys' fees and costs, and in the case of a class action, "such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor…." 15 U.S.C. § 1640(1)-(2)(B).

**B.  The Fair Credit Reporting Act**

28.     The FCRA's provisions apply to "consumer reports" defined as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing

the consumer's eligibility for— (A) credit or insurance to be used primarily for personal, family, or household purposes; (B)employment purposes; or (C)any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d)(1)(A)-(C).

29.     A person who obtains a consumer report without a permissible purpose or under false pretenses violates the FCRA. 15 U.S.C. § 1681b(f)(1)-(2) ("A person shall not use or obtain a consumer report for any purpose unless … (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.")

30.     A person who violates the FCRA negligently or willfully is liable to the consumer for actual damages, punitive damages, and attorney's fees and costs. 15 U.S.C. §§ 1681n, 1681o (provisions for willful and negligent violations.)

**C.  The Florida Consumer Collection Practices Act**

31.     The FCCPA prohibits debt collectors from engaging in certain abusive practices in the collection of consumer debts. *See generally* Fla. Stat. § 559.72.

32.     The FCCPA's goal is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

33.     Specifically, the FCCPA states that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." Fla. Stat. § 559.72(9).

34.     The FCCPA creates a private right of action under Fla. Stat. § 559.77.

35.     The FCCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." *Id.* § 559.55(8).

36.     The FCCPA mandates that "no person" shall engage in unfair, deceptive, or unconscionable practices when directly or indirectly collecting consumer debts. *Id.* § 559.72. This language includes all unlawful attempts at collecting consumer claims. *Williams v. Streeps Music Co.*, 333 So. 2d 65, 67 (Fla. Dist. Ct. App. 1976).

37.     The FCCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *Id.* § 559.55(6).

D. **The Florida Deceptive and Unfair Trade Practices Act**

38.     The FDUTPA is "construed liberally to promote" the protection of consumers and businesses from "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

39.     The FDUTPA creates a private right of action for FDUTPA violations. *Id.* § 501.211.

40.     The FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce" against consumers. *Id.* § 501.204(1).

41.     The FDUTPA defines "consumer" broadly as an individual, entity, or any group or combination. *Id.* § 501.203(7).

42.     The FDUTPA defines "trade or commerce" as "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Id.* § 501.203(8).

43.     Where there is a violation of a statute prohibiting unfair or deceptive acts, a *per se* violation of Florida's FDUTPA has also occurred. *See* Fla. Stat. § 501.203(3) (stating a violation of any law proscribing unfair methods of competition, or unfair, deceptive, or unconscionable acts is also a violation the FDUTPA); *Blair v. Wachovia Mortg. Corp.*, No. 11–cv–566–Oc–37TBS, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012) ("[A] *per se* violation of FDUTPA stems from the transgression of any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.").

## V.     FACTUAL ALLEGATIONS

### A.  Wyndham has a standard business practice of using deceptive, unfair, and unconscionable practices.

44.     Wyndham uses a variety of marketing strategies to attract potential borrowers into financing timeshares, "including sponsored contests that offer vacation packages or gifts[,]" and "sweepstakes, giveaways and promotional programs with professional teams at major sporting events and with other third parties at high-traffic

consumer events." [12] These directed marketing strategies generated "37,000, 36,000 and 33,000 new owners during 2018, 2017 and 2016, respectively."[13]

45.     Wyndham pressures its salespeople to sustain these numbers or risk losing their jobs. Wyndham rewards, compensates, and reprimands employees depending on whether they meet these sales goals. The salespeople, therefore, resort to unfair, deceptive, and unconscionable sales tactics to satisfy Wyndham's demands so they will not be fired.

46.     Upon information and belief, Wyndham has policies and procedures in place, including training materials, which encourage sales employees to use unfair, deceptive, and unconscionable conduct when selling timeshares.

47.     Wyndham's salespeople misrepresent and misstate the terms for buying a timeshare and omit material financial information for consumers to understand the offer.

48.     Wyndham's salespeople misrepresent the reason for needing the consumers' financial information.

49.     Consumers are not told the salespersons will use the financial information to submit credit applications to Comenity without the consumer's knowledge or consent.

50.     Sometimes, Wyndham's salespeople induce consumers to give their personal information by purporting to sign them up for a Wyndham "rewards" or "VIP program" or some other "incentive" when, in fact, the salesperson uses the personal information to submit credit applications with Comentiy.

51.     Wyndham's salespersons also misrepresent the nature of the timeshare

---

[12] *Id.*
[13] *Id.*

agreement to induce agreement. The salesperson tells the consumer that no "contract" is necessary to buy a timeshare, and the consumer can cancel at any time.

52.     During the sales solicitations, Wyndham's salespersons then use electronic tablets to fill out documents for consumers.

53.     Upon information and belief, Wyndham trains its salespeople to fill out any documents for the consumer. Because the documents are filled out not by the consumer, but by Wyndham's salesperson, consumers do not see or know the terms of the agreements, and sometimes, that a credit application is being filled out.

**B. Wyndham acts in lockstep with Comenity to consummate the unauthorized credit applications and accounts.**

54.     Comenity offers credit cards that are co-branded with retail stores, travel services, gas stations, auto dealers, healthcare providers, and financial institutions. It offers over 100 store-specific credit cards for retail financing, including with Wyndham.

55.     Comenity knows the credit applications Wyndham submits are unauthorized. Comenity negligently or intentionally pulls the consumers credit report and then approves unauthorized credit card accounts.

56.     Comenity has received thousands of consumer complaints about Wyndham's salespeople opening fraudulent credit cards.

57.     Yet, Comenity negligently or intentionally ignores the thousands of consumer complaints; blindly requests the consumer's credit reports from consumer reporting agencies, like Transunion, Equifax, and Experian; and issues the credit card with no verification.

58.     Comenity reports the credit activity on the consumer's credit report,

resulting in a hard inquiry and a drop in the consumer's credit score.

59.     Comenity knows or has reason to know that consumers have no knowledge and have not consented to the credit applications Wyndham submits. Even so, Comenity negligently or intentionally approves the credit applications, instantaneously, without verifying whether consumers actually consented.

60.     Upon information and belief, Comenity has policies and procedures in place, including training materials, which encourage blindly approving and issuing unauthorized credit cards for Wyndham.

61.     Once Comenity approves the unauthorized credit account, Wyndham's salesperson maxes the credit card out without the consumers' knowledge or consent.

**C. Defendants' deceptive, unfair, and unconscionable practices are not new.**

62.     Upon information and belief, Comenity has received thousands of consumer complaints about Wyndham submitting unauthorized credit applications.

63.     Upon information and belief, Wyndham has received thousands of consumer complaints about its salespersons sending unauthorized credit applications and opening unauthorized credit card accounts.

64.     In 2016, a jury awarded a Wyndham whistle blower employee $20 million after being wrongfully terminated for exposing Wyndham's illegal business practice of defrauding elderly consumers. The whistle blower revealed that Wyndham employees opened and maxed out credit cards without the consumer's knowledge and lied about fees in the credit agreement. Exhibit A.

65.     In October 2003, the California Attorney General Wyndham's predecessor,

Trendwest Resorts, for its unlawful sales practices and material misrepresentations. The case settled with Trendwest agreeing to an injunction barring future illegal conduct and requiring it to offer rescission to customers. Further, it paid $795,000 in civil penalties.[14]

66.     In 2015, the State of Wisconsin sued Wyndham, alleging sales personnel engaged in unfair, deceptive, and misleading sales practices. Wyndham paid $665,000 in restitution; a $99,520 civil fine; $62,702.20 in fees and costs; and had to rescind the contracts. (Sauk County Wisconsin Case No. 2015CX000005).

67.     Like Wyndham, Comenity has a history of using unfair, deceptive, and unconscionable conduct that harms consumers.

68.     In 2015, Comenity agreed to a settlement with the Federal Deposit Insurance Corporation regarding its deceptive practices and material misrepresentations and omissions in relation to credit card add-on products.[15] Comenity paid a $2 million penalty and $53 million in restitution to harmed consumers as part of the settlement.

69.     Beyond the lawsuits, consumers have posted numerous complaints on the internet about Wyndham and Comenity opening unauthorized credit cards.

70.     For example, the Campbells attended a Wyndham timeshare presentation, and unknown to them, left with a $15,000 credit line maxed out in their name.[16] The Wyndham salesperson told the Campbells that Wyndham needed their personal financial

---

[14] https://oag.ca.gov/news/press-releases/attorney-general-lockyer-settles-lawsuit-against-one-world s-largest-timeshare. (Last visited December 6, 2019).
[15] *FDIC Announces Settlement with Comenity Bank and Comenity Capital Bank for Deceptive Practices Related to Credit Card Add-On Products*, Federal Deposit Insurance Corporation (Sept. 8, 2015), https://www.fdic.gov/news/news/press/2015/pr15073.html.
[16] https://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/couple-goes-to-wyndham-timeshare-meeting-unknowingly-gets-15k-line-of-credit

information for their "free" prize, but "the Wyndham employees refused to give them their prize until they'd been there nearly five hours as salespeople took turns trying to sell them a timeshare." [17] Unknown to them, the Wyndham salesperson "opened a $15,000 account on us that I didn't know nothing about."[18] And the Campbells discovered the salesperson "applied for a Wyndham Rewards Visa card that same day" without their knowledge or consent.[19]

71.     On June 17, 2019, the Better Business bureau received the following complaint about Wyndham:

> We walked into the store in the Rivercenter Mall in San Antonio looking for coupons and ideas to entertain our kids that afternoon. We were told that Wyndham Resorts would provide our group of six tickets to the Ripley's Believe it or Not, Wax Museum, and the 4D IMAX theatre if we attended a short presentation. The card informed us it would be a two-hour presentation, but we were ensured by Clarissa that the presentations do not take that long and we could be out in as little as an hour or hour and a half. We were also given a promise card that there would be "absolutely be no high-pressure sales tactics!" From the time we left the store, got on the shuttle and back to the Rivercenter Mall, it was close to three hours. Our sales person, Joseph, met with us, discussed our travel experience and goals. We informed him from the beginning that we were not interested in purchasing the time share. He introduced us to several other employees and managers, and lied right in front of our face telling these people that we were ready to sign if the price was right. We NEVER made that claim, nor were we EVER even considering purchasing the time share. In addition, he asked us to take out our credit card and hold it up in the air as we walked by the resort so people would know we were serious. For the hundredth time, we had to tell him no, we are not serious and we would not do that. Furthermore, we

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

completed a survey just trying to go through the process so we could get the free tickets and spend quality time with our family, which they stole almost three hours of. We were not told there was going to be a credit check and we did not give permission to run our credit, especially a hard credit inquiry requesting a loan of over $50,000. We told Joseph multiple times even if money wasn't an issue, we were not interested. Even after we told him this, he told other sales managers we were ready to sign and purchase. After I tried to rush things along earlier in the presentation, he boldly requested that I be patient and show him respect as he is trying to do his job. From then, I was more patient and allowed him to keep talking, but finally at the end, I literally had to be forceful and slide the paper to him, look him straight in the eye and tell him as politely and respectful as I could that we had already told him no multiple times and we will not purchase. Yet, we still had one more closer, who was just as rude. This lady said, "you should have just told him no at the beginning, it would have saved you time." My husband said, "We did" and she walked off not acknowledging us.[20]

72.     On April 4, 2019, the BBB received the following complaint about Wyndham:

They practically coerced us to sign up for their membership even after we told them that we cannot afford purchasing a timeshare. They eventually offered us a low monthly fee in installment basis but upon closer inspection, it doesn't mention it anywhere in the agreement and we will be billed only in one full amount which is more than we can afford. When we finally asked the salesperson about it, he told us that he opened a credit line on our behalf without full disclosing it to us when we were there during the presentation. We felt betrayed because they told us one thing in person and a completely different thing in the agreement. Everything was done in a totally dishonest fashion. Product_Or_Service:     Timeshare     Account_Number: Member # 00203574998

Desired Outcome

---

[20] https://www.bbb.org/us/fl/orlando/profile/vacation-timeshare/wyndham-vacation-ownership-inc-0733-20000283/complaints

Other (requires explanation) Other (requires explanation)
We would like them to totally cancel the agreement because
it wasn't what we agreed on and we didn't approve of them
opening a credit line on our behalf.[21]

73.     On March 26, 2019, the BBB received the following complaint against

Wyndham:

Used my ss# to open a new credit account when I was not
aware that was to be the case Went for a Wyndham account
update. Agreed to have ss# ran for CREDIT CHECK only
should we decide to increase our vacation points. At no time
was a new credit card, vacation account discussed. About a
week later, I had received a new account with a $25K limit
that was titled vacation account. This was done fraudulently,
without my knowledge. And if I signed something, I
received NO paperwork from Wyndham notifying me this
was the case. Again, my social security #, as explained to
me, was going to ensure my credit was ok, that nothing had
changed in the 2 years since we became Wyndham
"owners", and would save time if we decided to move
forward with additional points. I called the company that
evening, after receiving notification thru the mall of the new
account, and was told that it would put in paperwork with
the credit bureaus so it would not go against my credit. At
the Alexandria, VA location, I dealt with Bridgett and
Tamika (Spelling may not be 100%) and I have no last
names. So, one of the two of them, and I am assuming
Tamika since she is the one who went to "run my credit"
used my social security # fraudulently.

Desired Outcome

Not only do I want my credit fixed. How do I ensure my ss#
will not be used for future things by Wyndham? I also do not
want to be contacted by Wyndham any longer. I do not want
to be hounded to increase my points with Wyndham any
longer. We will remain at our current level unless WE decide
to go to a seminar. That includes being hounded while on

---

[21] https://www.bbb.org/us/fl/orlando/profile/vacation-timeshare/wyndham-vacation-ownership-inc-0733-
20000283/complaints

vacation with family. Our trust in Wyndham is gone and we will not recommend this to anyone.[22]

74.    Complaints against Comenity are no different.

75.    On February 11, 2020, the BBB received the following complaint about Comenity and Wyndham:

The only time I had contact with Wyndham was when I went to a timeshare presentation on Saturday February 01, 2020 for free gifts. I did not authorize anyone to open an account or furnished information about an account. I was asked about opening an account and explicitly said no. my account number is ******************[23]

76.    On January 8, 2020, the BBB received the following complaint about Comenity and Wyndham:

wyndham vacation club in hawaii AT THE OUTRIGGER HOTEL illegally opened a account/charge card without my consent. i was on vacation in hawaii and took a tour for a credit to a luau. before i took the tour the timeshare person wanted to run my credit to see what i was eligible for. i was eligible BUT DID NOT PURCHASE. I DECLINED THE OFFER TO PURCHASE A TIME SHARE OR ANY RELATED PRODUCTS I HAVE NO DEED NO DOCUMENTATION NOTHING OTHER THAN A SIMPLIFIED LETTER STATING AN ACCOUNT NUMBER AND A CREDIT LIMIT AND A NUMBER TO CONTACT COMENITY. I TALKED TO A GENTLEMAN AND LEFT THE SAME DAY I TOOK THE TOUR THE LETTER RECEIVE IS DATED 11/26/19 I DIDNT RETURN BACK TO PA WHERE I RESIDE UNTIL NOV 29TH.. I DID NOT CONSENT TO OPENING ANYTHING MY NAME, SOCIAL, ANYTHING TO BE USED. THIS IS NOW ON MY CREDIT AND I WANT IT OFF. IVE LOOKED AT

---

[22] https://www.bbb.org/us/fl/orlando/profile/vacation-timeshare/wyndham-vacation-ownership-inc-0733-20000283/complaints

[23] https://www.bbb.org/us/oh/columbus/profile/credit-cards-and-plans/comenity-capital-bank-0302-70009182/complaints

TIMESHARES OVER MY LIFETIME AND HAVE
NEVER HAD SOMEONE ILLEGALLY OPEN AN
ACCOUNT ON MY BEHALF. PLEASE
INVESTIGATE AS THIS MOST LIKELY IS
HAPPENNG TO OTHER PEOPLE THANK yOU[24]

**D.  Defendants' Conduct as to the Plaintiffs.**

77.     On or about March 19, 2019, the Plaintiffs were leaving SeaWorld with their children when a Wyndham representative stopped them and asked if they were interested in a "free" prize to sit through a Wyndham timeshare presentation.

78.     Wyndham's representative asked the Plaintiffs for their personal financial information. The representative explained that the information was required before the Plaintiffs could sit through the presentation.

79.     Based on the representation, the Plaintiffs gave their information to the representative.

80.     Unknown to Plaintiffs, the Wyndham representative submitted a credit card application to Comenity with Mr. Carroll's information.

81.     In turn, Comenity obtained a consumer report on Mr. Carroll from a consumer reporting agency, and then blindly approved the application without verifying whether the Plaintiffs actually consented.

82.     The Plaintiffs never consented to have a credit application submitted in their name or have a credit account opened.

83.     At the end of the timeshare presentation, Mr. Carroll explained the

---

[24] https://www.bbb.org/us/oh/columbus/profile/credit-cards-and-plans/comenity-capital-bank-0302-70009182/complaints

timeshare was unaffordable, because he was in the military, and they did not want to be bound by a contract. But Wyndham's salesperson persisted, offering a no interest deal, payable by monthly installment payments of $100.

84.     Based on these representations, the Plaintiffs agreed, and Wyndham issued a Club Wyndham Discovery Membership Agreement ("Credit Agreement"). Exhibit B.

85.     At no time did Wyndham's representative inform the Plaintiffs that he used their information to submit a credit card application or open a credit card account.

86.     Unknown to Plaintiffs, Wyndham's representative charged $3,753.06 to the unauthorized credit card account, without the Plaintiffs' knowledge or consent, to pay for the timeshare.

87.     The Plaintiffs later received a letter in the mail from Comenity about the credit card, revealing the $3,753.06 charged to the account.

88.     The Plaintiffs were understandably confused, shocked, and distressed because they never agreed to have a credit application submitted in Mr. Carroll's name or to have the unauthorized credit account opened in his name.

89.     The Plaintiffs then discovered that the Comenity credit card account appeared on Mr. Carroll's credit report, which lowered his credit score.

90.     Plaintiffs immediately contacted Wyndham and Comenity and disputed the credit card account.

91.     Mr. Carroll also contacted three credit reporting agencies and disputed the Comenity account appearing on his credit report.

92.     To date, the Defendants have refused to cancel the account.

93.     After discovering the unauthorized credit account, the Plaintiffs have spent time trying to contact both Defendants and disputing the account and the amount allegedly owed. During this time, the Plaintiffs have suffered emotional distress and frustration after the Defendants refused to cancel the account.

**E.  Defendants' illegal conduct has caused consumers like the Plaintiffs actual, concrete damages.**

94.     Because Defendants acted in concert to submit thousands of unauthorized credit applications, and open thousands of unauthorized credit card accounts, including charging thousands of dollars in unauthorized amounts to those accounts, consumers like Plaintiffs are bound to pay amounts they did not consent to pay and cannot afford.

95.     Defendants' conduct has therefore created an imminent and material risk that consumers, like the Plaintiffs, will pay amounts not legally owed.

96.     Moreover, by impermissibly obtaining thousands of consumer reports, without consumers' knowledge or consent, Defendants have systematically lowered those consumers' credit scores and reduced their credit borrowing ability.

## VI.  CLASS REPRESENTATION ALLEGATIONS

97.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3) on behalf of the following class of persons (the "Nationwide Class 1"), subject to modification after discovery and case development:

> All consumers in the United States for whom Wyndham submitted a credit application to Comenity without the consumer's consent or who received a Wyndham-brand credit card, through Comenity, without consent, during the applicable statute of limitations.

98.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ.

P. 23(b)(3) on behalf of the following class of persons ("Nationwide Class 2"), subject to

modification after discovery and case development:

> All consumers in the United States for whom Wyndham
> or Comenity obtained a consumer report without the
> consumer's consent, during the applicable statute of
> limitations.

99.     Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ.

P. 23(b)(3) on behalf of the following class of persons ("Florida Class"), subject to

modification after discovery and case development:

> All consumers in Florida who were charged an amount
> under a Wyndham-brand credit card, through Comenity,
> without the consumer's consent.

100.    Defendants have acted or refused to act on grounds that apply generally to

the class members because they systematically submitted unauthorized credit applications,

obtained consumer reports without a permissible purpose, and opened unauthorized credit

card accounts without the consumers' knowledge or consent.

101.    Class members are identifiable through Defendants' records and payment

databases.

102.    Excluded from the Classes are Defendants; any entities in which they have

a controlling interest; their agents and employees; and any Judge to whom this action is

assigned and any member of such Judge's staff and immediate family.

103.    Plaintiffs propose that they serve as class representatives.

104.    Plaintiffs and the Classes have all been harmed by Defendants' conduct.

105.    Numerosity is satisfied as there are likely thousands of class members,

making individual joinder of these persons is impracticable.

106.    There are questions of law and fact common to Plaintiffs and to the Classes, including, but not limited to:

a.  Whether Defendants violated the TILA by issuing unauthorized credit cards;

b.  Whether Defendants violated the FCRA by obtaining consumer reports without a permissible purpose;

c.  Whether Defendants opened credit cards without the persons knowledge or consent;

d.  Whether Defendants charged the Class Members amounts not owed in violation of the FCCPA;

e.  Whether Defendants claimed and collected debts for amounts not owed in violation of FDUTPA;

f.  Whether the Class Members are entitled to void their credit agreements the Declaratory Judgment Act; and

g.  Whether the Class Members are entitled to actual and statutory damages under TILA, FCRA, the FCCPA and FDUTPA.

107.    Plaintiffs' claims are typical of the claims of class members. Defendants opened credit cards in the Class Members' names without their knowledge or consent. Defendants obtained consumer reports without the Plaintiffs' knowledge or consent. The Defendants also charged the Plaintiffs an amount that they did not owe under the unauthorized credit card account.

108.    Plaintiffs are adequate representatives of the Classes because their interests

do not conflict with the class members' interest, and they will fairly and adequately protect the class members' interests. Plaintiffs have taken actions before filing this amended complaint by hiring skilled and experienced counsel to protect the class members' interests.

109.    Plaintiffs have hired counsel that is skilled and experienced in class actions and capable of protecting the class members' interests.

110.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

111.    The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**COUNT I AS TO WYNDHAM'S VIOLATION OF THE TRUTH IN LENDING ACT 15 U.S.C. § 1642 and REGULATION Z 12 CFR § 1026.12(a)(1)**
**(Nationwide Class 1)**

112.    The Wyndham Credit Card is a "credit card" as defined by TILA because it is a "card … existing for the purpose of obtaining money, property, labor, or services on credit." 15 U.S.C. § 1602(l); 12 CFR § 1026.2(a)(15).

113.    Mr. Carroll is a "cardholder" as defined by Regulation Z because he is a natural person and the unauthorized credit card was issued for consumer credit purposes, *i.e.* the alleged purchase of a timeshare for personal, family, or household use. 12 CFR § 1026.2(a)(8).

114.    Wyndham and Comenity have an agency relationship, and because Wyndham is an agent of Comenity, and Comenity is a "card issuer," Wyndham is also a "card issuer" as defined by TILA and Regulation Z. 15 U.S.C. § 1602(o); 12 CFR

§ 1026.2(a)(7).

115.    Upon information and belief, Comenity has an agreement with Wyndham that allows Wyndham to market and sell credit cards for Comenity.

116.    Comenity acknowledged that Wyndham will market and sell credit cards for Comenity.

117.    Wyndham accepted that undertaking as shown by the unauthorized credit card application Wyndham submitted for the Plaintiffs.

118.    Comenity controls the actions of Wyndham surrounding the marketing and selling of credit cards for Comentiy.

119.    Upon information and belief, the agreement between the Defendants gives Comenity control over how Wyndham markets and sells credit cards for Comenity.

120.    For example, upon information and belief, Comenity controls the marketing material Wyndham uses when selling the credit cards; Comenity controls how Wyndham can submit the credit card applications; Comenity controls the credit products that Wyndham is can offer consumers; and Comentiy controls the standards by which Wyndham should act when obtaining consumers financial information to submit credit card applications.

121.    The Unsolicited Issuance Rule states that no credit card may be issued to any person except in response to an explicit oral or written request or application for the card. 12 C.F.R. § 1026.12(a)(1); 15 U.S.C. § 1642.

122.    Because Wyndham acted in concert with Comenity and submitted an unauthorized credit card application, resulting in the issuance of an unauthorized credit

card, Wyndham violated the Unauthorized Issuance rule.

123.    Because of Wyndham's conduct, Mr. Carroll is entitled to attorneys' fees and costs, actual damages, and "such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor…." 15 U.S.C. § 1640(1)-(2)(B).

## COUNT II AS TO WYNDHAM'S VIOLATION OF THE
## FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)
### (Florida Class)

124.    Plaintiffs are "consumers" as defined by Fla. Stat. § 559.55(8) because the credit transaction involved an alleged timeshare purchase for personal or family use.

125.    Wyndham is a "person" as interpreted under the FCCPA.

126.    Wyndham violated the FCCPA because it knew it had no legal right to use unfair, deceptive, or unconscionable acts or practices in connection with the timeshare purchase. *See Cliff v. Payco Gen. American Credits, Inc.*, 363 F.3d 1113, 1126 (11th Cir. 2004) ("With respect to determining what constitutes a misrepresentation of a legal right under Section 559.72(9), the Court "must refer to other statutes that establish the legitimacy of a debt and define legal rights."); *Brook v. Suncoast Sch., FCU*, 8:12-CV-01428-T-33, 2012 WL 6059199, at *3 (M.D. Fla. Dec. 6, 2012) (finding FCCPA violated when defendant asserted illegitimate legal right by attempting to collect a debt using unfair and deceptive practices in violation of FDUTPA.); *Ortega v. Collectors Training Inst. of Illinois, Inc.*, 09-21744-CIV, 2010 WL 11505559, at *5 (S.D. Fla. Mar. 31, 2010) (finding

FCCPA violated when defendant used debt collection techniques prohibited by the FDCPA.)

127. Wyndham's salesperson had no legal right to submit a credit application in the Plaintiffs' name.

128. Wyndham's salesperson had no legal right to bind the Plaintiffs to a credit agreement he knew they did not want and could not afford.

129. In connection with the alleged timeshare purchase, Wyndham directly and indirectly asserted a non-existent legal right when it misstated the reason for obtaining the Plaintiffs' financial information; when it submitted an unauthorized credit card application to Comenity; and when it charged $3,753.06 to the unauthorized credit card account to pay for the timeshare without Plaintiffs' knowledge or consent.

130. As a result of Wyndham's misconduct, the Plaintiffs have suffered the imminent risk of paying a debt they do not owe. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay an amount under the Wyndham Credit Card that they did not consent to pay and cannot afford.

131. Because of Wyndham's misconduct, the Plaintiffs have suffered lost time, emotional distress, and frustration disputing a credit card account, to which they did not consent or have knowledge of, that Defendants have refused to cancel.

132. As a result, the Plaintiffs are each entitled to actual damages; statutory damages, and reasonable attorneys' fees and costs. Fla. Stat. § 559.77(2).

**COUNT III AS TO COMENITY'S VIOLATION OF THE TRUTH
IN LENDING ACT 15 U.S.C. § 1642 and REGULATION Z 12 CFR § 1026.12(a)(1)**
**(Nationwide Class 1)**

133.    The Wyndham Credit Card is a "credit card" as defined by TILA because it is a "card … existing for the purpose of obtaining money, property, labor, or services on credit." 15 U.S.C. § 1602(l); 12 CFR § 1026.2(a)(15).

134.    Mr. Carroll is a "cardholder" as defined by Regulation Z because he is a natural person and the unauthorized credit card was issued for consumer credit purposes, *i.e.* the alleged purchase of a timeshare for personal, family, or household use. 12 CFR § 1026.2(a)(8).

135.    Comenity is a "card issuer" as defined by TILA and Regulation Z. 15 U.S.C. § 1602(o); 12 CFR § 1026.2(a)(7).

136.    The Unsolicited Issuance Rule states that no credit card may be issued to any person except in response to an explicit oral or written request or application for the card. 12 C.F.R. § 1026.12(a)(1); 15 U.S.C. § 1642.

137.    Because Comenity issued an unauthorized credit card without Mr. Carroll's explicit oral or written request or application, and then allowed Wyndham to charge $3,753.06 to that unauthorized credit card account, Comenity has violated the Unauthorized Issuance rule.

138.    Because of Comenity's conduct, Mr. Carroll is entitled to attorneys' fees and costs, actual damages, and "such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure

to comply by the same creditor shall not be more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor…." 15 U.S.C. § 1640(1)-(2)(B).

## COUNT IV AS TO COMENITY'S VIOLATION OF
## THE FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681 *et seq.*
### (Nationwide Class 2)

167.    Each time Comenity opens a new credit card, it obtains a "consumer report," as defined in the FCRA. 15 U.S.C. § 1681a(d).

168.    Under the FCRA, Comenity cannot obtain or use consumer reports from consumer reporting agencies under false pretenses and without proper authorization from the consumer who is the subject of the report. 15 U.S.C. § 1681b, 1681n, and 1681o.

169.    Comenity has a mandatory duty to use or obtain consumer reports only for permissible purposes. 16 U.S.C. § 1681b(f).

170.    Despite these clear and unambiguous requirements of the FCRA, Comenity regularly obtains consumer reports regarding consumers without their knowledge or consent in order to cause new unauthorized credit cards to be issued, in violation of the FCRA.

171.    Comenity violated FCRA when it knowingly and intentionally obtained or used the Plaintiffs' consumer reports under false pretenses and without Plaintiffs' consent, lowering their credit score and reducing their credit borrowing ability.

172.    As a result, Comenity is liable for negligently and willfully violating the FCRA by obtaining consumer reports without a permissible purpose or authorization. 15 U.S.C. §§ 1681n and 1681o,

**COUNT V AS TO COMENITY'S VIOLATION OF THE**
**FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)**
**(Florida Class)**

173.    Plaintiffs are "consumers" as defined by Fla. Stat. § 559.55(8) because the credit transaction involved a timeshare interest for personal or family use.

174.    Comenity is a "person" as interpreted under the FCCPA.

175.    Comenity violated the FCCPA because it knew it had no legal right to use deceptive, unfair, or unconscionable conduct in connection with the timeshare purchase. *See Cliff v. Payco Gen. American Credits, Inc*., 363 F.3d 1113, 1126 (11th Cir. 2004) ("With respect to determining what constitutes a misrepresentation of a legal right under Section 559.72(9), the Court "must refer to other statutes that establish the legitimacy of a debt and define legal rights."); *Brook v. Suncoast Sch., FCU*, 8:12-CV-01428-T-33, 2012 WL 6059199, at *3 (M.D. Fla. Dec. 6, 2012) (finding FCCPA violated when defendant asserted illegitimate legal right by attempting to collect a debt using unfair and deceptive practices in violation of FDUTPA.); *Ortega v. Collectors Training Inst. of Illinois, Inc*., 09-21744-CIV, 2010 WL 11505559, at *5 (S.D. Fla. Mar. 31, 2010) (finding FCCPA violated when defendant used debt collection techniques prohibited by the FDCPA.)

176.    Comenity had no legal right to approve the unauthorized credit application in the Plaintiffs' name.

177.    Comenity had no legal right to bind the Plaintiffs to a credit agreement he knew they did not want and could not afford.

178.    In connection with the alleged timeshare purchase, Comenity directly and indirectly asserted a non-existent legal right when it approved a credit application without

verifying whether the Plaintiffs consented; when it issued an unauthorized credit card; when it allowed Wyndham to charge $3,753.06 to the unauthorized credit card account to pay for the timeshare without Plaintiffs' knowledge or consent; and when it attempted to collect the $3,753.06 from the Plaintiffs.

179.   As a result of Comenity's misconduct, the Plaintiffs have suffered the imminent risk of paying a debt they do not owe. Further, Wyndham has caused the Plaintiffs financial harm because they are bound to pay an amount under the Wyndham Credit Card that they did not consent to pay and cannot afford.

180.   Because of Comenity's misconduct, the Plaintiffs have suffered lost time, emotional distress, and frustration disputing a credit card account, which they did not consent to or have knowledge of, that Defendants have refused to cancel.

181.   As a result, the Plaintiffs are each entitled to actual damages, statutory damages, and reasonable attorneys' fees and costs. Fla. Stat. § 559.77(2).

## COUNT VI AS TO WYNDHAM'S VIOLATION OF THE
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §§ 501.203(3), 501.204
### (Florida Class)

182.   Plaintiffs and the Florida Class Members are "consumers" as defined by Fla. Stat. § 501.203(7).

183.   Wyndham violated the FCCPA because it knew it had no legal right to use deceptive, unfair, and unconscionable acts or practices in connection with the timeshare purchase.

184.   A violation of Fla. Stat. § 559.72(9) of the FCCPA is a per se violation of FDUTPA under Fla. Stat. § 501.203(3).

30

185.     In addition to the above-referenced per se FDUTPA violations, Defendant also generally violated FDUTPA under Fla. Stat. § 501.204(1) when it engaged in unfair and deceptive practices in trade or commerce by taking advantage of consumers in approving a credit application without verifying whether the Plaintiffs consented; issuing an unauthorized credit card; allowing Wyndham to charge money to the unauthorized credit card account to pay for the timeshare without Plaintiffs' knowledge or consent; and attempting to collect the unauthorized amount from the Plaintiffs.

186.     Defendant never informed Plaintiffs and the Florida Class Members that they would approve credit applications without verifying consent; issue unauthorized credit cards; charge money to the unauthorized credit cards; or attempt to collect such unauthorized amounts.

187.     As a result of Defendant's FDUTPA violations, Plaintiffs and the Florida Class Members suffered substantial damage, including but not limited to financial damage incurred from Defendant's unlawful conduct.

### COUNT VII UNDER THE DECLARATORY JUDGMENT ACT 28 U.S.C. § 2201(a) AGAINST DEFENDANTS
#### (Nationwide Class 1 and 2)

188.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

189.     As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiffs and Class Members.

190.    Defendants have refused to cancel the unauthorized accounts and agreements.

191.    As a result, Plaintiffs, on behalf of the putative classes, seek an order declaring the unauthorized credit card accounts and Wyndham agreements void as a result of Defendants' practices of (1) completing credit applications and submitting them without authorization from the consumer; and (2) Defendants' practice of obtaining unauthorized consumer reports and causing unauthorized credit cards to be issued.

192.    As a result of Defendants' illegal conduct, Plaintiffs seek disgorgement of all monies unlawfully collected, an order from the Court voiding all unauthorized credit agreements, and an order from the Court declaring Defendants' conduct as described herein unlawful.

193.    Plaintiffs respectfully request attorney's fees and costs based on the "common benefit doctrine." *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392–393, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970); *see also Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (fees were awarded in a Medicare class action by ordering 1% deducted from each class member's Medicare benefit payment).

## JURY DEMAND AND RESERVATION OF PUNITIVE DAMAGES

194.    Plaintiffs are entitled to and respectfully demand a trial by jury on all issues so triable.

195.    Plaintiffs reserve the right to amend their complaint and add a claim for punitive damages.

## RELIEF REQUESTED

WHEREFORE. Plaintiffs on behalf of the Classes respectfully request this Court to enter judgment against Defendants for the following:

a.   That Plaintiffs and all class members be awarded actual damages, including but not limited to forgiveness of all amounts not owed;

b.   that Plaintiffs and all class members be awarded statutory damages;

c.   that all credit agreements between Defendants and Plaintiffs and all class members be voided.

d.   that all amounts paid by Plaintiffs and all class members be disgorged and returned.

e.   that Plaintiffs and all class members be awarded costs and attorney's fees;

f.   that the Court enter an order that Defendants and their agents, or anyone acting on their behalf, are immediately restrained from altering, deleting or destroying any documents or records that could be used to identify class members;

g.   that the Court certify Plaintiffs' claims and all other persons similarly situated as class action claims under the Federal Rules of Civil Procedure and

h.   Such other and further relief as the Court may deem just and proper.

Dated: March 19, 2020                    Respectfully submitted,

                                          _ /s/   James L. Kauffman____
                                          James L. Kauffman, FL Bar No. 12915
                                          Bailey & Glasser, LLP
                                          1055 Thomas Jefferson Street NW,

Suite 540
Washington, DC 20007
Telephone: (202) 462-2101
Facsimile: (202) 463-2103
jkauffman@baileyglasser.com

Darren R. Newhart, Esq.
FL Bar No: 0115546
E-mail: darren@cloorg.com
J. Dennis Card, Jr., Esq.
FL Bar No: 0487473
E-mail: dennis@cloorg.com
CONSUMER LAW ORGANIZATION,
P.A.
721 US Highway 1, Suite 201
North Palm Beach, Florida 33408
Telephone: (561) 822-3446
Facsimile: (305) 574-0132

Christopher W. Legg, Esq.
FL Bar No.: 44460
CHRISTOPHER W. LEGG, P.A.
499 E. Palmetto Park Rd., Ste. 228
Boca Raton, FL 33432
Tel: 954-962-2333
Email: Chris@theconsumerlawyers.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to all counsel of record through the Court's CM/ECF electronic case filing system this 19th day of March 2020.

*/s/ James L. Kauffman*
James L. Kauffman

# Exhibit A

MAR 10 2017

San Francisco County Superior Court

CLERK OF THE COURT
By _____
Deputy Clerk

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

PATRICIA WILLIAMS,

Plaintiff,

vs.

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION RESORTS,
INC.,

Defendants.

Case No. CGC-12-526187

**RULINGS ON DEFENDANTS' POST-
TRIAL MOTIONS**

Defendants move for a new trial and judgment notwithstanding the verdict ("JNOV").

Save for a reduction in the amount of punitive damages, the motions are DENIED.

## Summary of Trial Evidence

With a net worth of $3.7 billion, Wyndham Vacation Ownership, Inc. is one of the

world's largest timeshare companies. In 2010, Wyndham's[1] San Francisco site was defrauding

many customers, mainly the elderly. Wyndham's salespeople called the fraudulent practices

"pitching heat." The fraud took many forms. "Buy back fraud" was to make a sale by falsely

telling a prospect that Wyndham guaranteed to buy back timeshares. Wyndham's salespeople

also financed timeshares by opening credit cards in customers' names without their knowledge.

They falsely stated that monthly maintenance fees could not be raised, and sold the elderly more

---

[1] Wyndham Vacation Ownership, Inc. and Wyndham Vacation Resorts, Inc. are affiliated. At trial, its counsel called
the two "Wyndham" and rarely distinguished between them. I follow Wyndham's convention in this order.

time than they could reasonably use before death. When timeshare sales were off, Wyndham had "TAFT Days" – "Tell Them Any Frigging Thing."

Led by site manager Tara Dow, Wyndham incentivized the fraud in its fast-talking high-pressure commission-sales environment with "The Wheel." Using it, Dow assigned salespeople who sold timeshares by "pitching heat" on one day to prey on prime prospects the next day. Conversely, Dow assigned salespeople who refused to commit fraud to "one-leggers" – a wife or husband whose spouse was not present to enable a sale.

The most egregious fraudster, Anita Howell, bragged to co-workers that she "sold my soul to the Devil." Wyndham received 39 customer complaints against Howell.

Patricia Williams, a Wyndham salesperson in Virginia, was recruited to join Wyndham-San Francisco and moved herself cross-country. Confronted with the rampant fraud, Williams refused to join in and blew the whistle, reporting the fraud internally at Wyndham and then to the National Labor Relations Board. Wyndham fired Williams in retaliation. The Wyndham human resources officer who investigated her case and questioned the propriety of Williams' pretextual firing was then himself fired.

Meanwhile, as Howell continued to amass customer complaints, Wyndham lavished her with steak dinners, lobsters delivered to her home and tropical vacations.

Back in Virginia, Williams sought solace in alcohol, drinking herself to sleep most nights. At middle age, she was reduced to a restaurant greeter job and moved in with her mother.

## New Trial Motion

**Whitney Testimony.** Wyndham's lead argument regards Marty Whitney, a Williams co-worker. Formerly a co-plaintiff with Williams in this case, Whitney became unhappy when Williams did not settle along with her, believing that cost Whitney more money. Whitney thus

2

delivered on a written threat to turn coat and testify against Williams at trial. Among Whitney's testimony were details of what Williams would seek in mediation and settlement.

Wyndham claims Williams' counsel violated my orders on mediation and settlement. I ruled that, if former co-plaintiff witnesses (*e.g.,* Whitney) showed animus toward Williams in their testimony, they could be asked "whether they're unhappy that Ms. Williams would not settle thus costing them more money, but without saying settlement amounts." Whitney was thus asked in cross-examination: "Didn't you communicate if you had to settle for that [unstated] small amount, you were going to be a witness for Wyndham against Trish [Williams]?" This did not violate my orders.

Nor was it error. Wyndham opened the door to mediation-related matters with Whitney's testimony about her pre-mediation discussions with Williams. To not allow impeachment of Whitney with her post-mediation threat could only have misled the jury and violated due process. The Legislature's intent in enacting mediation laws was not to promote gamesmanship or perjury. (*See Rojas v. Sup. Ct.* (2004) 33 Cal.4th 407, 416-18.)[2]

Moreover, had any error occurred, it would have been harmless. Questioning about Whitney's threat took roughly one minute of a three-week trial. The rest of Whitney's spiteful testimony was self-contradictory, hyper-partisan, lacking in credibility and just plain bizarre.[3] Wyndham deems Whitney's testimony "devastating" to Williams, but it actually hurt Wyndham's case far more than it helped.

**Amount of Noneconomic Damages.** Williams sought noneconomic damages for "past physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience,

---

[2] Wyndham says it wanted Whitney to make "a forceful and complete denial" of her threat against Williams; that would have been a falsehood.

[3] Early on, for example, Whitney announced to the jury that she was "a domestic goddess."

grief, anxiety, humiliation, and emotional distress." The testimony of Williams and her former fiancé (set out on pages 5 and 6 of her opposition) was detailed and convincing.

The jury was instructed: "No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your commonsense." (California Civil Jury Instructions (CACI) 3905A.) This was, in fact, a commonsense jury. Jurors posed many intelligent written questions to witnesses and made cogent queries while deliberating. (*See* CACI 5009, 5019.)

Wyndham claims the jury's noneconomic damages verdict was "excessive" and based on "inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct." But Wyndham points to nothing persuasive. Its lead is again the minute of Whitney testimony – a weak reed. Wyndham next says the evidence of its sales fraud was "misconduct" by Williams' counsel. However, that evidence tracked my rulings and was relevant to the reasons for Williams' whistleblowing, to the motive for Wyndham's retaliation and to Wyndham's disparate treatment of Howell and Williams.

Wyndham also argues that awards in other cases mandate reversal of our jury's verdict. The California Supreme Court teaches otherwise: "The vast variety and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries award to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of fact finding." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65 n.12.)

No cause for a new trial on noneconomic damages exists.

4

**Jury Question.** During Phase I deliberations in this bifurcated punitive damages trial, the jury sent out a written question: "Regarding [CACI] 3946, punitive damages may apply if Wyndham engaged in malice [,] oppression or fraud. Must we consider only malice, oppression or fraud conduct towards Ms. Williams, or malice, oppression or fraud in general (i.e., defrauding the elderly)." (emphasis in original).

CACI 3946 is a lengthy instruction, but its first sentence answered the jury's query: "If you decide that Wyndham's conduct caused Patricia Williams harm, you must decide whether that conduct justifies an award of punitive damages" – *i.e.,* the jury must consider only conduct toward Williams, as the sentence mentioned no one else. I thus answered the jury question: "Please see first sentence of CACI 3946."[4]

Wyndham advocated that I instead clip a sentence from CACI 3949 – an instruction not to be given until Phase II of a bifurcated punitive damages trial. In any event, the two sentences' import is the same. This was no error.

**Amount of Punitive Damages.** In Phase II, the jury was instructed: "The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future." (CACI 3949.) As to "the amount of punitive damages," the jury was instructed to consider "[h]ow reprehensible" Wyndham's conduct was and, "[i]n view of" the "defendant's financial condition, what amount is necessary to punish it and discourage future wrongful conduct?" (*Id.*)

Wyndham's conduct was highly reprehensible; Wyndham fleeced elderly people rampantly. When Williams blew the whistle on the fraud, Wyndham retaliated against the "financially weak" and "vulnerable" single woman, who arrived in San Francisco with too little money to pay first month's rent. (*See* CACI 3949.) When Wyndham's own human resources

---

[4] This is unlike Wyndham's cited cases, in which instructions did not already state the requisite legal standards.

officer questioned Wyndham's conduct, it fired him too, showing "a pattern or practice" of retaliation. *(See id.)*[5]

The question for the jury thus became how much money, in view of Wyndham's "financial condition," was "necessary to punish" its highly reprehensible past misconduct and to "discourage future wrongful conduct." *(See CACI 3949.)* Wyndham is a $3.7-billion concern. The $130,000 in punitive damages it now proposes to pay would be a rounding error to Wyndham, not punishment.

Wyndham finds "passion and prejudice" in the jury's verdict based on no more than its amount. However, given the evidence and the CACI instructions the jury followed, the verdict is dispassionately sound. Wyndham's conduct was highly reprehensible; $18.6 million might well be necessary to actually punish, and deter future misconduct by, a company worth $3.7 billion.

Wyndham again cherry-picks awards from other cases. However, our Supreme Court's teaching is again wise: comparison to other awards in other cases to other plaintiffs based on other facts and other law seldom proves fruitful. *(See Bertero,* 13 Cal.3d at 65.) The evidence and instructions in *this* case are primary; they warranted the jury's punitive damages award.

That said, the U.S. Supreme Court has set "due process" limits on punitive damages. As stated in *State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 410, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy

---

[5] Other Wyndham employees also testified to its retaliatory practices and fraud:

   (1) Salesperson: After she complained of the fraud, "The managers wouldn't even look at me. They would skip me on the rotation. They did...everything they could so I wouldn't get sales."

   (2) Salesperson: When she complained to Wyndham about the fraud, site manager Dow told her to "keep my mouth shut or I'd be fired."

   (3) Manager: After he protested the fraud in a letter, Wyndham vice president Jim White told him he had to transfer out of San Francisco or be fired.

   (4) Salesperson: She was afraid to report fraud "because I would be fired"; Wyndham "was like the Mafia."

   (5) Quality control officer: She was shunned by fraudster salespeople after arriving in San Francisco because they could not "get away with as much"; after she reported a pattern of fraud, Wyndham did not take responsive steps.

due process." The punitive damages award is therefore reduced to $12.8 million – a less than 9:1 ratio between punitive and compensatory damages. (*See Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 375) ("appropriate order is for an absolute reduction," not remittitur).)[6]

## JNOV

**Labor Code §1102.5 Claim.** Williams had to prove that Wyndham discharged her in retaliation for (1) disclosure of information to a government agency or (2) refusal to participate in unlawful acts. The disclosure or refusal need have been only one "motivating reason" for the discharge decision. (11/14 Tr. 53.) There was substantial evidence on both grounds.

*First,* it was not seriously disputed that Williams informed the National Labor Relations Board that Wyndham committed sales fraud and told Wyndham of that disclosure before it fired her. Wyndham maintained Williams' statement in a business record that it concedes was admissible. That record established Williams' disclosure and Wyndham's knowledge of it.[7]

*Second,* after arriving at Wyndham-San Francisco, Williams soon learned the site was rife with fraud. She refused to participate in the unlawful acts and blew the whistle on them. This put Williams firmly on the wrong side of site manager Dow, who profited from the fraud.

Wyndham argues that Williams was not directly ordered to commit fraud, but it cites no authority holding that a direct order is required, and Wyndham management's actions spoke louder than words. For example, as detailed above, Dow rewarded fraudster salespeople with the prime spots on Wyndham's "Wheel." Those, such as Williams, who refused to participate in

---

[6] To the extent other opinions are relevant, three regarding punitive damages in employment cases have been published since *State Farm.* (1) *Gober v. Ralph's Grocery* (2006) 137 Cal.App.4th 204, 223 reduced a ratio to 6:1 given – unlike here – "only a modest degree of reprehensibility." (2) *Wysinger v. Automobile Club of Southern Calif.* (2007) 157 Cal.App.4th 413, 429 upheld a 3.6:1 ratio. (3) *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 719, reduced a ratio to 1:1 given – unlike here – a "relatively low degree of reprehensibility." *See also Nickerson,* 63 Cal.4th at 370 (10:1 ratio); *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1189 (10:1 ratio).
[7] Because the fact of Williams' disclosure to the board was not seriously disputed, the board's handling of the disclosure was excluded from trial as unduly time-consuming and likely to confuse issues. (*See* Evid. Code §352.) Likewise excluded, at Wyndham's request, was the later firing of Tara Dow for drug-abuse allegations, including snorting cocaine off another woman's breast. (*See id.*)

unlawful acts, had their compensation slashed by "one-legger" assignments and the like. Wyndham's clear directive: commit fraud.

Wyndham also isolates Williams' refusal to commit the fraud from her whistleblowing about the fraud. But the two were of a piece, and Wyndham cites no authority for such parsing.

**Wrongful Termination Claim.** Wyndham now argues that it is not a violation of public policy to discharge an individual because she disclosed information to her employer. However, Wyndham itself proposed a jury instruction stating: "It is a violation of public policy to discharge an individual because she disclosed information to her employer." The instruction Wyndham advocated – and the instruction given to the jury – correctly stated the law. (*See, e.g., Green v. Ralee Eng'g Co.* (1998) 19 Cal.4th 66, 80; *Gould v. Maryland Sound* (1995) 31 Cal.App.4th 1137, 1150; *Collier v. Sup. Ct.* (1991) 228 Cal.App.3d 1117, 1123-24.)

**Wyndham's Managing Agents.** Wyndham claims its executives who wronged Williams were not "managing agents" for punitive damages purposes. Jim White was vice president of Wyndham's western region, responsible for $275-300 million in annual sales and for sales practices of Wyndham employees in at least 16 sites. Kimberly Barber was Wyndham's Director of Human Resources for all of California, Nevada and Colorado. Karen Case was Area Vice President for Human Resources. Wyndham concedes Tara Dow "was the most senior person in the San Francisco operation," and, as detailed above, Wyndham gave Dow substantial independent authority.

People with authority equal to or less than these Wyndham executives are routinely held to be managing agents for punitive damages purposes. (*See, e.g., White v. Ultramar, Inc.* (1999) 21 Cal.4th. 563, 577-78 (zone manager); *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 373 (equal opportunities officer); *Powerhouse Motorsports Ground, Inc. v. Yamaha Motor*

*Corp.* (2013) 221 Cal.App.4th 867, 886 (regional sales manager); *Major v. Western Home* (2009) 169 Cal.App.4th 1197, 1220-21 (regional claims manager); *Wysinger*, 157 Cal.App.4th at 428-29 (vice president of district office); *Gober*, 137 Cal.App.4th at 221 (district manager); *Hobbs v. Bateman, Eichler, Hill Richards* (1985) 164 Cal. App.3d (1985) 174, 193 (office manager).)

Wyndham says in a single-sentence argument that Williams "was not wronged" by its managing agents. The treatment is abbreviated for a reason: the clear and convincing evidence established that the four Wyndham executives all participated in Williams' retaliatory firing and thus (1) "committed" the misconduct themselves, (2) "authorized" it and/or (3) knew of the misconduct "and adopted or approved that conduct after it occurred." (*See* CACI 3946.)

**Amount of Noneconomic Damages.** Wyndham seeks a "partial JNOV" on noneconomic damages. This is denied for the reasons already stated above.

**Amount of Punitive Damages.** Wyndham's arguments on the amount of punitive damages – incorporated into its new trial motion – are also addressed above.

Dated: March 10, 2017

Richard B. Ulmer Jr.
Judge of the Superior Court

# Exhibit B

# WYNDHAM VACATION RESORTS, INC.
## CLUB WYNDHAM® DISCOVERY
## MEMBERSHIP AGREEMENT

Date 03-19-2019

Representative Name **Joseph Garcia**

Location **Wyndham Bonnet Creek**

Representative Number **645019**

## MEMBER INFORMATION (*"Member"*)

Member #  ███71664

Name(s)  BRIAN MICHAEL  CARROLL and ASHLEY NICHOLE  CARROLL

Address  ████████

City  ████████        State **FL**        Zip **32724**

Home #  ████████        Work #

## PROGRAM INFORMATION

**Accommodations.** Wyndham Vacation Resorts, Inc., a Delaware corporation (*"Wyndham"*), agrees to sell and Member agrees to purchase the right to use accommodations during the Use Year specified below. The accommodations are described in the CLUB WYNDHAM Discovery Member's Directory (*"Member's Directory"*).

| | | | | |
|---|---|---|---|---|
| Membership Type | **Discovery VIP** | Point Value **400,000** | Processing Fee | $ 149.00 |
| Date of Enrollment | **03-19-2019** | | Purchase Price | $ 3,375.00 |
| Use Year Start Date | **04-18-2019** | | Down Payment | $ 3,753.06 |
| Use Year End Date | **24 months from Date of Enrollment** | | Amount Financed | $ 0.00 |

## DOWN PAYMENT METHOD

  Y   **Check Attached**

  N   **Credit Card**

## INSTALLMENT NOTE *(Complete only if financing)*

For value received the Member, jointly and severally, promises to pay to the order of Wyndham the sum of **$0.00** together with interest at the ANNUAL PERCENTAGE RATE OF **0.00%** payable over **1** installments at **$0.00** per month, beginning **03-19-2019** and on the same day of each successive payment period thereafter until the whole amount is fully paid. Payments are applied first to interest, then to reduce the principal balance due. **Interest will begin to accrue on the day after the Contract Date.**

PURCHASE PRICE **$3,375.00**        CASH DOWN PAYMENT **$3,753.06**        SALES TAX **$229.06**

Wyndham is the creditor. The *"Amount Financed"* noted below is the total of the PURCHASE PRICE and SALES TAX, less the DOWN PAYMENT.

The following is the Member's "Truth-in-Lending Disclosure Statement":

| ANNUAL PERCENTAGE RATE* The cost of your credit as a yearly rate: | FINANCE CHARGE The dollar amount the credit will cost you: | Amount Financed The amount of credit provided to you on your behalf: | Total of Payments The amount you will have paid after you have made all payments as scheduled: | Total Sale Price The total cost of your purchase on credit including your down payment of: $3,753.06 |
|---|---|---|---|---|
| 0.00% | $.00 | $.00 | $.00 | $3,753.06 |

| Your payment schedule will be: | | |
|---|---|---|
| Number of payments | Amount of payment: | When payments are due |
| 1 | $0.00 | 03-19-2019 |

*The ANNUAL PERCENTAGE RATE disclosed is a fixed rate.

## INSTALLMENT PAYMENT METHOD

  N   **Auto Pay Plan\*\***
  I authorize Wyndham to draft the monthly installment amount from the account indicated.

  N   **Credit Card \*\***
  I authorize Wyndham to charge the monthly installment amount to the credit card indicated.

**\*\*I/We agree to the monthly payment on Auto Pay Plan or credit card. In the event it is discontinued or dishonored, the remaining balance is due in full.

Dishonored checks are subject to a returned item fee of $15.00.

## CLUB WYNDHAM® Discovery Vacations by Wyndham Membership Terms and Conditions

CLUB WYNDHAM Discovery (**"Discovery"**) is a program offering access and use of CLUB WYNDHAM Discovery accommodations and other travel benefits. An individual becomes a Member of Discovery upon receipt of this completed and fully signed CLUB WYNDHAM Discovery Agreement (**"Agreement"**) and by paying the applicable Membership Fees and Expenses, subject to the following terms and conditions.

**1. Membership.** Membership in Discovery is available to individuals for personal use. A Member is responsible for following the procedures and guidelines for Discovery which are described in this Agreement and the CLUB WYNDHAM Discovery Member's Directory (**"Member's Directory"**). Discovery Member benefits are different than membership in CLUB WYNDHAM Plus and are set forth in the Directory. Membership in Discovery is non-transferable and may not be rented or sold.

**2. Term.** Membership is valid for no more than twenty-four (24) consecutive months beginning on the Enrollment Date. Membership in Discovery expires on the Use Year End Date, at which time all reservations and occupancy must be complete.

**3. Expenses and Release.** The Member is responsible for payment of any personal expenses and incidental charges incurred while utilizing any Discovery program or benefit. The Member may be responsible for any taxes related to their usage of units, such as sales tax or transient occupancy tax. The Member hereby agrees to release and hold harmless Wyndham, its subsidiaries, their advertising agencies, printers and other suppliers, as well as its officers, directors, employees and agents for any injury, liability, expense, damage or loss incurred by a Member, the Member's family or guest during any trip or utilization of any Discovery program or benefit and for any related damage, theft or loss caused or incurred by the Member, the Member's family or guest.

A Discovery VIP Member is an individual who purchases a Discovery membership of 400,000 points.

**4. Reservations.** Reservations of accommodations under this Agreement may be made any time after the Use Year Start Date, however, a minimum of **$1,400.00** in total principal must be paid toward the Discovery Membership before occupancy of accommodations may occur. **Total principal excludes taxes, interest and processing fee.** Accommodations are subject to availability and there is no guarantee that a Member will be able to obtain specific accommodations during a specific time period. The earlier the member requests a reservation, the greater the opportunity to receive a confirmed reservation. A Member may cancel a reservation for accommodations without loss of points if notice is provided to and received by Wyndham at least fifteen (15) days prior to the check-in date. If a reservation for accommodations is cancelled less than fifteen (15) days prior to the check-in date, a Member will forfeit the points applied for such reservation of accommodations. If a Member has a confirmed reservation for accommodations and does not check-in before 5:00 p.m. on the check-in date, Wyndham has the right to rent out the accommodations subject to such reservation or otherwise use the accommodations for its own account. CLUB WYNDHAM Discovery resorts are subject to change without notice. Only the Member may book reservations and the Member must be present at check-in.

**5. Membership Suspension and Termination.** This Agreement, together with Member status, may be suspended or terminated by Wyndham, its successors or assigns, without further obligation if the Member fails to make installment payments on the Purchase Price, as set forth above, or fails to comply with the terms and conditions of this Agreement and/or the terms and conditions of the various programs and benefits of Discovery. The terms and conditions of this Agreement and of the Discovery programs and benefits may be changed from time to time at the sole discretion of Wyndham, its successors or assigns.

**6. Date Agreement Effective/Controlling Law.** This Agreement is effective when signed by the Member and the Discovery representative and shall be governed exclusively by the laws and courts of the State of Florida.

**7. Membership in Perks by CLUB WYNDHAM.** Perks by CLUB WYNDHAM is a program that provides various travel-related benefits and privileges to its members. The Discovery Member automatically receives a complimentary twenty-four (24) month membership in Perks by CLUB WYNDHAM which shall begin on the date the Perks by CLUB WYNDHAM Membership Agreement is signed by the Member and a Wyndham representative. The Member must activate the Perks by CLUB WYNDHAM membership as indicated on the Perks by CLUB WYNDHAM Savings Card before commencing use. If the Member delays activation of the Perks by CLUB WYNDHAM Savings Card, the period of time between the beginning of the complimentary twenty-four (24) month period and the activation date shall be lost. In the event that the Discovery Membership is terminated or cancelled pursuant to Paragraphs 5 or 9 of this Agreement, the Member's Perks by CLUB WYNDHAM Membership shall also be cancelled simultaneously. Perks by CLUB WYNDHAM program features, price and restrictions are subject to change and are explained in greater detail in the Perks by CLUB WYNDHAM Membership Agreement and the Benefit Guide.

**8. Land and Sea Cruise Option.** For a Discovery Member who chooses to exercise the Land and Sea Cruise Option, the following will apply:

a.        Member shall be responsible for port fees, government fees, and taxes in effect and to be paid for at time of booking (approximately $99.00 per person on featured Land and Sea Cruise Option at time of printing).

b.        Land and Sea Cruise Option allows two (2) persons to travel together in the same studio, 1-bedroom suite and same cruise cabin. Up to two (2) additional persons (maximum of four (4) persons per cabin) may travel for an additional fee, subject to availability of accommodating cabin. Member is required to consult cruise counselors for the current additional person charges when making reservations. To ensure the best selection, reservations should be made well in advance, up to ten (10) months prior, to the desired sailing date.

c.        Member must reserve a four (4) night condominium stay in Orlando, Fort Lauderdale or Daytona Beach, Florida, immediately prior to three (3) night cruise. Cruise must immediately precede condominium stay and Member may not take cruise portion of vacation separate from condominium stay.

d.        Member who wishes to choose upgraded room or cabin accommodations or reverse the travel days and use three (3) nights condominium stay immediately followed by four (4) nights cruise may choose to do so for an additional cost to Member. Cost will vary by type of accommodation, day of check-in, and date of sailing. Please check with your cruise counselor for your specific charge.

e.    All requests for changes, such as change of name, must be submitted in writing via certified mail (Attention: CLUB WYNDHAM Travel, 6277 Sea Harbor Drive, Orlando, Florida 32821). Notices received 60 to 46 days prior to scheduled arrival date will be charged a minimum of $100.00 per person. Notices received 45 to 8 days prior will be charged a minimum of $150.00 per person. Some changes, such as change of sailing date, can require a complete cancellation and loss of points used to book the original reservation. Any changes sixty (60) days or less will result in a complete forfeiture of points used for booking the Land and Sea Cruise Option. Wyndham recommends the purchase of trip cancellation insurance.

f.    All benefits, programs, fees and costs of Land and Sea Cruise Option are subject to change and to the individual terms and conditions of the independent suppliers of those respective benefits or programs.

**9. Cancellation.** In the event of cancellation during the ten (10) day cancellation period, Wyndham will refund to Member all payments made under this Agreement, reduced by the proportion of any contract benefits the Member has actually received under this Agreement prior to the effective date of the cancellation, within twenty (20) days after receipt of notice of cancellation, or within five (5) days after receipt of funds from Member's cleared check, whichever is later. The specific value for each benefit received by the prospective Member under the Agreement will be agreed to between the prospective Member and Wyndham.

**10. Future Purchase.** **Member agrees to attend a Wyndham sales presentation during the member's first stay at a CLUB WYNDHAM accommodation (*"Scheduled Sales Presentation"*).** In the event Member purchases from Wyndham or its subsidiaries an interest in a Wyndham vacation ownership plan that is allocated at least 84,000 CLUB WYNDHAM Plus points (*"Wyndham Timeshare Interest"*) prior to the Use Year End Date set forth in this Agreement (for purposes of this Section 10, *"Discovery Use Year End Date"*), Member will be eligible to receive a credit toward the purchase price of a Wyndham Timeshare Interest in the amount of the total principal paid by Member toward the current Discovery Membership (**excluding taxes, interest, and processing fee**). A Member becomes eligible and will receive a credit in the amount of the total principal paid by Member once Member has paid the minimum identified in Section 4 above. If the Member purchases a Wyndham Timeshare Interest using the credit as described above, any unused Discovery points shall be transferred to Member's Wyndham Timeshare Interest account for Member's use. Discovery points transferred to Member's Wyndham Timeshare Interest account shall expire on the expiration of Member's first Wyndham Timeshare Interest Use Year End Date. The Discovery points transferred do not count towards VIP status.

**11. Price Guarantee.** If Member purchases an interest in a Wyndham vacation ownership plan within one (1) year from the date listed at the top of this form, Wyndham shall, subject to availability, offer it to Member at the pricing identified on the Guaranteed Discount Form received on the Enrollment Date of this Agreement. The price freeze does not apply to a future purchase of an interest that is eligible for the CLUB WYNDHAM Plus Presidential Reserve exchange benefit.

**12. Credit Information.** Member authorizes Wyndham to obtain credit information about the Member from a Consumer Reporting Agency, which Wyndham may use as permitted by applicable law.

**13. Notice.** **Any holder of this consumer credit Agreement is subject to all claims and defenses that the debtor could assert against the seller of goods or services, obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.**

**You May Cancel This Agreement Without Any Penalty Or Obligation Within ten (10) Calendar Days After You Sign This Agreement. If You Decide To Cancel This Agreement, You Must Notify Wyndham In Writing Of Your Intent To Cancel. Your Notice Of Cancellation Shall Be Effective Upon The Date Sent And Must Be Sent To: Wyndham Vacation Resorts, Inc., Attention: Account Servicing Operations-Rescission Department at P.O. Box 94443, Las Vegas, Nevada 89193 or 10750 West Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135. Any Attempt To Obtain A Waiver Of Your Cancellation Right Is Unlawful.**

If you execute a purchase contract for a timeshare period, Section 721.08 Florida Statutes (escrow accounts) will apply to any new funds or other property received from you or on your behalf. Section 721.10 Florida Statutes (cancellation) will apply to the purchase and you will not be entitled to a cancellation refund of the short-term product.

AUTHORIZATIONS

MEMBER: _____
         Brian Michael Carroll

MEMBER: _____
         Ashley Nichole Carroll

MEMBER: _____

MEMBER: _____

WYNDHAM VACATION RESORTS, INC.

BY: _____
    AUTHORIZED REPRESENTATIVE

*This advertising material is being used for the purpose of soliciting sales of a vacation ownership plan.*

No. 1282/Rev. 9-18

Date: 03-19-2019

Purchaser(s): BRIAN MICHAEL CARROLL and ASHLEY NICHOLE CARROLL

Contract No. 00065-1904418

Member No. 00203571664

## CLUB WYNDHAM® Discovery
## STATEMENT OF UNDERSTANDING

Congratulations and welcome to CLUB WYNDHAM Discovery (**"Discovery"**). Prior to submitting your CLUB WYNDHAM Discovery Agreement (**"Agreement"**) for acceptance, we want you to have an understanding of the Discovery Program. Please review the following statements, initial your understanding beside each item, and sign in the space provided.

1. I understand that I am purchasing a twenty-four (24) month Discovery membership which entitles me to **400,000 points.**

2. I understand that the Discovery membership is not an interest in real property.

3. I understand that prior to my first resort stay I must have paid a minimum of **$1,400.00** in total principal toward the balance of my membership.

4. I understand that the accommodations available are at select Wyndham Vacation Resorts, Inc. (Wyndham) locations or at a Wyndham location and cruise combination package, as listed in the current CLUB WYNDHAM Discovery Member's Directory.

5. I understand that all reservations may be requested up to ten (10) months in advance of the check-in date and are confirmed on a space available basis. In order to have the best opportunity to receive a confirmed reservation, I should request my reservation as soon as possible, after the Use Year Start Date. I further understand that demand is higher for holiday, summer and special event time periods. There is also a minimum three-consecutive night stay required for any reservation.

6. **I understand that I am required to attend a scheduled sales presentation during my first resort stay using my Discovery Points.**

7. I understand that this membership does not include an option to book airfare, car rental, or exchanges through an external exchange company (such as RCI or II) using my points.

8. I understand that interest will begin to accrue on the date of this Agreement.

9. I understand that only I may book reservations and that I must be present at check-in.

10. I understand that my Discovery membership includes a twenty-four (24) month membership to the Perks by CLUB WYNDHAM program and that this program does not use my points, but does entitle me to discounts on many travel related products including rental car, and cruises. I understand that Perks by CLUB WYNDHAM membership is voluntary and that any renewal will be my responsibility. I understand that I must activate the membership as indicated in the Perks by CLUB WYNDHAM Savings Card. I understand that my membership in Perks by CLUB WYNDHAM will automatically terminate if I am no longer a Discovery member.

11. I understand that my ability to occupy accommodations shall expire on my Use Year End Date or upon completion of use of all points purchased, whichever occurs first.

12. I understand that if I should decide to purchase a vacation ownership interest from Wyndham before my Use Year End Date, I will be entitled to the following benefits:

- Purchase Credit: If I purchase a minimum of 84,000 CLUB WYNDHAM Plus points, then once I have paid a minimum of **$1,400.00** in total principal toward my current Discovery membership, I can use the total principal paid towards the Discovery membership as a credit towards the purchase price of a Wyndham vacation ownership interest. **Total principal excludes taxes, interest and processing fee.**

- Price Guarantee: I received the Guaranteed Discount Form identifying the Price Freeze options available to me on a future vacation ownership purchase with Wyndham Vacation Resorts.

- CLUB WYNDHAM Discovery points: Any unused Discovery points will be transferred to my vacation ownership account for continued use. The Discovery points transferred do not count towards CLUB WYNDHAM VIP status. The expiration of the Discovery points/reservations will coincide with the end date of the first use year of my vacation ownership contract.

Purchaser Signature **Brian Michael Carroll**

Purchaser Signature **Ashley Nichole Carroll**

Purchaser Signature

Purchaser Signature

Discovery Representative Signature

Discovery Representative (Print Name) JosePL Gorcic

No. 2254/Rev. 9-18